NIXON PEABODY LLP
Daniel W. Sklar
Lee Harrington
Christopher M. Desiderio
Alexis Anzelone
Annica Sunner
437 Madison Avenue
New York, NY 10022
Telephone: (212) 940-3000
Facsimile: (212) 940-3111

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                             :
**In re:**                                                   :   **Chapter 11**
                                                             :
**ST. FRANCIS' HOSPITAL,**                                   :   **Case No. 13-37725**
**POUGHKEEPSIE, NEW YORK,** *et al.,*[1]                     :
                                                             :   **(Joint Administration Requested)**
                    **Debtors.**                             :
-------------------------------------------------------------  x

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION SECURED,**
**SUPERPRIORITY FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND**
**364 AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363;**
**(II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION INDENTURE**
**TRUSTEE AND MISCELLANEOUS SECURED CREDITORS PURSUANT TO 11 U.S.C.**
**§§ 361, 362, 363 AND 364; AND (III) SCHEDULING A FINAL**
**HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c)**

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification
number include: St. Francis' Hospital, Poughkeepsie, New York d/b/a Saint Francis' Hospital and Health Care
Centers (8503), Saint Francis Home Care Services Corporation (3842), SFH Ventures, Inc., d/b/a The Hearing
Works (0024) ("SFH Ventures"),  Saint Francis Health Care Foundation, Inc. (5066) (the "Foundation"), and
Saint Francis Hospital Preschool Program (1079).

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

St. Francis' Hospital, Poughkeepsie, New York ("St. Francis") and its affiliated debtors, as debtors in possession (collectively, the "Debtors"), respectfully represent:

## BACKGROUND

### General

1.      On the date hereof (the "Petition Date"), the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court. The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      The Debtors have requested that their chapter 11 cases be consolidated for procedural purposes only and jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### The Debtors' Business

3.      Founded in 1914, St. Francis has been dedicated to serving the healthcare needs of the residents of the Hudson Valley for a century.

4.      The Debtors serve more than 125,000 patients annually (excluding added homecare patients) and employ approximately 2,000 full and part-time employees.  In 2012, the Debtors serviced approximately 8,000 inpatient discharges, 32,000 emergency room visits, 38,000 home care visits, and 150,000 outpatient visits.  The hospital has 333 beds and the capability to serve patients with various physical and mental health issues.  In 2012, the Debtors had gross revenues of almost $150 million and an operating loss of approximately $7.7 million.

5.      The Debtors provide a wide array of medical service to their community, including:

A. <u>Emergency Treatment</u>: The Debtors are the home to the area's only Level II Trauma center that provides lifesaving care to severely injured patients. Over 9,000 trauma victims are cared for annually, making St. Francis' Level II Trauma center the busiest Level II Trauma Center in New York State.

B. <u>Mental Health and Addiction Services</u>: The Debtors are the region's recognized leader in providing mental health services. In addition, the Turning Point at St. Francis is a comprehensive not-for-profit chemical dependency treatment program that provides inpatient medically-managed detoxification from alcohol and all other types of substances, inpatient and outpatient rehabilitation, and a variety of specialized intensive outpatient programs, outpatient counseling, and support groups.

C. <u>Robotic Surgery</u>: The Center for Robotic Surgery offers patients an array of minimally-invasive surgical approaches through the use of the da Vinci surgical system. Robotic surgery is available for patients undergoing a wide variety of thoracic, urological, gynecological and oncological procedures.

D. <u>Physical and Occupational Therapy</u>: The Debtors' Physical and Occupational Therapy program treats a whole spectrum of diagnoses, including: neck pain, back pain, knee pain, foot and ankle pain, hand and wrist pain, shoulder pain, pre-surgical and post-surgical therapy needs, auto accidents and sports injuries, fractures, dizziness/light-headedness, balance problems, weakness, cancer related problems and stroke.

E.  <u>Cancer Treatment</u>: The Herb & Sue Ann Redl Center for Cancer Care offers

advanced treatments for all major cancers including breast, lung, colon, and other

digestive tract, prostate, bladder, lymphoma and melanoma.

F.  <u>Home Care</u>:  The Debtors provide home health services, including nursing care,

physical therapy, occupational therapy and speech therapy to patients in the

comfort of their homes.

G.  <u>Special Needs Preschool</u>: The Debtors also run a Special Needs Preschool

Program and Center for Communication Disorders, which are regional leaders in

providing language-based rehabilitation services to children and adults. The

special needs preschool program serves children from 18 months to 5 years that

have been diagnosed with developmental disabilities. It is the county's only

program for autistic preschool-aged children and also provides early intervention

services for children under 3 years of age, in addition to evaluation and treatment

for speech, language, hearing and swallowing. The center is also a Center for

Communication Disorders satellite site serving adults and children with speech,

hearing and swallowing disorders.

6.      The "CREST of Values" serves as the guiding principles for the Debtors' mission.

Each member of the Debtors' team works individually and collaboratively to make their core

values of Compassionate Care, Respect, Excellence, Service and Teamwork present in all

internal dealings within the hospital community and in their interactions with those the Debtors

are privileged to serve.

7.      Beginning in September 2012, the Debtors implemented a series of new comprehensive information systems in an effort to increase the Debtors' operational efficiency. By October 2012, the Debtors determined that the implementation of the software had failed.

8.      The failure of the software implementation under previous management and governance had a significant impact on the Debtors' financial reporting and revenue cycle functions.  The implementation failed because, among other things, the Debtors' medical records department and patient billing and collection department were understaffed and underperforming.  In addition, material aspects of the customer defined tables in the software were inadequately prepared.

9.      In an effort to rectify these issues, the Debtors engaged several consulting organizations during late 2012 and early 2013.   Unfortunately, not enough of the previous and rapidly aging accounts receivable were collected. In addition, ongoing billing issues during later 2012 and early 2013 further strained cash flow.

10.     As a result of the failed software implementation, increasing operational costs, increasingly regulated environment, and decreasing admittance levels, the Debtors were forced to explore their restructuring options, including the sale of substantially all of their assets. Ultimately, the Debtors determined that the filing of these chapter 11 cases was in the best interests of their creditors, patients, and other parties in interest.

11.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to this chapter 11 filing is set forth in more detail in the Declaration of Arthur Nizza, D.S.W. filed pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First Day Motions (the "First Day Declaration"), which Declaration is incorporated herein by reference and filed contemporaneously herewith.

## JURISDICTION

12.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

13.    By this Motion, the Debtors seek entry of an interim order (the "Interim Order")

and a final order (the "Final Order" together the "Financing Orders"), pursuant to

Sections 105(a), 361, 362, 363, 364(c) and 364(d) of Title 11, United States Code (the

"Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules for the United States

Bankruptcy Court for the Southern District of New York (the "Local Rules"), granting:

> (a)    authorization under sections 364(c) and 364(d) of the Bankruptcy Code and Rule 4001(c) of the Bankruptcy Rules for the Debtors to obtain secured, superpriority postpetition financing (the "DIP Financing") consisting of the following:

> > (i)    a revolving loan with a principal amount of up to Nine Million Dollars ($9,000,000) (the "DIP Revolving Loan") as set forth in that certain Debtor in Possession Revolving Loan Credit and Security Agreement, dated as of December 17, 2013, by and between the Debtors and MidCap Financial, LLC ("MidCap Financial"), a true and correct copy of which is attached to this order (the "Interim Order") as **Exhibit A** (the "DIP Revolving Credit Agreement"); and

> > (ii)    a term loan in the original principal amount of Eleven Million Dollars ($11,000,000) (the "DIP Term Loan"; and together with the DIP Revolving Loan, the "DIP Loan") as set forth in that certain Debtor in Possession Term Loan Credit and Security Agreement, dated as of December 17, 2013, by and between the Debtors and MidCap Funding V, LLC ("MidCap Funding"; and together with MidCap Financial, as lender, the "DIP Lender" and, as agent, the "DIP Agent"), which shall be substantially in the form as is attached hereto as **Exhibit B** (the "DIP Term Credit Agreement"; and together with the DIP Revolving Credit Agreement, the "DIP Credit Agreement");

> (b)    Authorization under section 363 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and 6004 for the Debtors to use Cash Collateral (as defined herein) the Debtors are holding or may obtain, and to use the proceeds from the DIP

Financing for the payment of: (i) the fees and expenses due DIP Agent under the DIP Credit Agreement; (ii) for general working capital purposes and general corporate purposes relating to the postpetition operations; (iii) the repayment of the Emergency Advances (as defined below); (iv) the adequate protection payments as set forth herein; and (v) the costs and expenses associated with these chapter 11 cases (the "Cases"), all in accordance with the terms of the Debtors' proposed budget (the "Budget"), a copy of which is annexed hereto as **Exhibit C**;

(c)     Authorization for the Debtors to grant security interests, liens, superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code), and related protections to the DIP Agent and DIP Lender to secure all DIP Obligations (as defined herein), as set forth in DIP Credit Agreement;

(d)     Authorization for the Debtors to execute and deliver the DIP Credit Agreement and all other loan documents related thereto (collectively, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents and pursuant to the provisions of the Interim Order and any final order granting the foregoing relief and such other relief as provided herein and in such final order (the "Final Order"; and together with the Interim Order, the "Financing Orders");

(e)     The limitation of the Debtors' right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code;

(f)     Authorization for the Debtors to continue to use the Cash Collateral (as defined herein) of Manufacturers and Traders Trust Company, in its capacity as indenture trustee (the "Indenture Trustee") on behalf of the holders of the Bonds (as defined below), subject to the terms of the Interim Order;

(g)     Authorization for the Debtors to grant the DIP Agent allowed, superpriority administrative expense claims in each of the Cases and any Successor Cases (as defined below) for the DIP Financing and all obligations owing thereunder and under the DIP Documents (collectively, and including all "Obligations" as described in the DIP Documents, the "DIP Obligations"), as more fully set forth herein;

(h)     Authorization for the Debtors to grant the DIP Agent automatically perfected security interests in and liens on all of the DIP Collateral (as defined below), including, without limitation, all property constituting Cash Collateral (as defined below), which liens shall be subject to the priorities set forth herein;

(i)     Authorization for the Debtors to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Documents as they become due, including, without limitation, closing/origination fees, unused line fees, collateral management fees, appraisal and/or audit fees, exit fees, the fees and

disbursements of the DIP Agent's and DIP Lender's attorneys, advisors, accountants, and other consultants, and any other legal expenses of the DIP Agent and DIP Lender, all to the extent provided by and in accordance with the terms of the respective DIP Documents;

(j)      Authorization for the Debtors to use the proceeds of the DIP Loan in all Cases in accordance with the Budget, and as otherwise provided in the DIP Documents;

(k)      Authorization for the Debtors to provide adequate protection to the Indenture Trustee and Miscellaneous Secured Creditors (as defined herein) pursuant to the terms of the Financing Orders in consideration for the use of their respective collateral and the priming of their liens and subordination of their claims to the claims of the DIP Lender and DIP Agent;

(l)      To vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Documents; and

(m)      To waive any applicable stay as provided in the Bankruptcy Rules and provide for the immediate effectiveness of the Interim Order.

14.      Access to the funds under the DIP Credit Agreement and the use of Cash Collateral are essential to ensure that the Debtors can fund their postpetition operating requirements and preserve and maintain their properties and the infrastructure of their businesses pending a sale of substantially all of their assets to the successful purchaser under a proposed sale pursuant to Section 363 of the Bankruptcy Code (the "Stalking Horse")[2]. As set forth above, it is essential that the Debtors' continued health care operations be maintained in order to ensure patient safety, maintain the employee workforce and provide an essential community service to an underserved population. Having adequate financing in place also will demonstrate to the Debtors' vendors and suppliers that the Debtors have the financial wherewithal to make ongoing purchases of goods and services and otherwise pay their postpetition obligations as they become due. Absent adequate funding, the Debtors would not have the ability to satisfy the conditions of

---

[2]      Simultaneous with the filing of the petitions initiating these Cases and the instant motion, the Debtors have filed a motion, *inter alia*, seeking the approval of proposed bid procedures and the sale of a substantial portion of the Debtors' assets to the Stalking Horse.

their sale agreement with Stalking Horse, effectuate an orderly sale of their assets and preserve value for the benefit of their creditors.

15.     The DIP Credit Agreement and all other DIP Documents have been negotiated at arms' length with all parties represented by experienced counsel.  Further, as set forth below, the proposed financing is on terms better than the Debtors could obtain from other lenders.

## PREPETITION SECURED DEBT

### A.     Prepetition Secured Obligations

#### The 2004 and 2007 Bond Debt

16.     Pursuant to that certain Indenture dated as of March 1, 2004 (the "Original Indenture") by and between Dutchess County Industrial Development Agency (the "Issuer") and the Indenture Trustee, as amended by, among other things, the Second Supplemental Indenture, dated as of June 1, 2007 (the "Supplemental Indenture"; and together with the Original Indenture, the "Indenture"), the Issuer authorized and issued those certain: (a) $19,275,000 Civic Facility Revenue Refunding Bonds, Series 2004A (St. Francis Hospital, Poughkeepsie, New York Civic Facility) and $8,760,000 Civic Facility Revenue Bonds, Series 2004B (St. Francis Hospital, Poughkeepsie, New York Civic Facility) (collectively, the "2004 Bonds"); and (b) $9,430,000 Civic Facility Revenue Bonds, Series 2007 (St. Francis Hospital, Poughkeepsie, New York Civic Facility) (the "2007 Bonds"; and together with the 2004 Bonds, the "Bonds").

17.     Proceeds from the sale of the Bonds were used, in part, to finance or refinance a portion of the costs of constructing, renovating, installing, furnishing and equipping certain facilities owned and operated by the Debtors.

18.     In addition, a portion of the initial proceeds of the Bonds was also used to create Debt Service Reserve Funds.  The funds previously held in the Debt Service Reserve Funds, as

well as all other accounts held by the Indenture Trustee, are referred to herein collectively as the "Bond Funds".

19.    Pursuant to that certain Hospital Lease, dated as of March 1, 2004, between St. Francis and the Issuer (as amended, the "Hospital Lease"), St. Francis leased the Facility (as defined in the Indenture) (including, without limitation, the land described on Exhibit A to the Hospital Lease, and the improvements located on the land and the personal property and equipment made a part of the Facility) to the Issuer.  Pursuant to that certain Lease Agreement dated as of March 1, 2004 between the Borrower and the Issuer and that certain Amendment to Lease Agreement between the Borrower and the Issuer dated as of June 1, 2007 (together, the "Lease Agreement"), the Issuer agreed to sublease the Facility to St. Francis in exchange for rental payments in amounts equal to the debt service payments on the Bonds.  In addition, St. Francis and the Foundation executed a certain Guaranty dated March 1, 2004 (the "Guaranty") pursuant to which St. Francis and the Foundation guaranteed the amounts and obligations due under the Bond Documents.

20.    As security for the obligations owing on the Bonds, the Hospital, the Issuer, and the Indenture Trustee entered into that certain (a) Mortgage and Security Agreement (the "2004 Mortgage") dated as of March 1, 2004, (b) Mortgage and Security Agreement dated as of June 1, 2007 (the "2007 Mortgage"), and (c) Mortgage Consolidation, Modification, Extension and Security Agreement dated as of June 1, 2007 (the "Mortgage Consolidation"; and collectively with the 2004 Mortgage and the 2007 Mortgage, the "Mortgages")[3] pursuant to which the Hospital and the Issuer granted the Indenture Trustee a first priority mortgage and lien against the real and personal property described therein (the "Mortgaged Property").

---

[3] The Indenture, Lease Agreement, Guaranty, and Mortgages, together will all other documents related thereto, shall hereinafter be referred to as the "**Bond Documents**".

21.     As further security for the payment of all amounts due under the Bond Documents, the Hospital granted to the Indenture Trustee a first priority lien against all "Gross Receipts" (as defined in the Mortgages), including all accounts, accounts receivable, revenues, and proceeds thereof (Gross Receipts together with the Mortgaged Property is defined as the "Prepetition Bond Collateral").

22.     Pursuant to the Bond Documents, all of the rights, remedies and benefits of the Issuer under the Mortgages, including all of the security interests and rights and remedies granted by the Hospital to the Issuer in the Prepetition Bond Collateral, were assigned to the Indenture Trustee, subject to the retention of certain rights by the Issuer.  The Indenture Trustee has the sole right to exercise the rights and benefits granted to the Issuer under the Bond Documents.

23.     As of the Petition Date, the amounts due and owing to the Indenture Trustee under the Bond Documents are as follows (collectively, the "Bond Claim"):

(i)     Unpaid principal on the Bonds in the amount of $31,835,000;

(ii)    Accrued but unpaid interest on the Bonds as of the Petition Date in the amount of $272,000; and

(iii)   Unliquidated, accrued and unpaid fees and expenses of the Indenture Trustee and its professionals incurred through the Petition Date, which amounts shall be added to the Bond Claim as liquidated.

**Prepetition Emergency Advances by the Indenture Trustee**

24.     Immediately prior to the Petition Date, the Debtors required certain necessary funding to support their operations, and in particular, pay payroll and payroll related expenses (the "Critical Expenses").  At the request of the Debtors, the Indenture Trustee advanced certain funds to the Debtors to cover the costs of the Critical Expenses, which advances were in the

aggregate amount of $2,300,000 (the "Emergency Advances") and were secured by the various

assets of the Debtors.

**Other Putative Miscellaneous Secured Creditors**

25.    The Debtors also have certain prepetition obligations under (a) that certain

Mortgage and Security Agreement, dated as of March 1, 2004, given by St. Francis to The

Archdiocesan Pension Plan;[4] (b) that certain Term Note, dated as of June 17, 2011, given by

SFH Ventures in favor of Manufacturers and Traders Trust Company in the original principal

amount of $141,973.39; (c) that certain Term Note, dated as of June 17, 2011, given by SFH

Ventures in favor of Manufacturer and Traders Trust Company in the original principal amount

of $258,490.77; and (d) certain putative leases by which parties claim security interests in certain

of the Debtors' assets (the respective creditors related to (a), (b), (c), and (d), collectively, the

the "Miscellaneous Secured Creditors").    The prepetition liens and claims of the Indenture

Trustee and Miscellaneous Secured Creditors are collectively referred to the "Prepetition Liens";

and, the real and personal property in which the Indenture Trustee and Miscellaneous Secured

Creditors hold Prepetition Liens is collectively referred to herein at the "Prepetition Collateral".

The prepetition claims and obligations of the Indenture Trustee and the Miscellaneous Secured

Creditors secured by their respective Prepetition Liens in Prepetition Collateral are collectively

referred to as the "Prepetition Obligations".

---

[4] Prior to the Petition Date, the liens and claims arising under the Mortgage and Security Agreement with The
Archdiocesan Pension Plan were subordinated to the liens and claims arising under the Bond Documents,
pursuant to that certain Subordination Agreement given by The Archdiocesan Pension Plan in favor of the
Indenture Trustee.

### PROPOSED DIP LOAN AGREEMENT AND USE OF CASH COLLATERAL

**A.     The Need for Postpetition DIP Financing.**

26.     As noted above, in order to maximize the value of their existing asset base, the Debtors intend to sell substantially all of their assets to the Stalking Horse which, after closing, will operate the Debtors' former facilities as a new entity.  The proposed sale will allow for the continuation of the Debtors' charitable not-for-profit mission.  Moreover, it will continue the providing of health care services to Poughkeepsie and the Hudson Valley Region.  It is a condition of the sale that, *inter alia*, (a) there be no material adverse change in the business or assets of the Debtors and (b) operations continue in the ordinary course pending the closing.

27.     The Debtors have an immediate need to obtain the DIP Financing and use of the Cash Collateral.  Absent the DIP Financing and use of the Cash Collateral, the Debtors will not have sufficient sources of working capital to continue as a community based health care provider and maintain the value of their assets.  The ability of the Debtors to pay their medical staff and other employees, provide critical patient care, maintain business relationships with vendors and suppliers, purchase new inventory, and otherwise finance their operations is essential to the Debtors' continued viability and the ultimate sale process.  Without the DIP Financing and use of the Cash Collateral, serious and irreparable harm could result, not only to the operations but to the patients who depend on the Debtors' services.  The funds under the DIP Credit Agreement and use of the Cash Collateral will allow the Debtors to preserve and maintain going concern value and protect patients and other persons dependent on the Debtors' services while the sale process unfolds.

28.     Given the Debtors' current financial condition, financing arrangements, capital structure, and other factors described herein, the Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Financing.  The

Debtors have been unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code or solely in exchange for the grant of a special administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code. The Debtors have also been unable to obtain credit: (a) having priority over that of administrative expenses of the kind specified in sections 502(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien pursuant to section 364(c)(2) of the Bankruptcy Code; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien pursuant to section 364(c)(3) of the Bankruptcy Code. Within the timeframe required, financing on a postpetition basis is not otherwise available without granting the DIP Agent: (x) perfected security interest in and liens on all of the Debtors' existing and after-acquired assets with the priorities set forth herein; (y) superpriority claims with the priorities set forth herein; and (z) the other protections, terms and conditions set forth herein and in the Interim Order.

29.    The Debtors made inquiry of other lenders and were unable to obtain from another lender the necessary postpetition financing that they need on terms more favorable in the aggregate than those provided in the DIP Credit Agreement. As a result of the Debtors' efforts, the Debtors, with the advice of their financial advisors, had further discussions with five other potential lenders. Of these five, three passed on the opportunity after initial due diligence. The other two presented proposals containing collateral and guaranty terms which were less advantageous or otherwise could simply not be satisfied by the Debtors. Thus, the DIP Lender presented the only viable source for postpetition financing.

**B.      The Economic Terms of the Postpetition Financing; DIP Liens and Superpriority Claim**

30.      Under the proposed DIP Credit Agreement, the DIP Lender will make cash advances and other extensions of credit in a maximum principal amount not to exceed $20.0 million on a combined revolving credit and term basis under and subject to the terms and conditions of the DIP Documents.

31.      The DIP Agent requires, and the Debtors have agreed, that the proceeds of the DIP Financing shall be used in a manner consistent with the terms and conditions of the DIP Documents, including any covenant contained therein pertaining to compliance with the Budget as the same may be modified from time to time in accordance with the consents required under the DIP Documents (the "Budget Compliance Covenant"), solely for: (a) working capital and other general corporate purposes; (b) repayment of the Emergency Advances; (c) payment of the adequate protection amounts set forth under the Financing Orders; (d) permitted payment of costs of administration of the Cases (subject to the limitations of the Carve Out); and (e) payment of fees and expenses due according to the terms of the DIP Documents.

32.      The other significant terms of the DIP Financing and DIP Documents include the following[5]:

   (i)      Maximum Loan Amount: The Maximum Loan Amount under the DIP Credit Agreement shall be $20,000,000.  The amount available to Debtors under the DIP Credit Agreement at any one time shall be based upon the Availability (as described below).

   (ii)     Availability: Availability under the DIP Revolving Credit Agreement shall be the lesser of (a) the Maximum Loan Amount or (b) an amount equal to eighty-five

---

[5]      The terms and conditions set forth herein are qualified in their entirety by reference to the provisions of the DIP Documents, copies of which are available upon request to Counsel for the Debtors.  The description of the terms of the DIP Documents set forth in this Motion is provided for the convenience of the Court and the parties-in-interest.  In the event of any inconsistency between the description of the terms of the DIP Documents contained in this Motion and the actual DIP Documents, the terms of the DIP Documents shall govern.

percent (85%) of the Net Collectable Value (defined below) of Debtors' accounts receivable due from eligible third-party payors. Availability under the DIP Credit Agreement shall be reduced for such availability reserves and/or adjustments as may be established and maintained from time to time by DIP Agent in its sole discretion including, without limitation, any reserve against borrowing availability in the full amount of any Carve-Out (defined below) or other priming lien or obligation authorized by the Financing Orders approving the DIP Credit Agreement and, to the extent allowed by the Bankruptcy Court, certain professional fees and expenses which had not been paid to or held by certain professionals prior to the first business day following certain defaults.

(iii)   <u>Secured Term Debt</u>: DIP Lender shall also provide term debt under the DIP Term Credit Agreement to Debtors based upon the difference between the Availability on the revolver and the $20 million (Maximum Loan Amount). Term debt shall be interest only, payable monthly in arrears at an annual rate of 30-day, reserve adjusted, LIBOR (subject to a 1.00% floor) plus 7.0% reset monthly secured by a priming lien on the real estate.

(iv)   <u>Term</u>: The earlier of (a) twelve (12) months from the date of closing or (b) the occurrence of a DIP Credit Agreement Termination Event (as defined below) (in either case, the "<u>DIP Credit Agreement Maturity Date</u>"). The term "<u>DIP Credit Agreement Termination Event</u>" means the termination of the DIP Credit Agreement by DIP Lender, in its sole discretion, based upon any one of the following events: (i) the occurrence of an event of default under the DIP Loan, DIP Documents or the Financing Orders, (ii) the indefeasible payment in full of the indebtedness and obligations under the DIP Credit Agreement, (iii) a sale of all or substantially all or any material portion of the assets of Debtors, (iv) the conversion of any of these Cases to a case under chapter 7, (v) appointment of a trustee or examiner, (vi) the effective date of any plan confirmed by a final order in any of the Cases, and (vii) such other events as designated by DIP Agent in the DIP Loan Documents or set forth in the Financing Orders.

(i)   <u>Rights and Remedies Upon Event of Default</u>. Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Agent, as provided in the DIP Documents, may declare: (a) all DIP Obligations owing under the DIP Documents to be immediately due and payable; (b) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains; and/or (c) the termination of the DIP Credit Agreement and any other DIP Document as to any future obligation of the DIP Agent or DIP Lender, but without affecting any of the DIP Liens or the DIP Obligations (any such declaration by the DIP Agent shall be referred to herein as a "<u>Termination Declaration</u>"). The earliest date any such Termination Declaration is made shall be referred to herein as the "<u>Termination Declaration Date</u>"). The DIP Obligations would be due and payable, without notice or demand, on the Termination Declaration Date. Any automatic stay otherwise applicable to the DIP Agent is hereby modified so that beginning on the seventh (7th) day after the Termination Declaration Date (such seven day period being the

"Remedies Notice Period"), the DIP Agent shall be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the DIP Documents and this Interim Order, and shall be permitted to satisfy the DIP Obligations and DIP Superpriority Claims, subject to the Carve Out.  Notwithstanding the foregoing, and without order of or application or motion to the Court, if an Event of Default exists, the DIP Agent may do any one or more of the following at any time, including during the Remedies Notice Period, and in any order: (u) reduce the amount of the Revolving Loan Commitment or the Borrowing Base under the DIP Documents; (x) restrict the amount of or refuse to make loans under the DIP Documents; (y) terminate the DIP Lender's commitment to lend under the DIP Documents; or (z) declare the DIP Financing to be immediately due and payable. Upon the occurrence and during the continuance of an Event of Default, the DIP Agent may, and shall if requested by DIP Lender, (a) by notice to Borrowers suspend or terminate the DIP Loan Commitment and the obligations of DIP Agent and the DIP Lender with respect thereto, in whole or in part and/or (b) by notice to Borrowers declare all or any portion of the DIP Obligations to be immediately due and payable, with accrued interest thereon, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower and Borrowers will pay the same.

(v)     Use of Proceeds:  The proceeds of the DIP Financing will be used in a manner consistent with the terms and conditions of the DIP Documents, including any covenant pertaining to compliance with the Budget as the same may be modified from time to time in accordance with the consents required under the DIP Documents (the "Budget Compliance Covenant"), solely for: (a) working capital and other general corporate purposes; (b) repayment of the Emergency Advances; (c) payment of the adequate protection amounts set forth in the Financing Orders; (d) permitted payment of costs of administration of the Cases (subject to the limitations of the Carve Out); and (e) payment of fees and expenses due according to the terms of the DIP Documents.

(vi)    Carve Out. The "Carve Out" shall encompass the following expenses, following the occurrence of a Triggering Event (as defined below): (A) (i) allowed fees and reimbursements for disbursements of professionals retained by the Debtors (the "Debtors' Professional Fee Payments") in an aggregate amount for all the Debtors' Professional Fee Payments not to exceed $150,000 incurred after the Triggering Event; (ii) allowed fees and reimbursements for disbursements of professionals retained by any Committee appointed by this Court (the "Committee's Professional Fee Payments") in an aggregate amount for all of the Committee's Professional Fee Payments not to exceed $50,000 incurred after the Triggering Event; (iii) quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court; and (iv) fees payable to a chapter 7 trustee in an aggregate amount not to exceed $15,000 (collectively, (i), (ii), (iii), and (iv) the "Carve Out Amount"); and (B) all Debtors' Professional Fee Payments and Committee's Professional Fee Payments allowed, or subsequently allowed, and payable under sections 330 and 331 of the Bankruptcy Code, to the extent incurred prior to such Triggering Event and not otherwise previously paid

(the "Pipeline Period") subject to the amounts set forth in the Budget.  The DIP Agent shall be authorized on a monthly basis to accrue and hold in escrow in an interest bearing deposit account (the "Professional Fee Account") the amount contained in the Budget relating to the Debtors' Professional Fee Payments and Committee's Professional Fee Payments, which amount is earmarked for, and shall be applied toward, the payment, upon proper application to, and allowance by, the Court, of such professionals' fees, including as provided in any order entered by this Court with respect to the procedures for seeking compensation and reimbursement for expenses (an "Administrative Fee Order").  As used in this Paragraph, the term "Triggering Event" shall mean the earlier to occur of: (a) the date the DIP Agent or Indenture Trustee provides to the Debtors, any Committee appointed by this Court and the Indenture Trustee or DIP Agent (as applicable), with a copy to Debtors' counsel at the address set forth in the DIP Documents and to counsel for any Committee appointed by this Court, a notice of (i) an Event of Default or Cash Collateral Termination Event and (ii) termination of the Pipeline Period for purposes of the Carve Out; or (b) the date upon which a failure of the Debtors to notify the DIP Agent of the occurrence of a Default (as defined in the DIP Documents) or Event of Default (of which the DIP Agent is not otherwise aware of on such date) constitutes a failure to comply with the requirement to give such a notice under the DIP Documents.

(vii)    Limitations on Use of DIP Financing. The DIP Financing, DIP Collateral, Carve Out and proceeds thereof may not be used: (a) in connection with or to finance any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to the DIP Agent's rights and remedies under the DIP Documents (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the DIP Obligations, (iii) for monetary, injunctive or other affirmative relief against the DIP Agent or DIP Lender or its collateral contrary to the DIP Documents or (iv) preventing, hindering or otherwise delaying the exercise by the DIP Agent of any rights and/or remedies permitted under the DIP Documents, or applicable law, or the enforcement or realization by the DIP Agent upon any of the DIP Collateral; (b) to make any distribution under a plan of reorganization in any of the Cases while the DIP Documents remains in effect or any DIP Obligations remain outstanding; (c) to make any payment in excess of $50,000 in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consents required under the DIP Documents; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in any of the Debtors without the prior written consents required under the DIP Documents; (e) to object to, contest, or interfere with in any way the DIP Agent's enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred, except as to any challenge as to the occurrence of such an Event of Default as provided for herein; (f) to sell or otherwise dispose of DIP Collateral without the consents required under the DIP Documents; (g) to use or seek to use any insurance proceeds constituting DIP Collateral other than as set forth in the DIP Documents; (h) to incur Debt (as defined in the DIP Credit Agreement) outside the ordinary course of business without the prior consents required under the DIP Documents; (i) to

object to or challenge in any way the claims, liens, or interests (including interests in the DIP Collateral) held by or on behalf of the DIP Agent; (j) to assert, commence or prosecute any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the DIP Agent or DIP Lender; (k) to prosecute an objection to, priority, or enforceability of any of the DIP Obligations or DIP Liens or any other rights or interests of DIP Agent or DIP Lender.

(viii)  <u>Principal Repayment</u> ; All obligations under the DIP Credit Agreement shall be due and payable in full by Debtors to DIP Agent at the DIP Credit Agreement Maturity Date.

(ix)  <u>Payment Date and Basis</u>: Interest and fees due under the DIP Credit Agreement shall be due and payable monthly in arrears.

(x)  <u>Interest and Fees</u>:   Interest on the outstanding balance of the DIP Credit Agreement shall be payable monthly in arrears at an annual rate of 30-day, reserve adjusted, LIBOR (subject to a 1.00% floor) plus 5.25%, reset monthly. Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year.   Collections of cash by DIP Lenders under the DIP Credit Agreement shall be credited to Debtors obligations thereunder on a daily basis, but shall be subject to five business clearance days for purposes of calculating interest and fees.   Debtors shall pay Agent a collateral management fee of .05% per month on the outstanding balance of the DIP Credit Agreement. Debtors shall pay DIP Lenders an unused line fee equal to 0.042% per month of the average unused portion of the DIP Credit Agreement. Debtors shall pay DIP Lenders a non-refundable origination fee equal to 1.0% of the Maximum Loan Amount. Debtors shall pay DIP Lenders a fully earned exit fee due upon the indefeasible payment in full of all amounts outstanding under the DIP Credit Agreement equal to 1.0% of the Maximum Loan Amount, which exit fee shall be waived if DIP Lender provides the Exit Financing with terms that are acceptable to DIP Lender.

(xi)  <u>Collateral</u>:   All obligations of Debtors under the DIP Credit Agreement (collectively, the "<u>Obligations</u>") will be secured by valid first priority perfected and priming security interests and liens in and pledges of all now existing and hereafter acquired assets of the Debtors, including all real and personal property and other assets of the Debtors' estates, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Debtors, and whether owned or consigned by or to, or leased from or to, the Debtors, and regardless of where located  (the " <u>DIP Collateral</u>").  All liens and security interests in and to the DIP Collateral shall be secured: (i) pursuant to Section 364(d) of the Bankruptcy Code, by a first priority, senior priming perfected lien on, and security interest in, the Collateral that is subject to any valid, duly perfected lien of any party; (ii) pursuant to Section 364(c) of the Bankruptcy Code, by a first priority, perfected lien on, and security interest in, all Collateral that is not subject to any valid, duly perfected lien of any party (such security interests, liens and pledges collectively referred to herein as the "<u>DIP Liens</u>"), and the DIP Liens shall be accorded super-

priority under Section 364(c) of the Bankruptcy Code, including over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code. Notwithstanding the foregoing, the DIP Liens shall be subject to any Permitted Liens (as defined in the DIP Credit Agreement). The DIP Collateral excludes any and all causes of action and proceeds therefrom of the Debtor or any of their estates under sections 544, 545, 547, 548, 550 and 724 of the Bankruptcy Code (the "Avoidance Actions").

(xii)   Financial Covenants: Financial covenants shall include, without limitation, minimum monthly revenue and minimum monthly cash receipts. Additional financial covenants and covenant levels shall be determined subsequent to completion of due diligence. In addition, Debtors shall furnish a borrowing base certificate to the Agent at least once each week, and on a monthly basis, a 13-week budget setting forth on a weekly basis cash revenue, receipts, expenses, disbursements, variances to the prior budget and other information.

(xiii)  Superpriority Administrative Expense Claim; Waiver under Section 506(c). Pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall have the status of an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (collectively, the "DIP Superpriority Claims"). The DIP Superpriority Claims shall be subordinate in payment and priority only to the Carve Out and shall have priority over any and all administrative expenses and unsecured claims against the Debtors or their estates in any of the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code §§ 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code. All rights of the Debtors to surcharge any DIP Collateral under sections 105 or 506(c) of the Bankruptcy Code will be waived. For the avoidance of doubt, the DIP Superpriority Claim shall extend to any avoidance actions or claims in each case arising under section 549 of the Bankruptcy Code and the proceeds thereof.

(xiv)   Cash Management. Debtors shall maintain their cash management procedures reasonably satisfactory to the DIP Agent.

(xv)    Adequate Protection Obligations: The DIP Documents also provide for the adequate protection for the Indenture Trustee and Miscellaneous Secured Creditors as described more fully below.

(xvi)   Bankruptcy Court Approval: The DIP Lender's commitment to fund is subject to entry of the Financing Orders satisfactory to the DIP Lender and DIP Agent in their sole discretion.

**C.**    **Use of Cash Collateral**

33.    By this Motion, the Debtors propose to use the proceeds of the Indenture Trustee's and Miscellaneous Secured Creditors' Cash Collateral in accordance with the Budget, and to provide the Indenture Trustee and Miscellaneous Secured Creditors with adequate protection as described more fully below.

34.    Until the occurrence of a Cash Collateral Termination Event (as defined below), the Debtors are authorized to use as cash collateral (as defined in section 363 of the Bankruptcy Code) the proceeds of the DIP Financing and any revenues from Gross Receipts (together, the "Cash Collateral"), *provided*, *however*, that such use of Cash Collateral shall be limited solely for payment of: (i) interest, fees, expenses and advances made by the DIP Lender as authorized by the Interim Order; and (ii) those amounts, categories and at the times set forth in the Budget.

35.    Notwithstanding anything herein to the contrary, Cash Collateral does not include: (i) any cash, securities or funds on deposit with the Indenture Trustee, such as the Bond Funds; or (ii) proceeds of any lease, sublease license or sale outside the ordinary course of business of any of the Debtors' Assets (together, the "Extraordinary Proceeds").  Nothing herein, or in the Interim Order or any subsequent order concerning the extension of debtor in possession financing to the Debtors or the use of cash collateral by the Debtors shall entitle the Debtors to use any portion of the Bond Funds, and no lien or other interest may be granted in the Bond Funds to any third party including but not limited to the DIP Lender or any other debtor in possession lender.

**D.**    **Adequate Protection**

36.    As noted above, the Debtors' obligations under the DIP Documents will be secured by (a) first priority liens on, and security interests in, all of the Collateral, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code subject and junior only to the

Carve Out.  Given the extent of the Indenture Trustee's claims and the value of the underlying

collateral, without the consent of the Indenture Trustee relating to the priming of its liens and

claims and the protections provided in the Interim Order, the Debtors would be unable to obtain

the proposed DIP Financing.

37.    <u>Adequate Protection Provided to the Indenture Trustee</u>.  The Indenture Trustee is

entitled to receive adequate protection on account of its respective interests in the Prepetition

Collateral pursuant to sections 361, 362, and 364 of the Bankruptcy Code.

(a)    <u>Paydown of Emergency Advances</u>.  The Debtors shall use proceeds of the initial funding under the DIP Financing to repay in full the amounts outstanding under the Emergency Advances, which amount is $2,300,000 plus interest.  Upon such payment, such Emergency Advances shall be deemed indefeasibly paid in full and not subject to any claim or cause of action of any type or nature.

(b)    <u>Adequate Protection Payments</u>.  In consideration for the use of the Cash Collateral, and in consideration of the Indenture Trustee's consent to subordination of its liens pursuant to the Financing Orders, the Debtors shall make adequate protection payments in an amount equal to the regularly scheduled, non-default amounts due to be paid by the Debtors under the Bond Documents, including, without limitation, any amounts due for the payment of fees and expenses of the Indenture Trustee and its professionals (the "<u>Adequate Protection Payments</u>").  The fees and expenses incurred by the Indenture Trustee, including the Indenture Trustee's own fees and expenses and those of it professionals, shall not be subject to the provisions of sections 327, 328, 329, 330 or 331 of the Bankruptcy Code and shall be paid by the Debtors without further order of the Court within five (5) business days of delivery to the Debtors of any invoices therefor, which invoices may be redacted with respect to privileged matters.  The amounts payable by the Debtors for such fees and expenses incurred by the Indenture Trustee in any one month shall not exceed $75,000; provided that any unused amount in any month may be rolled over to any subsequent month to increase such cap; and provided further that nothing herein shall prevent the Indenture Trustee from asserting all rights it has to recover such fees and expenses under the Bond Documents.

(c)    <u>Rollover Lien</u>.  As additional adequate protection, and in consideration for (1) the use of the Cash Collateral by the Debtors and (2) the Indenture Trustee's consent to subordination of its liens and claims, on and after the Petition Date, the Indenture Trustee is hereby granted a valid, perfected enforceable continuing replacement lien and security interest (the "<u>Rollover Lien</u>") in all assets of the Debtors existing on or after the Petition Date of the same type as the collateral securing the Bond Claim and Emergency Advances, together with the proceeds,

rents, products and profits thereof, whether acquired or arising before or after the Petition Date, to the same extent, validity, perfection, enforceability and priority of the liens and security interests of the Indenture Trustee in such collateral as of the Petition Date.  The Rollover Lien shall be subject only to: (i) prior valid and perfected liens existing as of the Petition Date; (ii) the liens and claims granted to the DIP Agent and DIP Lender; and (iii) the Carve Out.

(d)      Supplemental Lien.      As additional adequate protection, and in consideration for (1) the use of the Cash Collateral by the Debtors and (2) the Indenture Trustee's consent to subordination of its liens and claims, the Indenture Trustee is hereby granted a valid, perfected and enforceable continuing supplemental lien and security interest (the "Supplemental Lien") in all of the assets of the Debtors of any kind or nature whatsoever within the meaning of section 541 of the Bankruptcy Code, whether acquired or arising prepetition or postpetition, together with all proceeds, rents, products, and profits thereof inclusive of all causes of action of any kind or nature including those under chapter 5 of the Bankruptcy Code and the proceeds thereof.  The Supplemental Lien shall be subject only to: (i) prior valid and perfected liens existing as of the Petition Date; (ii) the liens and claims granted to the DIP Agent and DIP Lender; and (iii) the Carve Out.

(e)      Treatment of the Rollover Lien and Supplemental Lien.  Each of the Rollover Lien and Supplemental Lien shall be deemed a Permitted Lien as defined in the DIP Credit Agreement.    Each of the Rollover Lien and Supplemental Lien shall be valid and enforceable against any trustee or other estate representative appointed in the Cases or any Successor Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Cases or Successor Cases.   Neither the Rollover Lien nor Supplemental Lien shall be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code.

(f)      Additional Liens.    The assets subject to the Rollover Lien and the Supplemental Lien (together, the "Post-Petition Bond Collateral") shall be in addition to all other rights of the Indenture Trustee, including its liens and security interests in the Prepetition Bond Collateral.    The Rollover Lien and the Supplemental Lien shall not be: (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Section 551 of the Bankruptcy Code, (B) with the exception of the liens and claims granted to the DIP Lender under the Financing Orders, any liens arising after the Petition Date including, without limitation, any liens or security interests in favor of any federal, state, municipal or other government unit, commission, board or court for any tax liability of the Debtors, whether secured or unsecured, including property taxes for which liability is *in rem*, *in personam*, or both, except a tax of a kind specified in section 507(a)(8) of the Bankruptcy Code, or (C) any intercompany or affiliate liens of the Debtors; or (ii) subordinated to or made *pari passu* with any other lien or security interest under

sections 363 or 364 of the Bankruptcy Code or otherwise, with the exception of the liens and claims granted to the DIP Lender under the Financing Orders.

(g)     Indenture Trustee Superpriority Claims.  As additional adequate protection and in consideration for (1) the use of the Cash Collateral by the Debtors and (2) the Indenture Trustee's consent to subordination of its liens and claims pursuant to the Interim Order, the Indenture Trustee shall have a super-priority administrative expense claim pursuant to Bankruptcy Code Section 507(b) against all assets of the estates, including, but not limited to (i) the causes of action and proceeds therefrom of Debtors or their estates under Sections 544, 545, 547, 548, 549, 550 and 724(e) of the Bankruptcy Code; and (ii) the Debtors' rights, choses in action, or claims of any kind whatsoever, choate or inchoate, present or residual which for any reason cannot not be made the subject of the Post-Petition Bond Collateral, with priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, including any Secured Party Superpriority Claims, now existing or hereafter arising, of any kind whatsoever (the "Indenture Trustee Superpriority Claim"), including, without limitation, all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, and shall at all times be senior to the rights of Debtors, any successor trustee or any creditor, in these Cases or any Successor Cases, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre- and post-petition property of Debtors and all proceeds thereof, *provided*, *however*, the Indenture Trustee Superpriority Claim shall be subordinate only to: (i) the DIP Superpriority Claims; and (ii) the Carve Out.

(h)     Compliance With Bond Documents.  As additional adequate protection of and in consideration of (A) the use of Cash Collateral by the Debors and (B) the Indenture Trustee's consent to subordination of its liens and claims pursuant to the Financing Orders, the Debtors shall comply with all terms and provisions of the Bond Documents set forth on **Schedule 1** attached to the Financing Orders and incorporated herein by reference.  The requirements of the Financing Orders shall be in addition to, and not in substitution for, the terms and provisions of the Bond Documents set forth on **Schedule 1**; provided, however, in the event of any inconsistency between the Bond Documents and the Financing Orders, the terms of the Financing Orders shall control.

(i)     Financial Information.  As additional adequate protection of the Indenture Trustee's security interests in the Cash Collateral, and in consideration of the Indenture Trustee's consent to the subordination of its liens pursuant to the Financing Orders, the Debtors shall allow the Indenture Trustee reasonable access during normal business hours to the premises, officers, employees, auditors, appraisers and financial advisors of the Debtors in order to conduct appraisals, analyses and/or audits of the Prepetition Bond Collateral and the Post-Petition

Bond Collateral, and shall otherwise reasonably cooperate in providing any other financial information requested by the Indenture Trustee. After the closing of the DIP Revolving Loan, the Debtors shall provide to the Indenture Trustee all Borrowing Base Certificates (as defined in the DIP Credit Agreement) and all similar documents submitted to the DIP Lender and a copy of each monthly operating report as and when submitted to the Office of the United States Trustee. The Debtors shall furnish such other reports and information as may be reasonably requested from time to time by the Indenture Trustee, all such reports to be certified by the Debtors' chief financial officer or chief executive officer. From and after the entry of the Interim Order, the Debtors shall provide to the Indenture Trustee on Wednesday of each week (commencing with the second week after the Petition Date), a weekly report certified by the Debtors' chief financial officer and in the same form as the Budget indicating all receipts received and disbursements made by the Debtors in the week ending the prior Friday compared to the Budget and detailing any variances of more than 5% and at least $10,000 from the expenditures and receipts in the Budget. The Debtors and their professionals and consultants shall be available weekly (subject to reasonable scheduling conflicts) for a telephonic conference call with the DIP Agent and Indenture Trustee and/or their professionals and holders of the Bonds to discuss the status of the Cases and the results of operations and other matters pertaining to the Cases. The DIP Agent and Indenture Trustee shall have independent access to Debtors' financial advisor and investment banker to discuss matters relating to the Cases.

(j)      Bankruptcy Proceeding Milestones. As further adequate protection, and in consideration for (1) the use of the Cash Collateral by the Debtors and (2) the Indenture Trustee's consent to the subordination of its liens and claims pursuant to the Financing Orders, and subject to the scheduling by the Bankruptcy Court, the Debtors shall comply with the following milestones, subject to any extensions being granted by the Indenture Trustee in its sole discretion (the "Milestones"):

(1)      On or before December 18, 2013, the Debtors shall have filed a motion seeking to sell substantially all of their assets (the "Sale Motion"), along with a motion to approve bidding procedures relating to such sale (the "Bidding Procedures Motion"), all such documents in form and substance reasonably acceptable to the Indenture Trustee;

(2)      On or before December 23, 2013, the Debtors shall have obtained an order from the Court approving the bidding procedures, in form and substance reasonably acceptable to the Indenture Trustee;

(3)      On or before January 13, 2014, the Debtors shall have filed a proposed plan of reorganization or liquidation (the "Plan") and accompanying disclosure statement (the "Disclosure Statement") in form and substance reasonably acceptable to the Indenture Trustee;

(4)      If applicable, on or before February 10, 2014, the Debtors shall have conducted an auction of those assets subject to the Sale Motion;

(5)      On or before February 14, 2014, the Debtors shall have obtained an order from the Court approving the sale of assets pursuant to the Sale Motion, in form and substance reasonably acceptable to the Indenture Trustee;

(6)      On or before February 14, 2014, the Debtors shall have obtained an order from the Court approving a Disclosure Statement in form and substance reasonably acceptable to the Indenture Trustee;

(7)      On or before March 31, 2014, the Debtors shall have obtained an order from the Court confirming the Plan, in form and substance reasonably acceptable to the Indenture Trustee;[6] and

(8)      On or before April 7, 2014, the Debtors shall have consummated the Plan and the Plan shall otherwise have become effective.

(k)      <u>Failure of Adequate Protection</u>.  Nothing herein shall constitute a waiver, release or modification of the rights of the Indenture Trustee to assert a claim under sections 364(c) and 507(b) on a basis subordinate to the DIP Superpriority Claims.

38.      <u>Adequate Protection Provided to the Miscellaneous Secured Creditors</u>.  The Miscellaneous Secured Creditors are entitled to receive adequate protection on account of their respective interests in the Prepetition Collateral pursuant to sections 361, 362, and 364 of the Bankruptcy Code to the extent of any Diminution in Value of their respective interests in their Prepetition Collateral.

(a)      <u>Replacement Liens</u>.  Pursuant to sections 361, 364 and 507(b), but only to the extent that (a) the respective Prepetition Obligations remain outstanding, (b) the Miscellaneous Secured Creditors hold valid and perfected Prepetition Liens in the Prepetition Collateral, and (c) any Diminution in Value of their respective interests in the Prepetition Collateral, the Miscellaneous Secured Creditors will hereby receive as adequate protection automatically perfected, replacement liens on the DIP Collateral to the same extent and priority of their respective Prepetition Liens (the "<u>Replacement Liens</u>"; and together with the Rollover Lien and Supplemental Lien, the "<u>Adequate Protection Liens</u>") and against each

---

[6] Any order relating to the sale of the assets of the Debtors or confirmation of any Plan shall be in form and substance satisfactory to the DIP Agent as set forth in the DIP Credit Agreement.

Debtor in which such Miscellaneous Secured Creditor holds a Replacement Lien (an "Applicable Debtor"). The Replacement Liens shall be deemed a Permitted Lien within the meaning of the DIP Credit Agreement. The Replacement Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Cases or any Successor Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Cases or Successor Cases. The Replacement Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the Replacement Liens (for any lien or interest avoided other than the Prepetition Liens).

(b)     Secured Creditor Superpriority Claims.     Junior only to the DIP Superpriority Claims, Indenture Trustee Superpriority Claim, and the Carve Out, and only to the extent Replacement Liens fail to protect the Miscellaneous Secured Creditors against any Diminution in Value, the Miscellaneous Secured Creditors shall be entitled, pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, to an allowed superpriority administrative expense claim in each of the Cases of the Applicable Debtors and any Successor Cases of the Applicable Debtors (collectively, the "Secured Creditor Superpriority Claims") for all Diminution in Value claims. The Secured Creditor Superpriority Claims, if permitted, shall be subordinate in payment and priority only to the DIP Superpriority Claims, Indenture Trustee Superpriority Claim, and the Carve Out, and shall (a) otherwise have priority over any and all administrative expenses and unsecured claims against the Debtors or their estates in any of the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code §§ 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code, except as set forth herein, and (b) at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative, to the extent permitted by law.    The Secured Creditor Superpriority Claims, if permitted, shall not extend to (i) commercial tort claims or (ii) any avoidance actions or claims arising under chapter 5 of the Bankruptcy Code, or any of the proceeds of (i) and (ii), except that the Miscellaneous Secured Creditor Super Superpriority Claims shall extend to any avoidance actions or claims in each case arising under section 549 of the Bankruptcy Code and the proceeds thereof.

39.     Termination of Use of Cash Collateral.    The Debtors' authority to use Cash

Collateral pursuant to the terms of the Interim Order will terminate without any further action by

the Bankruptcy Court seven (7) days after written notification sent by the Indenture Trustee to

the Debtors, the DIP Lender, the Committee, and the U.S. Trustee of the occurrence of any of the

following (each a "Cash Collateral Termination Event"):

(i)     the incurrence by the Debtors of administrative expenses or any other amounts, of a type not set forth in the Budget;

(ii)    payment of claims or amounts or at the times not set forth in the Budget;

(iii)   the failure of the Debtors to timely pay all fees due under 28 U.S.C. §1930;

(iv)    Any of the Cases are dismissed or converted to a proceeding under chapter 7 of the Bankruptcy Code;

(v)     the earlier of (y) the date of the entry of an order of this Court appointing a chapter 11 trustee or an examiner with enlarged powers (beyond those set forth in sections 1104(c) and 1106(a)(3) and (4) of the Bankruptcy Code); or (z) the date the Debtors file a motion, application or other pleading consenting to or acquiescing in any such appointment;

(vi)    the closing of a sale of all or substantially all of the Debtors' assets;

(vii)   the Bankruptcy Court suspends the Cases under section 305 of the Bankruptcy Code;

(viii)  the Debtors default or are in further breach of any term of the Bond Documents as set forth on **Schedule** 1 of the Financing Orders;

(ix)    the Debtors fail to comply with, keep, observe or perform any of their agreements or undertakings under the Financing Orders including, but not limited to, the Milestones;

(x)     entry of an order confirming a plan in the Cases;

(xi)    either of the Financing Orders becomes stayed, reversed, vacated, amended, suspended or otherwise modified in any respect without the prior written consent of the Indenture Trustee;

(xii)   an adversary proceeding or contested matter is commenced by the Debtors, or any other person or entity, challenging the validity, extent, enforceability, priority or extent of the Indenture Trustee's liens or claims;

(xiii)    imposition of orders, penalties or fines by any governmental agency or unit which does or could, if not cured promptly, result in the cessation of operations of the Debtors; or

(xiv)    any Event of Default under the Financing Orders or any agreement related thereto.

40.    <u>Right to Use Cash Collateral Notwithstanding a Termination Event</u>. Notwithstanding the expiration of the seven (7) day period referenced above and the failure of the Debtors to cure any Event of Default that is curable or a Bankruptcy Court to order otherwise, the Debtors may continue to use the Cash Collateral solely for the purposes of paying amounts due and owing under the Carve Out and the DIP Loan, provided that the Debtors shall cease using Cash Collateral immediately upon payment of all such amounts.  In addition, upon the expiration of such seven (7) day period, the automatic stay shall be lifted with respect to the Post-Petition Bond Collateral and the Prepetition Bond Collateral for the benefit of the Indenture Trustee to allow the Indenture Trustee to exercise all of its available rights and remedies against the Prepetition Bond Collateral and Post-Petition Bond Collateral under the Bond Documents and applicable law; <u>provided</u>, <u>however</u>, in exercising such remedies, the Indenture Trustee shall not restrict access of the DIP Agent or DIP Lender to the DIP Collateral; <u>provided</u>, <u>further</u>, that nothing contained in this Paragraph shall be deemed to restrict the rights of the DIP Agent to exercise its rights against the DIP Collateral.

41.    <u>Termination Without Notice and Right of Temporary Use of Cash Collateral.</u>  In the event a final order authorizing the use of the Cash Collateral has not been entered within thirty (30) days of entry of an interim order authorizing the use of Cash Collateral in form and substance acceptable to the Indenture Trustee, the Debtors' authority to use the Cash Collateral shall automatically terminate.  Notwithstanding such automatic termination of the Debtors'

authority to use the Cash Collateral, the Debtors may continue to use the Cash Collateral for the purposes of paying the DIP Loan.

**E.**     **Extraordinary Provisions of the Proposed DIP Loan Agreement**

42.     Pursuant to this Court's Guidelines for Financial Requests, adopted by General Order No. M-274, the Debtors are required to highlight any "Extraordinary Provisions" contained in the proposed DIP Documents.  The Debtors highlight the following Extraordinary Provisions as described by the General Order:

> (a)     Section 506(c) Waiver: The DIP Credit Agreement is conditioned upon the Financing Orders providing that the surcharge provisions of section 506(c) of the Bankruptcy Code shall not be imposed upon DIP Agent, the DIP Lender or the Indenture Trustee any of their property or Collateral.  The Carve Out includes, however, unpaid Court allowed fees and expenses of a trustee under section 726(b) of the Bankruptcy Code, in an amount not to exceed $15,000.

> (b)     Liens on avoidance actions:  The Supplemental Liens granted to the Indenture Trustee as part of the Adequate Protection includes the granting of liens in favor of the Indenture Trustee in causes of action under chapter 5 of the Bankruptcy Code.

> (c)     The DIP Lender would not have agreed to provide financing and the Indenture Trustee would not have agreed to the priming of its liens and subordination of its claims to the Debtors absent such extraordinary provisions.

## EFFORTS TO OBTAIN FINANCING

43.     Prior to the Petition Date, the Debtors explored other potential DIP financing arrangements but no other parties proposed more favorable terms than those provided in the DIP Documents with DIP Lender.  Five other potential lenders were contacted.  Two passed on the opportunity after a preliminary exploration period.   Two others executed non-disclosure agreements and began the due diligence process, only to withdraw their expression of interest.  A fifth presented proposals containing terms which were less advantageous or otherwise could simply not be satisfied by the Debtors.

44.     Thus, the DIP Lender presented the only viable option for postpetition financing to meet the Debtors' working capital needs within the Debtors' time constraints and without some of the contingencies which were tied to the other proposals.  As negotiated, the DIP Financing will enable the Debtors to maintain their infrastructure, pay their post-petition operating expenses and costs of case administration and maximize the value of their assets and properties.  The Debtors' ability to effectuate a sale(s) or other transaction(s) and realize the maximum value for the Debtors' assets is dependent upon its ability to obtain the postpetition credit sought herein so that the assets and properties can be effectively marketed.  The DIP Financing is the best alternative available to the Debtors.

45.     The Debtors are otherwise unable to obtain an adequate unsecured revolving credit Agreement allowable under section 503(b)(1) of the Bankruptcy Code.  The DIP Lender also conditioned all advances to be made under the DIP Documents upon the grant to it of (a) the DIP Superpriority Claim allowable under section 503(b) of the Bankruptcy Code with priority over any and all expenses and claims of any kind or nature whatsoever specified in any other section of the Bankruptcy Code, including, without limitation, sections 503(b) and 507(b) of the Bankruptcy Code, (b) first priority and senior liens on and security interests in the Postpetition Collateral (subject only to Permitted Liens), all in accordance with sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and (c) the granting of the Priming Lien in a portion of the Postpetition Collateral, senior in right to the Indenture Trustee and the Miscellaneous Secured Parties in accordance with section 364(d) of the Bankruptcy Code.

46.     Given the nature of the Debtors' financial condition, the Debtors submit that the financing proposed to be provided under the DIP Credit Agreement is fair and reasonable and represents the best financing available to the Debtors under all of the circumstances herein.

Certainly, without the DIP Financing, it is likely that the Debtors would have to cease operations, which would have a tragic effect on an underserved population that relies heavily upon the facilities.

## **BASIS FOR RELIEF REQUESTED**

47.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or security.  If a debtor in possession cannot obtain postpetition credit on an unsecured basis, the court may authorize the debtor to obtain credit or incur debt, repayment of which is entitled to superpriority administrative expense status or is secured by a lien on unencumbered property, a junior lien on encumbered property, or a combination of these protections.  11 U.S.C. § 364(c).  A debtor in possession may also obtain postpetition credit secured by liens senior to prior existing liens pursuant to Section 364(d) of the Bankruptcy Code.

48.     Section 363(c)(2) of the Bankruptcy Code also contemplates that the Bankruptcy Court may authorize the use of cash collateral without the consent of secured parties.  Courts may authorize such use if adequate protection is provided pursuant to section 363(e).

49.     Section 363 governs the Debtor's use of property of its estate.[7]  Section 363(c)(1) provides that:

> If the business of the debtor is authorized to be operated under Section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing,

---

[7]  Pursuant to section 1107 of the Bankruptcy Code, a debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363 of the Bankruptcy Code. See 11 U.S.C. § 1107(a).

> and may use property of the estate in the ordinary course of
> business without notice or a hearing.

11 U.S.C. § 363(c)(1).

50.     Section 363(c)(2), however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the ordinary course. Specifically, a trustee or debtor in possession may not use, sell, or lease "cash collateral" under section 363(c)(1) unless:

> (A)     each entity that has an interest in such
>         collateral consents; or
> (B)     the court, after notice and a hearing, authorizes
>         such use, sale, or lease in accordance with the
>         provisions of [section 363].

11 U.S.C. § 363(c)(2).

51.     Here, the Debtors' use of Cash Collateral, subject to the terms and conditions set forth in the Interim and Final Order, is authorized under section 363(e) based upon the adequate protection provided to the Indenture Trustee and Miscellaneous Secured Creditors.

52.     Under the circumstances here, the Debtors' request to use Cash Collateral should be approved. Pending the Final Hearing, the Debtors require immediate use of Cash Collateral for, among other things, the purchase of new supplies, the funding of payroll obligations, the operation their healthcare facilities, and other operating needs. This interim relief is urgently required to prevent immediate and irreparable harm to the Debtors' operations and to maximize its potential for a successful reorganization.

## A.     The DIP Financing Should be Approved Under Section 364 of the Bankruptcy Code

53.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and a hearing, that the debtor in possession is "unable to obtain

unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense." 11 U.S.C. § 364(c).   See e.g., In re Photo Promotion Assocs., 89 B.R. 328, 333 (Bankr. S.D.N.Y. 1988) (Section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.)

54.    In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Bray v. Shenandoah Fed. Say. & Loan Assn. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992).   A debtor need only demonstrate "a good faith effort that credit was not available without" the protections of section 364(c) and 364(d).  See e.g. In re Snowshoe, 789 F.2d. at 1088.   When there are few lenders likely, able, or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aft' d sub nom, Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117,120 n.4 (N.D. Ga. 1989).

55.    As described in this Motion and the First Day Declaration, the Debtors' management has concluded after appropriate investigation and analysis that the DIP Lender's proposal was the best -and only viable alternative available to them for postpetition financing. Postpetition financing cannot realistically be procured on an unsecured basis.  Negotiations with the DIP Lender have been arms' length and conducted on a good faith basis.  The DIP Lender is only willing to extend Postpetition Financing on the terms outlined above, including the additional protections of Liens on the Collateral subject only to Permitted Liens.

56.    Given the immediacy of the Debtors' financing needs, and the pressing need to move the sale process quickly to avoid more and continuing losses, the Debtors were required to

move quickly but prudently to ensure that the Debtors would be able to negotiate a new financing agreement to preserve ongoing operations.   There is no reason to believe that a different postpetition lender offering terms more favorable than the DIP Lender could have been located, and certainly not before all of the Debtors' limited cash resources were depleted.   The Debtors' decision to proceed with the proposed DIP Financing with the DIP Lender and DIP Agent was a reasonable exercise of business judgment.

**B.**  **The Priming Lien Under the Postpetition Financing Should be Approved Under Section 364(d) of the Bankruptcy Code**

57.   The Debtors also seek approval of the DIP Financing under section 364(d)(1) of the Bankruptcy Code to permit the Debtors to grant priming liens on the Prepetition Collateral. The statutory requirement for obtaining postpetition credit under section 364(d)(1) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors in possession are "unable to obtain such credit otherwise."   In addition, the secured creditors whose liens are being "primed" by a new postpetition lender under section 364(d) of the Bankruptcy Code must be provided with adequate protection of their interests in collateral.   See In re Swedeland Dev. Group, Inc., 16 F. 3d 552, 564 (3d Cir. 1994) (en banc) (noting that adequate protection is required under section 364(d)(1)(B) of the Bankruptcy Code to ensure that the creditor receives the value for which it bargained pre-bankruptcy); In re Dunes Casino, 69 B.R. 784, 793 (Bankr. D.N.J. 1986) (noting that '[a]dequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy").   The proposed DIP Liens would "prime" the liens of the Indenture Trustee and the Miscellaneous Secured Creditors.

58.   As set forth above, to obtain postpetition financing, the Debtors and their advisors approached several commercial lenders which provide financing to distressed entities and chapter 11 debtors.   After such inquiry, the Debtors determined that no other financing is

available on terms better than proposed under the DIP Credit Agreement based on responses that the Debtors received.

59.     In addition, under section 364(d)(1) of the Bankruptcy Code, if interests in collateral are to be "primed," then such "primed" parties must be adequately protected.   11 U.S.C. §364(d)(1).  The principal purpose of adequate protection is to safeguard the interests of the secured creditor in the collateral against diminution in the value of that interest postpetition.  See In re 495 Central Park Avenue Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (stating that the goal of adequate protection is to safeguard the secured creditor from diminution in value of its interest during the chapter 11 case); In re Continental Airlines, Inc., 154 B.R. 176, 180 (Bankr. D. Del. 1993) (same); In re Beker Indus Corp., 58 B.R. 725, 738 (Bankr. S.D.N.Y. 1986) (same).

60.     Courts determine the means for providing adequate protection on a case by-case basis.  See In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Realty Southwest Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725 (Bankr. S.D.N.Y. 1986); see also In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985).

61.     The means by which adequate protection can be provided are addressed in section 361 of the Bankruptcy Code.   Section 361 sets forth three non-exclusive forms of adequate protection:  (a) lump sum cash payments to the extent the use of property results in a diminution in value of an entity's interest in property; (b) provision of additional or replacement liens to the extent the use of property results in a diminution in value of an entity's interest in property; and (c) such other relief as will result in a entity realizing the indubitable equivalent of its interest in property.  11 U.S.C. § 361.  As the foregoing is neither exclusive nor exhaustive,

there is a great deal of flexibility in terms of what may constitute adequate protection.  In re

O'Connor, 808 F. 2d 1393, 1396-97 (10th Cir. 1987).  Ultimately, adequate protection is

determined on a case-by-case basis in light of the particular facts and circumstances presented.

Id. (stating that "the courts have considered 'adequate protection' a concept which is to be

decided flexibly on the proverbial `case-by-case' basis); In re 495 Central Park, 136 B.R. at 631

(stating that, although section 361 presents some specific illustrations of adequate protection, the

statute is not exclusive and suggests a broad and flexible definition); In re Constable Plaza

Assocs., L.P. 125 B.R. 98, 105-06 (Bankr. S.D.N.Y. 1991) (authorizing debtor to use cash

collateral to operate and maintain office building, thereby protecting secured lender's collateral

and existing equity cushion); Pagano v. Cooper (In re Cooper), 22 B.R. 718, 720 n. 3 (Bankr.

E.D. Pa. 1982) ("While "adequate protection" is not defined in the Bankruptcy Code, the

legislative history of section 361 reflects the intent of Congress to give the courts the flexibility

to fashion the relief in light of the facts of each case and general equitable principles."  (citing

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 339 (1977)).

62.     In the case at bar, without the consent of the Indenture Trustee relating to the

priming of its liens and claims and the protections provided in this Interim Order, the Debtors

would be unable to obtain the proposed DIP Financing from MidCap Financial or MidCap

Funding.  After various negotiations, the Indenture Trustee is willing to consent to the priming of

its liens subject to the terms and conditions set forth in the Interim Order.  In addition, the

Debtors assert that the Indenture Trustee's and Miscellaneous Secured Creditors' interests are

being preserved by the offers of Adequate Protection provided herein.

63.     As set forth above, the Indenture Trustee is willing to consent to the priming of its

liens based upon the adequate protection proposed in the Interim Order.  The Miscellaneous

Secured Creditors likewise will be granted Adequate Protection Liens to the extent of any Diminution in Value of their interests in their Prepetition Collateral as well as a Prepetition Secured Creditor Superpriority Claim. The Debtors submit that the foregoing suffices as adequate protection in a case that is anticipated to be expeditiously conducted.

C.   **The Postpetition Financing is Necessary to Preserve the Assets of the Debtors' Estates**

64.     The Debtors' need for immediate access to a new working capital Agreement is apparent. As described above and in the First Day Declaration, the immediate access to credit is necessary to meet the substantial day-to-day operating needs associated with the operation of the Hospital during the pendency of these cases. Continuation of operations with minimal disruption is a precondition to the closing. Access to sufficient cash is critical to the continuation of patient care. In the absence of immediate access to cash and credit, the Debtor's suppliers and third party vendors will likely refuse to sell critical supplies to the Debtor on reasonable trade terms on which the Debtor's business depend, and absent which the Debtor will be unable to meet its current obligations.

D.   **The Terms of the DIP Financing are Fair, Reasonable and Appropriate and Represent the Sound Exercise of Business Judgment**

65.     As outlined in detail, to the extent possible the Debtor reached out to the available credit markets and has been unable to obtain financing on an unsecured basis or on terms that were more advantageous. In the Debtor's business judgment, the DIP Financing was the best financing option available under the circumstances of these cases.

66.     The proposed terms of the DIP Financing were negotiated in good faith and at arms' length among the parties. They are fair, reasonable, and adequate in that the terms do not prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, and they do not abridge the rights of other parties in interest. As contemplated by the policies

underlying the Bankruptcy Code, the purpose of the DIP Financing is to enable the Debtors to maintain the value of their estates while pursuing an advantageous going-concern sale.  See generally, In re First S. Sav. Assn, 820 F.2d 700, 710-15 (5th Cir. 1987).

67.    Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money.  In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Banr. S.D. Ohio 1983) (Business judgments should be left to the board room and not to this Court.).  See also, In re Curlew Valley Assocs., 14 B.R. 506, 511-14 (Bankr. D. Utah 1981) (In general, a bankruptcy court should defer to a debtor-in-possession's business judgment regarding the need for and proposed use of funds, unless such decision is arbitrary and capricious).  Courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code."  Curlew Valley, 14 B.R. at 513-14 (footnotes omitted).

68.    The Debtors submit that they have exercised their sound business judgment in determining the merits and necessity of the DIP Financing and have aptly demonstrated that its terms are fair and reasonable and are in the best interests of the Debtors' estates.  Accordingly, the Debtors should be granted the requested relief to borrow funds from the DIP Lender and use Cash Collateral on a secured and superpriority basis, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.

**E.    The Indenture Trustee and Miscellaneous Secured Creditors are Adequately Protected**

69.    The Indenture Trustee and Miscellaneous Secured Creditors are entitled to receive adequate protection to the extent of any diminution in value of their interest in the Prepetition Collateral resulting from the Debtors' use of Cash Collateral.  The Bankruptcy Code does not

explicitly define "adequate protection."  Section 361 of the Bankruptcy Code, however, provides

three nonexclusive examples of what may constitute "adequate protection" of an interest of an

entity in property under sections 362, 363 or 364 of the Bankruptcy Code:

> (1)    requiring the trustee to make a cash payment or periodic cash payments to
> such entity, to the extent that the . . . use . . . under section 363 of this title,
> or any grant of a lien under section 364 of this title results in a decrease in
> the value of such entity's interest in such property;
>
> (2)    providing to such entity an additional or replacement lien to the extent that
> such . . . use . . . or grant results in a decrease in the value of such entity's
> interest in such property; or
>
> (3)    granting such other relief . . . as will result in the realization by such entity
> of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

70.    Similarly, the Bankruptcy Code does not expressly define the nature and extent of

the "interest in property" of which a secured creditor is entitled to adequate protection under

sections 362, 363, and 364.  Nonetheless, the Bankruptcy Code provides that a qualifying interest

is entitled to protection only to the extent that the debtor's use of the creditor's collateral would

result in a decrease in "the value of such entity's interest in such property."  See 11 U.S.C. § 361.

Indeed, courts repeatedly have held that the purpose of adequate protection "is to safeguard the

secured creditor from diminution in the value of its interest during the Chapter 11

reorganization."  In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992);

see also Bank of New England v. BWL, Inc., 121 B.R. 413, 418 (D. Me. 1990) (same); In re

Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (focus of adequate protection "is

protection of the secured creditor from diminution in the value of its collateral during the

reorganization process").  The determination of adequate protection is a fact-specific inquiry to

be decided on a case-by-case basis.  See In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y.

1996). "Its application is left to the vagaries of each case . . . but its focus is protection of the

secured creditor from diminution in the value of its collateral during the reorganization process."
Id. (quoting In re Beker Indus. Corp., 58 B.R. at 736).

71.     The focus of the adequate protection requirement is to protect a secured creditor from diminution in the value of its interest in collateral during the reorganization process, not to compensate the creditor for the delay imposed by the bankruptcy on its ability to pursue non-bankruptcy remedies against the property.    See In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); In re Saypol, 31 B.R. 796, 799-802 (Bankr. S.D.N.Y. 1983).

72.     Absent the consent by the Indenture Trustee, the Debtors could not obtain the proposed DIP Financing.  The Indenture Trustee is willing to consent, based upon the terms and conditions set forth in the Interim Order.  With regard to the Miscellaneous Secured Creditors Miscellaneous Secured Creditors the Debtors believe that the proposed adequate protection is fair and reasonable beyond any question.

73.     Furthermore, where a debtor's proposed use of cash collateral augments the value of the Indenture Trustee's and Miscellaneous Secured Creditor's collateral, further adequate protection exists.  See In re Pine Lake Village Apartment, 19 B.R. 819, 826 (Bankr. S.D.N.Y 1982) (creditor had adequate protection where the debtor used cash collateral to maintain and preserve the value of the collateral).  In fact, such use would generally give rise to a claim under section 506(c) of the Bankruptcy Code, which provides that a debtor may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving such property, to the extent of any benefit to the holder of such claim.  11 U.S.C. § 506(c); see also, In re Trim-X, Inc., 695 F.2d 296 (7th Cir. 1982).

F.     **Modification of the Automatic Stay is Warranted**

74.     As set forth more specifically in the Interim and Final Orders, the proposed DIP Financing contemplates a modification of the automatic stay pursuant to section 362 of the

Bankruptcy Code to permit the DIP Lender and the Indenture Trustee, in their sole discretion, (a) to file financing statements, deeds of trust, mortgages or other similar documents to evidence their respective security interests under the DIP Financing, the Interim Order, and the Final Order, (b) subject to certain notice requirements, to execute upon such security interests or exercise other remedies under their respective DIP Documents or Bond Documents following an Event of Default, or other termination event, and (c) to take other actions required or permitted by the DIP Documents or Bond Documents, as applicable.  Stay modification provisions of this sort are ordinary and usual features of a postpetition financing and, in the Debtors' business judgment, are reasonable under the circumstances of this Chapter 11 case.  The Bankruptcy Court accordingly should modify the automatic stay to the extent contemplated by the DIP Credit Agreement and the Interim and Final Orders.

**G.**      **The Debtor's Request for Interim Relief is Appropriate**

75.      Pending the Final Hearing, the Debtors require immediate financing for, among other things, the purchase of new supplies, the funding of payroll obligations, the operation of their healthcare facilities and other working capital needs required for the provision of critical patient care.  The Debtors' interim request represents the minimum amount of cash necessary to operate during the period prior to the Final Hearing.  It is essential that the Debtors immediately stabilize their operations and resume paying ordinary operating expenses postpetition in order to minimize the damage occasioned by its current cash flow problems, facilitate the sale process, and maximize the value of its assets.

76.      Absent immediate financing for their continuing business operations, the Debtors will not have any funding to pay operating expenses and, therefore, will be unable to continue to conduct their business pending the Final Hearing.  Consequently, if the emergency relief sought herein is not obtained, the Debtors' attempt to continue operations without compromising patient

care and ultimately realize the maximum values of their assets will likely be immediately, if not irreparably, jeopardized, to the detriment of their estates, their creditors and other parties in interest.

77.     Accordingly, the Debtors request that, pending the Final Hearing, the Court conduct an interim hearing (the "Interim Hearing") as soon as practicable to consider the Debtor's request for authorization  to obtain the DIP Financing and to use Cash Collateral  in accordance with and pursuant to the terms and conditions contained in the DIP Documents and the Interim Order.

78.     Bankruptcy Rule 4001 (b) and (c) permits a court to approve a debtor's request for use of cash collateral or to incur postpetition financing during the 15-day period following the filing of a motion requesting such authorization the extent "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2) and (c)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  See, e.g., Simasko, 47 B.R. at 449.  After the 15-day period, a debtor is entitled to borrow those amounts that it believes prudent in the operation of its business.  See, e.g., Simasko, 47 B.R.  at 449.  Under this standard, as described herein and in the First Day Declaration, the Debtors' request for entry of the Interim and Final Orders, in the time periods and for the financing amounts requested herein, is appropriate.

## NOTICE

79.     No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases.  The Debtors have provided notice of this Motion by either electronic mail, facsimile or overnight mail to the Master Service List.

80.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

**WHEREFORE**, the Debtors respectfully request entry of an order granting the relief

requested herein and such other and further relief as is just.

Dated: December 17, 2013
        New York, New York

                                    ___/s/ Christopher M. Desiderio_____
                                    Daniel W. Sklar
                                    Lee Harrington
                                    Christopher M. Desiderio
                                    Alexis Anzelone
                                    Annica Sunner
                                    NIXON PEABODY LLP
                                    437 Madison Avenue
                                    New York, NY 10022
                                    Telephone: (212) 940-3000
                                    Facsimile: (212) 940-3111

                                    *Proposed Counsel to the Debtors
                                    and Debtors in Possession*