NIXON PEABODY LLP
Daniel W. Sklar
Lee Harrington
Christopher M. Desiderio
Alexis Anzelone
437 Madison Avenue
New York, NY 10022
Telephone: (212) 940-3000
Facsimile: (212) 940-3111

*Proposed Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                           :

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **ST. FRANCIS' HOSPITAL,** | : | **Case No. 13-37725** |
| **POUGHKEEPSIE, NEW YORK,** *et al.*,[1] | : | |
| | : | **(Joint Administration Requested)** |
| **Debtors.** | : | |

-------------------------------------------------------------x

**DEBTORS' *EX PARTE* MOTION FOR ORDER: (A) AUTHORIZING AND
APPROVING BID PROCEDURES IN CONNECTION WITH PROPOSED SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) AUTHORIZING THE
SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR
OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (C)
AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS; (D) SCHEDULING A SALE HEARING; AND
<u>(E) GRANTING OTHER RELATED RELIEF</u>**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

      St. Francis' Hospital, Poughkeepsie, New York ("<u>St. Francis</u>") and its affiliated debtors,

as debtors in possession (collectively, the "<u>Debtors</u>"), respectfully move this Court to enter an

order pursuant to 11 U.S.C. §§ 105, 363, and 365 (A) authorizing and approving bid procedures

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number include: St. Francis' Hospital, Poughkeepsie, New York (8503), Saint Francis Home Care Services Corporation (3842), SFH Ventures, Inc. (0024), Saint Francis Health Care Foundation, Inc. (5066), and Saint Francis Hospital Preschool Program (1079).

in connection with the proposed sale of substantially all of the Debtors' assets, (B) authorizing

the sale of those assets free and clear of all liens, claims, encumbrances and other interests, (C)

authorizing the assumption and assignment of certain contracts and establishing procedures to

determine cure amounts and establishing deadlines for objections for certain contracts and

leases to be assumed and assigned by the Debtors, (D) scheduling a hearing on the proposed

sale of those assets, and (E) granting related relief.  As set forth more fully below, the Debtors

have negotiated a form of Asset Purchase Agreement by and between the Debtors and Health

Quest Systems, Inc. or its designee (the "Stalking Horse") to facilitate the contemplated

transactions.  As also set forth more fully below, the Debtors request the initial entry of an order

approving Bid Procedures to be used in the sale process, approving procedures relating to notice

to parties in interest and the assumption and assignment of executory contracts and unexpired

leases, approving certain bid protections and scheduling (a) a sale hearing to consider the entry

of a formal order approving the actual sale of assets and (b) a deadline for objections to that

sale.  In support of this Motion, the Debtors respectfully represent as follows:

## BACKGROUND

### General

1.      On the date hereof (the "Petition Date"), the Debtors commenced voluntary

cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this

Court.  The Debtors continue to operate their business and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      The Debtors have requested that their chapter 11 cases be consolidated for

procedural purposes only and jointly administered pursuant to Rule 1015(b) of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### The Debtors' Business

4.      Founded in 1914, St. Francis has been dedicated to serving the healthcare needs of the residents of the Hudson Valley for a century.

5.      The Debtors serve more than 125,000 patients annually (excluding added homecare patients) and employ approximately 2,000 full and part-time employees.  In 2012, the Debtors serviced approximately 8,000 inpatient discharges, 32,000 emergency room visits, 38,000 home care visits, and 150,000 outpatient visits.  St. Francis' Poughkeepsie acute care hospital facility has 333 licensed beds and has the capability to serve patients with various physical and mental health issues.

6.      The Debtors provide a wide array of medical service to their community, including:

    A.  <u>Emergency Treatment</u>: The Debtors are the home to the area's only Level II Trauma center that provides lifesaving care to severely injured patients.  Over 9,000 trauma victims are cared for annually, making St. Francis' Level II Trauma center the busiest Level II Trauma Center in New York State.

    B.  <u>Mental Health and Addiction Services</u>: The Debtors are the region's recognized leader in providing mental health services.  In addition, the Turning Point at St. Francis is a comprehensive not-for-profit chemical dependency treatment program that provides inpatient medically-managed detoxification from alcohol and all other types of substances, inpatient and outpatient rehabilitation, and a

variety of specialized intensive outpatient programs, outpatient counseling, and support groups.

C.  <u>Robotic Surgery</u>:  The Center for Robotic Surgery offers patients an array of minimally-invasive surgical approaches through the use of the da Vinci surgical system.  Robotic surgery is available for patients undergoing a wide variety of thoracic, urological, gynecological and oncological procedures.

D.  <u>Physical and Occupational Therapy</u>: The Debtors' Physical and Occupational Therapy program treats a whole spectrum of diagnoses, including; neck pain, back pain, knee pain, foot and ankle pain, hand and wrist pain, shoulder pain, pre-surgical and post-surgical therapy needs, auto accidents and sports injuries, fractures, dizziness/light-headedness, balance problems, weakness, cancer related problems and stroke.

E.  <u>Cancer Treatment</u>: The Herb & Sue Ann Redl Center for Cancer Care offers advanced treatments for all major cancers including breast, lung, colon, and other digestive tract, prostate, bladder, lymphoma and melanoma.

F.  <u>Home Care</u>:  The Debtors provide home health services, including nursing care, physical therapy, occupational therapy and speech therapy to patients in the comfort of their homes.

7.  The "CREST of Values" serves as the guiding principles for the Debtors' mission.  Each member of the Debtors' team works individually and collaboratively to make their core values of Compassionate Care, Respect, Excellence, Service and Teamwork present in all internal dealings within the hospital community and in their interactions with those the Debtors are privileged to serve.

## Events Culminating in the Chapter 11 Cases

8.      These proceedings and the Asset Purchase Agreement represent the final phase of the Debtors' efforts to address significant financial stress that has affected the Debtors and their business.

9.      In 2012, the Debtors had gross revenues of almost $150 million but an operating loss of approximately $7.7 million.

10.     Beginning in September 2012, the Debtors implemented a series of new comprehensive information systems in an effort to increase the Debtors' operational efficiency. By October 2012, the Debtors determined that the implementation of the systems software had failed.  In order to address the implementation failures, the Debtors attempted to retrain their staff and employed a consultant to assist in the transition and implementation of the software.

11.     The failure of the system implementation had a significant impact on the Debtors' financial reporting and revenue cycle functions.  The implementation failed because, among other things, the Debtors' medical records department and patient billing and collection department were understaffed and underperforming.

12.     As a result of the failed implementation, increasing operational costs and regulatory environment, and decreasing admittance levels, the Debtors were forced to explore their restructuring options, including the sale of substantially all of their assets.  The Debtors' financial difficulties have also prevented the Debtors from meeting obligations under two series of civic facility revenue bonds issued for the benefit of the Debtors by the Dutchess County Industrial Development Agency (the "Revenue Bonds").  Manufacturers and Traders Trust Company serves as indenture trustee ("Bond Trustee") for the holders of the Revenues Bonds.

13.     In October 2013, the Debtors engaged Deloitte Corporate Finance LLC ("Deloitte") to serve as their Investment Bankers and thereby to market the Debtors' assets. Ultimately, the Debtors determined that the filing of these chapter 11 cases for the purpose of consummating a sale of their respective assets was in the best interests of their creditors, patients, and other parties in interests.

14.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to this chapter 11 filing is set forth in more detail in the Declaration of Arthur Nizza, D.S.W. filed pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First Day Motions (the "First Day Declaration"), which Declaration is incorporated herein by reference and filed contemporaneously herewith.

### The Asset Purchase Agreement

15.     In connection with the commencement of these proceedings, the Debtors and the Stalking Horse have entered into the Asset Purchase Agreement, a true and correct copy of which is attached as **Exhibit A** (the "Asset Purchase Agreement").  The Asset Purchase Agreement contemplates the sale of substantially all of the Debtors' assets (collectively, the "Purchased Assets").

16.     The Asset Purchase Agreement between the Debtors and Stalking Horse represents the "Stalking Horse Bid" in these proceedings and is subject to higher or better offers and the approval of this Court.  The material provisions of the Asset Purchase Agreement include:[2]

a)      Purchase Price. $24,150,000.

---

[2]      This summary is intended solely as an overview of the terms of the Asset Purchase Agreement.  In the event of any inconsistency between the summary provided herein and the actual provisions of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall control.

b)      <u>Deposit</u>. $2,415,000.00.

c)      <u>Purchased Assets</u>.  Substantially all of the tangible and intangible assets of the Debtors, excluding, among other things, (a) cash and deposits; (b) accounts receivable; (c) avoidance actions; (d) all trade names; and (e) Debtors' provider numbers. (together, the "<u>Excluded Assets</u>").

d)      <u>Bankruptcy Court Approval</u>. The sale is conditioned on the Court entering an order, in form and content reasonably satisfactory to the Stalking Horse, approving the sale of the Purchased Assets to the Stalking Horse, which order shall contain, without limitation, a finding that the Stalking Horse is a good faith purchaser for value within the meaning of section 363(m) of the Bankruptcy Code and a provision that the stays of Bankruptcy Rules 6004(g) and 6006(d) do not apply.

e)      <u>Warranties</u>.  The Purchased Assets are being conveyed "AS IS" and "WHERE IS"

f)      <u>Termination</u>. Stalking Horse may terminate the Asset Purchase Agreement for various reasons including the following: (i) upon mutual consent; (ii) if the Bid Procedures Motion, Order, Auction and other matters do not take place  by certain deadlines set forth in the Asset Purchase Agreement, (iii) if a governmental authority issues a ruling or order prohibiting the transactions; (iv) upon material breach by the Seller of the Asset Purchase Agreement; (v) if Seller enters into and closes an alternate transaction; (vi) if Seller withdraws the Sale Motion or announces a standalone plan of reorganization or ceases to operate the business as a going concern; (vii) if Stalking Horse is not the Successful Bidder in the auction; (viii) upon sale, transfer or other disposition of assets in connection with the close or liquidation or winding up of the business of Seller; (ix) if the bankruptcy case is dismissed or converted to a Chapter 7; (x) if the Bankruptcy Court has not issued an interim cash collateral order and a final order within certain time limits set forth in the Asset Purchase Agreement; (xi) if certain conditions as enumerated in the Asset Purchase Agreement shall be incapable of fulfillment by Debtor; and (xii) if regulatory approval contingency milestones are not achieved within the time periods as set forth in the Asset Purchase Agreement.

17.      The Purchase Price was derived from the Buyer's assessment of the approximate

total enterprise value of the Business as a going concern of Forty Million Dollars ($40,000,000)

("<u>TEV</u>").  For purposes of deriving the Purchase Price, TEV was adjusted to account for: (i) the

Buyer's assessment of the  value of certain Excluded Assets (e.g. in excess of Twenty Million

Dollars ($20,000,000) of net realizable accounts receivable, and other working capital normally

conveyed in connection with a going concern sale, that the Estate will retain the value thereof); (ii) an allowance for capital equipment necessary to support the services being transferred that is not otherwise assumed in the form of capital lease liabilities; (iii) an estimated allowance of Five Hundred Thousand Dollars ($500,000) for Cure Costs associated with assumed vendor contracts and assumed real estate operating leases; and (iv) the Buyer's estimate of its transition costs including but not limited to expenses related to the clinical realignment plan and the related information technology systems transition expense estimate of Three Million Two Hundred Fifty Thousand Dollars ($3,250,000).

18.     The Asset Purchase Agreement requires the entry of bid procedures reasonably satisfactory to the Debtors and Stalking Horse.  The proposed Bid Procedures provide for, without limitation, a Break-Up Fee and Expense Reimbursement Fee to be paid to the Stalking Horse, in the event that, notwithstanding submission of the Stalking Horse Bid to the Court for approval, and the satisfaction or waiver of all material conditions precedent contained in the Asset Purchase Agreement, the Court approves a sale to a party other than the Stalking Horse; and the Stalking Horse subsequently does not acquire the Purchased Assets.

**RELIEF REQUESTED**

19.     By this Motion, the Debtors request an order substantially in the form of the order attached hereto as **Exhibit B** (the "Bid Procedures Order"), (i) authorizing and approving the procedures substantially in the form attached hereto as **Exhibit C** (the "Bid Procedures") to be employed in connection with the proposed sale of the Purchased Assets to the Stalking Horse or another bidder submitting a higher or better offer; (ii) authorizing and approving certain bid incentives, including payment of a break-up fee in the amount of $1,200,000 (the "Break-Up Fee") and an expense reimbursement fee in the amount of up to $1,200,000 (the "Expense

Reimbursement Fee"), payable to the Stalking Horse under the terms, circumstances and requirements of the Asset Purchase Agreement and the Bid Procedures; (iii) scheduling an auction if one or more Qualified Bids (defined below) are presented in a manner that conforms to the Bid Procedures ("Auction") and a hearing (the "Sale Hearing") to approve the proposed sale to the party holding the highest or best bid (the "High Bidder") and second highest or otherwise best bid, if any (the "Backup Bid") as determined under the Bid Procedures; and (iv) approving the form and manner of Notice of the Motion and the Sale Hearing.

20.     The Debtors further request that, at the Sale Hearing, the Court enter a further order (the "Sale Order") (i) approving a sale to the High Bidder (the "Successful Bidder"), (ii) approving the Asset Purchase Agreement or a substantially similar asset purchase agreement applicable to the Successful Bidder, (iii) authorizing the Debtors (a) to sell the Purchased Assets, free and clear of all liens, claims, encumbrances, and interests (other than certain specified assumed liabilities), and (b) to assume and assign to the Successful Bidder certain executory contracts associated with the Debtors' business (the "Assigned Contracts"); and (iv) granting related and ancillary relief.

## THE BID PROCEDURES SHOULD BE APPROVED

21.     In accordance with the terms of the Asset Purchase Agreement, the Stalking Horse Bid is subject to higher or better offers for the Purchased Assets.  The Debtors request that the Court approve the Bid Procedures Order and Bid Procedures so that the Debtors can market-test the Stalking Horse Bid and determine whether higher or better offers for the Purchased Assets can be solicited.

22.     Due to the magnitude of Debtors' current and ongoing cash flow losses, the Debtors request Bid Procedures that permit the Debtors to determine promptly whether third

parties have interest in performing due diligence and evaluating whether to submit a formal and binding bid for the Purchased Assets.  The Debtors specifically request Bid Procedures that include a 5:00 p.m. (Prevailing Eastern Time) January 3, 2014 deadline for interested parties, that are prepared to invest the financial and other resources required to complete the due diligence necessary to submit a binding offer or bid on the timeline described herein, to submit a non-binding Expression of Interest ("EOI") to the following notice parties: (i) Debtors' counsel, Nixon Peabody LLP, 900 Elm Street, Manchester, New Hampshire 03101, Attn: Daniel W. Sklar, Esq. and Nixon Peabody LLP, 437 Madison Avenue, New York, New York 10022, Attn: Christopher Desiderio, Esq.; (ii) counsel to the Bond Trustee, Mintz Levin Cohn Ferris Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: Daniel S. Bleck, (iii) Office of the United States Trustee, 74 Chapel Street, Albany, New York 12207, (iv) debtor-in-possession financer, (v) counsel to any Committee  (each a "Notice Party" and collectively, the "Notice Parties").  Each EOI shall be in a form substantially similar to **Exhibit E** attached hereto and incorporated herein by reference.

23.    The proposed Bid Procedures contemplate that if the Debtors receive one or more timely and compliant EOI's that comply with the Bid Procedures, then any party (a "Potential Bidder") may continue to perform diligence pending the Bid Deadline (defined below), and the Sale Hearing will be scheduled for February 10, 2014.  The proposed Bid Procedures also provide a mechanism to shorten the process if the Debtors do not receive any EOI's by 5:00 p.m. (Prevailing Eastern Time)  on January 3, 2014.  If that occurs, the Debtors will so inform the Court and the Notice Parties whereupon the Court will conduct the Sale Hearing on or about January 10, 2014 to consider the sale of the Purchased Assets to the

Stalking Horse, pursuant to the terms and conditions contained in the Asset Purchase Agreement.

24.    In accordance with the terms of the Asset Purchase Agreement, and to the extent the Debtors receive at least one timely EOI that complies with the Bid Procedures so that the sale process continues after January 3, 2014, the proposed Bid Procedures include the following additional requirements with respect to formal and binding offers for the Purchased Assets:

(a) To bid, a Potential Bidder must submit a Bid Package to each Notice Party so as to be received by no later than February 10, 2014 at 5:00 p.m (Prevailing Eastern Time). (the "Bid Deadline").

(b) Each bid must include (collectively, the "Bid Package"): (i) a written and signed irrevocable offer (x) stating that the bidder offers to consummate a sale transaction on terms and conditions no less favorable than in the Asset Purchase Agreement and in an amount at least equal to the Minimum Bid (as defined below), (y) confirming that the bid will remain irrevocable until the earlier of (i) sixty (60) days following entry of the final Sale Order (as defined below), or (ii) closing with the Successful Bidder and (z) stating that the Bidder has had the opportunity to conduct due diligence prior to its offer and does not require further due diligence, has relied solely upon its own independent review and investigation and did not rely on any written or oral representation except as expressly provided in the Modified Purchase Agreement (as defined below); (ii) an executed copy of the Asset Purchase Agreement as modified by the bidder in accordance with its bid (the "Modified Purchase Agreement"); and (iii) an electronic markup clearly showing the revisions in the Modified Purchase Agreement to the Asset Purchase Agreement.

(c) Each bid must include a description of the consideration to be used for the acquisition of the Purchased Assets.  For the avoidance of doubt, a Potential Bidder may offer cash and/or other forms of consideration, including, but not limited to, notes or other securities; provided that: (i) any offer by a Potential Bidder shall at a minimum include cash consideration in an amount of not less the Break-Up Fee plus the Expense Reimbursement Fee plus $200,000; and (ii) any offer that includes the issuance or delivery or assumption of bonds or similar instruments must be on terms that pay interest on those instruments on a tax-exempt basis and such an offer must otherwise acknowledge that the consummation of a transaction that involves the use of such instruments shall occur only with the consent of the Bond Trustee. Each bid must include sufficient cash consideration to fully fund (i) the cash amounts necessary to retire the debtor in possession financing at closing, (ii) any required administrative expense payments pursuant to a feasible plan of liquidation or reorganization, and (iii) any necessary and actual reserve amounts for wind down costs, pursuant to a wind down budget agreed to by the Bond Trustee and Seller that would not be otherwise satisfied by

assets of the estates, in accordance with a feasible plan of liquidation or reorganization.

(d) The amount of the purchase price in each bid must provide net cash (or a combination of cash and notes or other securities with a value as determined by the Debtors in consultation with the Bond Trustee and any Committee but otherwise in their sole discretion) in the minimum amount of the sum of: $24,150,000, plus the amount of the Break-Up Fee plus the maximum amount of the Expense Reimbursement Fee, plus $200,000.00 (collectively, the "Minimum Overbid").

(e) The Bid Package must contain such financial and other information, including but not limited to financial statements, that will allow the Debtors to make a determination, in consultation with the Bond Trustee and any Committee, as to the Potential Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Purchase Agreement, including any proposed conditions to Closing and adequate assurance of such bidder's ability to perform under any Assigned Contracts.

(f) The bid must not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment.

(g) Each Potential Bidder must fully disclose the identity of each entity that will be bidding for the Purchased Assets, as well as disclose the organization, form and the business conducted by each entity and what, if any, connection the Potential Bidder has with the Debtors. Potential Bidders shall be required to provide such additional information as the Debtors may require regarding a bidder's ability to satisfy the requirements of the transaction contemplated by the Modified Purchase Agreement.

(h) Except for regulatory approvals, and the contingencies contained in section 9.2 of the Asset Purchase Agreement, the bid must not contain any contingencies of any kind, including, among others, (i) obtaining financing; (ii) shareholder, board of directors or other approval; or (iii) the outcome or completion of due diligence. Each Potential Bidder must also affirmatively acknowledge that the Potential Bidder (i) had an opportunity to conduct due diligence regarding the Purchased Assets prior to making its offer and does not require further due diligence, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Purchased Assets in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith except as expressly stated in these Bid Procedures.

(i) Each Potential Bidder must represent that it obtained all necessary organizational (not regulatory) approvals to make its competing bid and to enter into and perform under the Modified Purchase Agreement.

(j) A Potential Bidder must deposit cash in an amount equal to the Deposit provided for in section 3.2 of the Asset Purchase Agreement with the Debtors in the form of a certified

check or wire transfer on or before the Bid Deadline. Each Potential Bidder or the Backup Bidder (as defined below) shall forfeit its Deposit if (i) the Potential Bidder or Backup Bidder is determined to be a Qualified Bidder and withdraws or modifies its bid other than as provided herein before the Bankruptcy Court approves the Debtors' selection of the Successful Bidder, or (ii) the bidder is a Successful Bidder (defined below) and (x) modifies or withdraws the bid without the Debtors' consent before the consummation of the sale contemplated by the bid, or (y) breaches any of the terms of the Modified Purchase Agreement. The Deposit shall be returned to the bidder (i) as soon as practicable if the bidder is not determined to be a Qualified Bidder or the Backup Bidder or (ii) no later than five (5) business days after entry of the Sale Order if the bidder is a Qualified Bidder (who has not otherwise forfeited its Deposit) but is not the Successful Bidder or the Backup Bidder, provided, however, in the event the Stalking Horse is not the Successful Bidder, its Deposit shall be returned to it promptly upon termination of the Purchase Agreement but in no event later than five (5) business days from such termination. The Debtors will maintain any Deposit in a non-interest bearing Debtor account.

(k) Any Modified Purchase Agreement must provide that the Sale will be on an "as is, where is" basis and without representations or warranties of any kind except and solely to the extent expressly set forth in the Asset Purchase Agreement.. Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its bid and that it has relied solely upon its own independent review and investigation in making its bid.

(l) The Debtors will have the right, in consultation with the Bond Trustee and any Committee but otherwise in their sole discretion, to determine that a bid is not a Qualified Bid if the terms of the bid are materially more burdensome or conditional than the terms of the Asset Purchase Agreement and are not offset by a material increase in purchase price, which determination may take into consideration, among other things: (1) whether the bid requires any indemnification of such Qualified Bidder; (2) whether the bid does not provide sufficient cash as set forth in section ¶24(c) above, consideration to pay transfer taxes, cure costs or other cash costs of the transaction (including accrued professional fees, the Breakup Fee, the Expense Reimbursement Fee and other administrative expenses); (3) whether the bid includes a non-cash instrument or similar consideration that is not freely marketable or is of a materially lower credit quality than the non-cash consideration being proposed under the Asset Purchase Agreement; or (4) any other factors the Debtors may reasonably deem relevant. For avoidance of doubt, the Stalking Horse Bid pursuant to the Asset Purchase Agreement is deemed a Qualified Bid, and the Stalking Horse is deemed a Qualified Bidder.

25.    After the Bid Deadline, the Bid Procedures contemplate that the Debtors shall review each Bid Package on the basis of factors relevant to the sale process including, without limitation, factors affecting the timing and certainty of consummation of the proposed sale.

After such review, the Debtors shall determine in consultation with the Bond Trustee and any Committee those bids ("Qualified Bids") deemed qualified to participate in the Auction. Each person submitting a Qualified Bid shall constitute a "Qualified Bidder".

26.     The Debtors propose that if the Debtors receive at least one Qualified Bid in addition to the Stalking Horse Bid, the Debtors shall conduct the Auction to obtain a High Bid and Backup Bid.

27.     If the Debtors receive at least one Qualified Bid in addition to the Stalking Horse Bid and accordingly conduct an Auction, the Auction shall commence on February 13, 2014 at 9:00 a.m. (Prevailing Eastern Time) at the offices for the Debtors' attorneys, Nixon Peabody, LLP, 437 Madison Avenue, New York, New York 10022, or at such other place and time designated by the Court pursuant to the Bid Procedures Order. The Debtors believe that only Qualified Bidders, the Bond Trustee, holders of the Revenue Bonds, representatives of any Committee, any state or Federal regulatory authority, and their respective professionals, should be eligible to participate in or observe the Auction. For all purposes herein, the Stalking Horse Bid pursuant to the Asset Purchase Agreement shall be considered a Qualified Bid.

28.     The Debtors propose that the Auction commence with the announcement of the highest or otherwise best Qualified Bid as determined by the Debtors in consultation with the Bond Trustee and any Committee but otherwise in the sole discretion of the Debtors, and proceed as an open auction or a sealed bid auction, at the sole discretion of the Debtors in consultation with their advisors, the Bond Trustee and any Committee. The proposed Bid Procedures contemplate that Qualified Bidders must increase their bids in increments of not less than One Hundred Thousand ($100,000) Dollars and that after the conclusion of the Auction, the Debtors shall review and consider all further bids received for the Assets and determine in

consultation with the Bond Trustee and any Committee and announce the parties that the

Debtors have identified as holding the High Bid and Backup Bid.  If the Bid Procedures are

approved in their current form, the Debtors shall present the holder of the High Bid to the Court

for its approval as the Successful Bidder and shall proceed to a closing of the sale in accordance

with the terms set forth herein and the Sale Order.

29.      At the conclusion of the Auction, if held, the Debtors intend to announce in

consultation with the Bond Trustee and any Committee the second highest or otherwise best bid

from among the Qualified Bids submitted at the Auction (the "Backup Bid").  The bidder

submitting such Backup Bid shall become the "Backup Bidder," and subject to the rights of the

Successful Bidder, shall have such rights and responsibilities of the Stalking Horse, as set forth

in the Modified Purchase Agreement or the Asset Purchase Agreement, as applicable.  The

Backup Bid shall remain open and irrevocable until the earlier of (x) sixty (60) days following

entry of the Sale Order and (y) closing of the Sale, provided, however, if the Stalking Horse's

bid is deemed the Backup Bid, the Stalking Horse's rights and obligations with respect to such

bid shall be subject to the terms of the Asset Purchase Agreement.  The Backup Bidder's

Deposit will be returned by the Debtors upon consummation of the Sale of the Acquired Assets

to the Successful Bidder(s) or will be otherwise applied or forfeited as provided for in the Bid

Procedures.

30.      The Bid Procedures contemplate deadlines for the filing and service of any

objections to the terms of the Asset Purchase Agreement or the terms of sale contemplated by

this Motion by parties in interest, including holders of the Revenue Bonds.  The Debtors request

that the Court order that objections to the Asset Purchase Agreement, the sale-related

transactions contemplated by the Asset Purchase Agreement and the sale terms and conditions

described in this Motion must be filed not later than the Bid Deadline. The Debtors also propose that parties in interest including holders of the Revenue Bonds be permitted to file objections not later than 36 hours prior to the scheduled start of the Sale Hearing to the extent objections are based on the selection of a Successful Bidder or Back Up Bidder that is not the Stalking Horse or based on any aspect of the proposed transaction that was modified or presented for the first time in connection with the Auction or after the Bid Deadline. If there is no EOI the Court shall conduct the Sale Hearing on or about January 10, 2014, and objections shall be due no later than  5:00 p.m. (Prevailing Eastern Time), on January 8, 2014.

31.    The Debtors intend to seek entry of an Order approving the High Bid and Backup Bid and related relief at the Sale Hearing. All Bid Deposits shall be held by the Debtors in an escrow account. In the event that the Bid Deposits earn interest, any such interest shall accrue to the benefit of and be payable to the party submitting the respective Proposed Bid. Within five (5) business days of the Auction, Bid Deposits (and, in the case of the Stalking Horse, the Deposit) shall be returned to the bidders, except Bid Deposits provided by the High Bidder and the Backup Bidder. The Deposit of the High Bidder and the Backup Bidder shall be held until the closing on the sale of the Purchased Assets and applied in accordance with the terms of the Successful Bidder's accepted bid. The Backup Bidder's Deposit will be returned by the Debtors upon consummation of the Sale of the Acquired Assets to the Successful Bidder(s) or will be otherwise applied or forfeited as provided for in the Bid Procedures.

32.    The Debtors believe that the sale process set forth above is calculated to balance the need to market the Debtors' assets, market test the Stalking Horse Bid and solicit overbids against the desire to minimize the operating losses during the marketing period. The Debtors, through its management and retained professionals, have already undertaken considerable

efforts to market the Debtors assets. The steps taken to date by Deloitte to identify and contact potential buyers are set forth in detail in the Declaration of Simon Gisby attached hereto as **Exhibit G**. Based upon reaction to Deloitte's efforts to date, the Debtors believe the likelihood is low that it will receive an overbid to the Stalking Horse Bid. Further, the Debtors are projected to lose approximately $3,000,000.00 per month from operations while the Stalking Horse Bid is subjected to the market test process. Said losses will be funded through the DIP Loan which will have to be repaid from the Sale Proceeds. Consequently, there is material risk that an extended sale process could result in a significant reduction in the net funds that will be available from the Sale Proceeds for the benefit of the estate and its creditors, especially general unsecured creditors. The requested Bid Procedures, including the objection, bidding and other deadlines set forth above should also be approved given the terms of the Asset Purchase Agreement, which impose strict deadlines for the approval of the anticipated sale.

### REGULATORY APPROVAL PROCESS

33.    Approval of the transfer of the Purchased Assets will require approval from various governmental authorities, including but not limited to the New York State Department of Health (the "DOH"), New York State Public Health and Health Planning Council, the New York State Office of Mental Health, the New York State Office of Alcoholism and Substance Abuse Services, the New York State Board of Regents and/or the New York State Education Department (collectively, the "Governmental Authorities").

34.    Accordingly, the Asset Purchase Agreement provides that the Stalking Horse shall, at its own cost and expense promptly after the entry of the Sale Order by the Court, submit to all governmental bodies all applications for any healthcare regulatory consents or permits required on the part of the Stalking Horse in order for the Stalking Horse to

consummate the sale and to operate the business in accordance with applicable law (collectively, the "Healthcare Applications").The parties shall cooperate in the preparation and prosecution of the Healthcare Applications.  The Asset Purchase Agreement further provides that each party shall also furnish the other party with such necessary information and assistance as such other party may reasonably request in connection with the Healthcare Applications.

35.     As noted, this approval process is anticipated to last up to two (2) months following the entry of the Sale Order.

36.     In addition to complying with the regulatory approval process, the New York Not-for-Profit Corporation Law ("N-PCL") requires certain conditions must be met when a not-for-profit disposes of substantially all of its assets.  Section 510 of the N-PCL provides that the board of a "Type B" not-for-profit corporation must request permission of the New York Supreme Court in the jurisdiction where the corporation is located prior to the sale, lease, exchange or other disposition of all, or substantially all, the assets of such a corporation.  N-PCL § 510(a).

37.     The purpose of this provision is to provide for judicial oversight and absent bankruptcy, the applicable court would be the New York State Supreme Court.   As noted, under section 363(d) of the Bankruptcy Code, this Court may make the required substantive findings under the N-PCL.  By seeking approval of the New York State Supreme Court, the Debtors are not waiving any rights to claim that this Court has the sole and exclusive jurisdiction to make the required determination under section 363(d) of the Bankruptcy Code and any applicable state law contemplated thereby.  *See* 28 U.S.C. §§ 157(b) and 1334.

38.     St. Francis' Hospital, St. Francis Home Care Services Corporation, and  St. Francis Health Care Foundation, are all  "Type B" not-for-profit corporations, and the assets

being sold pursuant to the Asset Purchase Agreement constitute substantially all of those corporations' assets.  As described in greater detail below, the Debtors will petition the New York Supreme Court for approval under the N-PCL and believe the Sale Transaction complies with applicable non- bankruptcy law.

39.    In addition, the Asset Purchase Agreement provides that the Seller and Buyer will act diligently and reasonably, and shall cooperate with each other, to secure any consents and approvals of any other governmental authority required to be obtained by them under anti-trust or competition laws including, if necessary, under the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

## THE COURT SHOULD APPROVE PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS

40.    The Asset Purchase Agreement contemplates the potential assumption by the Debtors and assignment by the Debtors to the Stalking Horse of certain executory contracts and unexpired leases.  The Debtors submit that the Court should approve procedures relating to the assumption and assignment of executory contracts and unexpired leases.

41.    The procedures specifically contemplate that within two (2) business days of entry of the Bid Procedures Order, the Debtors will serve copies of the Bid Procedures Order and the notice of the assumption and assignment of the Assigned Contracts substantially in the form attached hereto as **Exhibit F** upon all non-debtor parties to the Assigned Contracts.

42.    With respect to the Assigned Contracts, the Debtors propose that any interested party seeking to object to the assumption and assignment to the Successful Bidder or to the validity of any cure amount which is set forth in the Assigned Contract Notice, or to otherwise assert that any amounts, defaults, conditions, or pecuniary losses as of the Petition Date (including accrued but not yet due obligations) must be cured or satisfied under any of the

Assigned Contracts in order for such contract to be assumed and/or assigned (collectively, a "Cure Obligation"), must file and serve an objection (a "Cure Objection") setting forth with specificity any and all Cure Obligations or conditions which such party asserts must be cured or satisfied with respect to such Assigned Contract.    The Cure Objection shall be served so that it is received by the Notice Parties no later than 5:00 p.m. (Prevailing Eastern Time), on January 8, 2014 (the "Cure Objection Deadline") assuming the Debtors fail to receive a timely and compliant EOI.  In the event a timely and compliant EOI is received and there is an Auction, the Debtors would propose that the Cure Objection Deadline be February 10, 2014.  Unless a Cure Objection is filed and served by the Cure Objection Deadline, all interested parties who have received actual notice hereof shall be deemed to have waived and released any right to assert a Cure Obligation and to have otherwise consented to the assignment, and shall be forever barred and estopped from asserting or claiming against the Debtors, the Successful Bidder, or any other assignee of the relevant assigned contract that any additional amounts are due, or that defaults exist, or that additional conditions to assignment must be satisfied under such Assigned Contract relating to the period prior to the Petition Date.  Cure Objections should set forth the cure amount that the objector asserts is due, the specific types and dates of the alleged defaults, pecuniary losses and conditions to assignment, and the support therefor and for all other objections to assumption and assignment.

43.    The Debtors propose that hearings with respect to Cure Objections be held (a) at the Sale Hearing, or (b) at such other date as the Court may designate, provided that if the subject Assigned Contract is assumed and assigned prior to resolution of any Cure Objection, the cure amount asserted by the objecting party (or such lower amount as may be fixed by the Court) shall be deposited by Successful Bidder to be held in a segregated account maintained by

the Debtors or such other person as the Court may direct pending further order of the Court or

mutual agreement of the parties.

44.    Any non-debtor party to any Assigned Contract that does not object to the

assumption and assignment of such Assigned Contract strictly in accordance with this Order

shall be deemed to have given the consent contemplated by Sections 365(c)(1)(B) and 365(f)(1)

of the Bankruptcy Code to the assumption and assignment of such Assigned Contract pursuant

to the Asset Purchase Agreement, upon payment of cure amounts, if any, as specified in the

Assigned Contract Notice.

45.    In addition, each bidder that seeks the assignment of executory contracts that

have not been listed in the Stalking Horse Bid shall be required to give notice thereof to the

Debtors.  Upon notice by the bidder, the Debtors shall be required to give notice thereof to the

non-debtor party by providing them with a copy of the Bid Procedure Order and the Notice of

Proposed Assumption and Assignment of Executory Contracts.  In connection with the sale, the

Debtors request that the Court establish a schedule for addressing any disputes with respect to

any objection to the assumption and cure of such contracts at the Sale Hearing.

46.    In assuming and assigning the Assigned Contracts, the Debtors intend to comply

with the provisions of Bankruptcy Code Section 365(f)(2).

47.    Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

> The [debtor] may assign an executory contract or unexpired lease
> of the debtor only if -
>
> (A)    the [debtor] assumes such contract or lease in
> accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the
> assignee of such contract or lease is provided,
> whether or not there has been a default in such
> contract or lease.

11 U.S.C. § 365(f)(2). Under Bankruptcy Code section 365(a), a debtor, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor. 11 U.S.C. § 365(a).

48.     Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor. This subsection provides:

> (b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -
>
> (A)     cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

49.     Section 365(b) of the Bankruptcy Code requires the debtor to cure any defaults under the contract or provide adequate assurance that it will promptly cure such defaults.  If there has been a default, the debtor must also provide adequate assurance of future performance under the contract.  Pursuant to the Asset Purchase Agreement, the Successful Bidder will be responsible for curing any existing defaults prior to the assignment of any Assigned Contracts.

50.     Second, with respect to adequate assurance of future performance, the meaning of adequate assurance of future performance depends on the facts and circumstances of each case, but should be given practical, pragmatic construction. *EBG Midtown S. Corp. v.*

*McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992); *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) (the degree of assurance necessary falls considerably short of an absolute guaranty); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

51.     Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it strong likelihood of succeeding).

52.     The Debtors will demonstrate facts at the Sale Hearing to show the financial wherewithal and the Successful Bidder's willingness and ability to perform under the Assigned Contracts.  The Sale Hearing will therefore provide the Court and the other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance under the Assigned Contracts, as required under Bankruptcy Code section 365(b)(1)(C).  The Court should therefore authorize the Debtors to assume and assign contracts as set forth herein.

53.     The Debtors also request that the Court include in its order relating to this Motion provisions barring non-debtor parties to executory contracts, assumed and assigned under such order, from: (i) asserting any default, loss, or liability against the assignee of such contract based on any event or circumstance arising prior to the date of assignment; or (ii) objecting to the assumption and assignment of its contract, unless the non-debtor party timely objects to this Motion.

54.    The Debtors believe that the foregoing procedures provide counterparties to affected contracts notice and a reasonable opportunity to protect their individual interests and should be approved.

### THE COURT SHOULD APPROVE THE FORMS OF NOTICE AND NOTICE PROCEDURES CONTEMPLATED BY THE BID PROCEDURES.

55.    The Debtors have proposed specific provisions in the Bid Procedures that are intended to provide notice of the Bid Procedures, notice of the Debtors' plan to sell the Purchased Assets pursuant to the terms of the Asset Purchase Agreement, notice of the potential for third parties to submit competing bids, and notice as to the procedures and deadlines for parties to submit competing bids or and for parties, including holders of the Revenue Bonds, to present objections to the relief contemplated.

56.    Pursuant to Bankruptcy Rule 2002, twenty-one (21) days' notice by mail is sufficient notice of the proposed use, sale, or lease of property of the estate other than in the ordinary course of business.  Subject to Bankruptcy Rule 6004, the notice of a proposed use, sale, or lease of property required under Bankruptcy Rule 2002(a)(2) must include the time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections.  *See* Fed. R. Bankr. P. 2002(c)(1).  The notice of a proposed use, sale, or lease of property is sufficient if it generally describes the property.  *Id*.

57.    To ensure that adequate notice of the Asset Sale is provided, the Debtors seek approval of a form of Notice of Sale attached hereto as **Exhibit D** (the "Notice of Sale").

58.    Within two (2) business days following entry of the Bid Procedures Order, the Debtors will serve copies of the Bid Procedures Order and the Notice of Sale upon: (a) the Notice Parties as set forth in the Motion (b)  all parties known to have asserted liens against the Purchased Assets; (c) federal and state taxing authorities offices which have a reasonably

24

known interest in the relief requested in the Motion; (d) counsel to the Stalking Horse; and (e) all parties who have filed notices of appearance requesting service of notices and pleadings in this case and any party that has expressed to the Debtors an interest in a transaction with respect to the Purchased Assets. In addition, within two (2) business days of the entry of the Bid Procedures Order, the Debtors will serve a copy of the Notice of Sale upon all other creditors and other persons entitled to notice under Bankruptcy Rule 2002(a) and the Case Management Order [Dkt. No. 5].

59.    As notice to holders of the Revenue Bonds, the Debtors propose that the Bond Trustee shall, within three (3) business days after the entry of this Order, deliver a copy of the Notice of Sale or a notice indicating the availability of the Notice of Sale to the Depository Trust Company for delivery to holders of the Existing Bonds.  To provide additional notice, including notice to holders of the Revenue Bonds and the public bond markets, the Debtors propose that the Bond Trustee be directed to, within three (3) days after the entry of the Bid Procedures Order, cause the posting of the Notice of Sale or notice indicating the availability of the Notice of Sale to the Electronic Municipal Market Access (EMMA) service.

60.    As noted above, the Debtors also intend to provide notice to all non-debtor parties to Assigned Contracts within two (2) business days of entry of the Bid Procedures Order

61.    The Debtors respectfully submit that the notice, procedures, and rules set forth in the Motion satisfy the notice requirements of the Bankruptcy Rules and section 363(b) of the Bankruptcy Code, and constitute good and sufficient notice.

62.    The foregoing notice is calculated to provide notice of the intended sale, notice of the terms of the proposed sale and the procedures for submitting competing bids, and notice

to parties in interest, including Bondholders, of the relevant objection and other deadlines associated with the sale.

63.    The Debtors submit that each of the foregoing notices provides the recipient with ample notice of the relief requested, the relative impact that such relief may have on the recipient and the procedures that a recipient must follow in the event that such recipient wishes to respond, participate in the Auction, or otherwise object to the relief requested, as the case may be, and that that the foregoing notices therefore constitute good and sufficient notice of the Bid Procedures, the Sale Hearing, the assumption and assignment of the Assigned Contracts, this Motion, and all relief contemplated thereby.

**THE COURT SHOULD APPROVE CERTAIN BID PROTECTIONS**

64.    The Asset Purchase Agreement includes certain bid protections that the Stalking Horse and Debtors have negotiated at length to compensate the Stalking Horse for serving as a stalking horse whose bid will be subject to higher or better offers.  The Stalking Horse has specifically bargained for a Break-Up Fee in the amount of $1,200,000, an Expense Reimbursement Fee of not more than $1,200,000 and the Minimum Overbid requirement.  The Asset Purchase Agreement contemplates that the Break-Up Fee and Expense Reimbursement Fee, when earned, shall constitute an administrative claim under Bankruptcy Code sections 503(b) and 507(a)(2).

65.    Bidding incentives such as the Break-Up Fee, Expense Reimbursement Fee and Minimum Overbid encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with debtors and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the Chapter 11 process.  Historically, bankruptcy courts have approved bidding incentives, including incentives

such as the Break-Up Fee, under the business judgment rule, which circumscribes second-guessing as to the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Avenue Assocs. L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives "may be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking.") (citation omitted); *Official Comm. of Subordinated  Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 657 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (establishing three basic factors for determining whether to permit such fees in bankruptcy: whether (1) relationship of parties who negotiated break-up fee is tainted by self-dealing or manipulation; (2) fee hampers, rather than encourages, bidding; and (3) amount of fee is unreasonable relative to purchase price).

66.    The Debtors and Stalking Horse believe that the Break-Up Fee, Expense Reimbursement Fee and Minimum Overbid benefit the estates as they are preconditions to the Asset Purchase Agreement. The parties believe and that the Break-Up Fee is necessary to preserve and enhance the value of the Debtors' estates through the proposed asset sale.

67.    In the instant case, the Break-Up Fee, Expense Reimbursement Fee and other bid protections set forth in the Bid Procedures are the product of good faith, arm's-length negotiations between the Debtors and the Stalking Horse, each of whom was represented by counsel.  The Break-Up Fee provides a material benefit to the estates by enabling the Debtors to obtain a commitment from the Stalking Horse which has expended, and will continue to expend, money, time and effort formulating and negotiating an offer, notwithstanding that Asset Purchase Agreement is subject to higher or better offers.

68.     At the request of the Debtors and various community constituents, the Stalking Horse engaged in conversations related to considering a transaction to assist the the Debtors given its deeply distressed and declining financial position.  The Stalking Horse has expended significant resources, including in excess of $1.5 million in out-of-pocket expenses, over several months prior to the Petition Date in association with reviewing and assessing this transaction. The Stalking Horse, in addition to deploying internal resources, also retained third-party consultants and advisors to perform extensive financial, operational, legal and regulatory due diligence of the Debtors' enterprise.  Much of this due diligence process was severely hampered by the Debtors' absence of standard operational and financial reporting tools due to unreliable information systems and the corresponding inability to readily access the necessary  information to properly assess its financial condition, operating condition and legal exposures.  As a result of its limited data, access and integrity issues, the Debtors' have only been able to generate internal financial statements for one month, July 2013, in its current fiscal year, and has not successfully completed an audit of its financial statements since 2011.  Furthermore, the Debtors are unable to generate statistical operating data on any regular or reliable basis. Working under such conditions in the absence material data reporting, the Buyer, in coordination with its consultants and advisors, had to perform inordinate amounts of financial review and data analytics, including the extrapolation of trends and identification of reasonable assumptions and estimates, in order to approximate the likely, ongoing underlying performance of the Business.   Nonetheless, in the face of these most challenging circumstances, the Stalking Horse has committed and continues to commit significant resources in an effort to identify financial, operational, legal and regulatory requirements to prudently assess and meet the feasibility requirements of this transaction.

69.     The Stalking Horse, in keeping with its mission and in an effort to ensure the continued delivery of comprehensive health care services in the Poughkeepsie community, has expeditiously deployed significant external and internal resources to determine a pathway to a transaction solution, conducting: (i) necessary elements to clinical realignment planning, (ii) the identification of requisite capital needs to address significant deferred maintenance issues and continuity of community services, (iii) determination of necessary licenses, certifications, and regulatory approvals to complete the contemplated transaction, and (iv) reviews necessary to gain perspective as to a fair and reasonable value of the business as a going concern. Given the likelihood, in the absence of a transaction, of the closure and forced liquidation of the Debtors and the corresponding disruption of access to healthcare, the potential loss of certain community-oriented services, and associated loss of employment opportunities, the Stalking Horse has pursued in good faith with the Debtors a means to consummate a feasible transaction alternative that will provide materially great value to the community and the constituents involved.

70.     Moreover, the Break-Up Fee does not hamper any other party's ability to offer a higher or better bid for the Purchased Assets.  Because the Stalking Horse's bid has created a floor for any additional bids, the Stalking Horse has provided significant value to the Debtors' estates.

71.     Finally, the Break-Up Fee is reasonable in relation to the size of the proposed sale and under the facts and uncertainties of this transaction.  The Break-Up Fee equals approximately five percent 5% of the Purchase Price.  Courts in this District have approved breakup fees in approximately the same amount as measured in proportion to the proposed purchase price offered for a debtor's assets.  *See In re Cabrini Med. Ctr.*, Case No. 09-14398

(AJG) (Bankr. S.D.N.Y. Dec. 30, 2009) (approving a break-up fee of 3.75% for an $80 million sale); *In re Tronox Inc.*, Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Sept. 23, 2009) (approving a break-up fee and expense reimbursement totaling 3.7% of total purchase price); *In re Bearingpoint, Inc.*, No. 09-10691 (REG) (Bank. S.D.N.Y. Apr. 7, 2009) (approving a break-up fee of 3% on a $350 million sale); *In re Silicon Graphics, Inc.*, Case No. 09-11701 (MG) (Bankr. S.D.N.Y. Apr. 3, 2009) (approving a break-up fee and expense reimbursement totaling approximately 6% of total purchase price); *In re Bally Total Fitness of Greater N.Y., Inc.*, Case No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (approving breakup fee of 4.3% of the purchase price).]

72.     Additionally, your Movants submitted that factors other than the Purchase Price should factor into the setting of a Break-Up Fee.  For example, the complexity of the Debtors' business and therefore the magnitude of the due diligence required to submit a Stalking Horse Bid should be considered.  In the case at hand, the bidder is bidding for a large hospital which is heavily regulated and an extremely complex enterprise.  The Debtors have over nine hundred (900) executory contracts, eight (8) primary regulators, three (3) separate labor bargaining units and publicly traded debt, to name but a few of the items that required over sixty (60) days of work by the Stalking Horse senior management and outside consultants.  Based upon the foregoing, the Debtors concluded that the Fees are reasonable under the circumstances.

73.     In sum, the Debtors' ability to offer the Break-Up Fee, Expense Reimbursement Fee and other bid protections ensures that the sale of the Purchased Assets will be to a contractually-committed bidder at a price they believe to be fair.  At the same time, the Break-Up Fee provides the Debtors with the potential of even greater benefit to the estates.  Accordingly, the Break-Up Fee and Expense Reimbursement Fee should be approved.

**AT THE SALE HEARING, THE COURT SHOULD APPROVE THE SALE OF
SUBSTANIALLY ALL OF THE DEBTORS' ASSETS
AND GRANT RELATED RELIEF**

74.     Section 363 (b)( 1) of the Bankruptcy Code provides that "[a debtor], after notice
and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of
the estate." 11 U.S.C. § 363(b)(1).  Moreover, section 105(a) of the Bankruptcy Code provides
that bankruptcy courts "may issue any order, process, or judgment that is necessary or
appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  At the
Sale Hearing, the Debtors will request that the Court approve the Stalking Horse Bid, or such
other bid that is the Highest Bid if there is an Auction for the Purchased Assets.

75.     The proposed Asset Sale pursuant to the Asset Purchase Agreement (as may be
modified at the Auction) is supported by sound business justifications and, at the Sale Hearing,
should be approved.  In light of the significant marketing efforts undertaken by the Debtors and
their investment banker over a period of several months prior to the Petition Date, the Debtors
believe that the relatively narrow pool of potential purchasers for the Debtors' highly
specialized assets have been adequately identified.  The delay of any sale would lead to
additional administrative expenses, without the likelihood of identifying any additional potential
purchasers.  Accordingly, a prompt sale is necessary to maximize the value of the Purchased
Assets for the estate.

     **i)**       **Sound Business Justification Exists**

76.     Under section 363(b) of the Bankruptcy Code, a proposed sale must represent the
reasonable exercise of business judgment on the part of a debtor-in-possession.  *See, e.g., In re
Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992); *In re Lionel Corp.,* 772 F.2d at 1071.  *See also,
In re Integrated Res., Inc*., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992), *appeal dismissed,* 3 F.3d

49 (2d Cir. 1993) *quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985) (stating that the business judgment rule is applicable in bankruptcy and presumes that when making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company).

77.     There is more than adequate business justification to sell the Purchased Assets to a successful bidder.  Absent a sale of the Purchased Assets to a third party, the Debtors would likely be forced to liquidate their assets and wind-down their operations.  Currently, the Debtors' project that it will operate at a loss of approximately $3 million per month as shown in the Debtors' 13 week cash flow projections submitted with its Motion to Authorize Use of Cash Collateral.  As of the Petition Date the Debtors had virtually no cash reserves and limited exit financing options.  Further, if the Debtors are sold as a going concern, as noted above that sale will require various federal and state regulatory approvals prior to funding which are expected to take up to two months after the entry of a Sale Order to obtain.

78.     Absent consummation of the proposed sale the Debtors will exhaust their cash resources and be compelled to close their facilities which will also impose a significant hardship upon the Debtors' community.  As noted, the Debtors are the largest provider of mental health services in the Hudson Valley and the only Level II Trauma Center north of Westchester and south of Albany.  The Debtor's believe the loss of the Debtors' services will be felt immediately throughout the Hudson Valley.

79.     However, the Stalking Horse or another successful bidder can continue providing vital care to the Debtors' patients and community, a significantly greater value can be captured from the assets than would be achieved through liquidation.  Moreover, the needs of the community currently serviced by the Debtors would continue to be met.  The Debtors' patients

will continue receiving basic care without significant disruption and the Debtors' not-for-profit healthcare mission would be continued.

### ii)    The Asset Sale is For Fair And Reasonable Consideration

80.    The Debtors have determined that the Asset Sale according to the sale procedures described herein and in the Asset Purchase Agreement will enable the Debtors to obtain the highest or best offers for the Purchased Assets and maximize the value of the Purchased Assets for the estates.

81.    As previously noted, prior to the Petition Date, in consultation with their pre-petition lenders, the Debtors employed Deloitte as their investment banker.   Almost immediately, Deloitte began marketing the Purchased Assets in order to maximize the value realized from a sale.   In connection therewith Deloitte has been actively promoting the subject assets for sale all as set forth in the Declaration attached hereto as **Exhibit F**.

82.    The Stalking Horse Bid is the only competent offer the Debtors have received as of the Petition Date.

### iii)    The Asset Sale Is In Good Faith and Purchaser is a Good Faith Purchaser

83.    The Asset Purchase Agreement provides that a Sale Order must include a finding of the Court that the Successful Bidder is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.   The Debtors have fully disclosed and requested the Court's approval of all of the terms and conditions of the proposed sale and intends to provide notice as directed by the Court.   Furthermore, the Debtors will be prepared to introduce evidence at the Sale Hearing regarding the conduct of the Auction and the negotiation of the Asset Purchase Agreement.   The Asset Sale pursuant to the Asset Purchase Agreement has been proposed, and is, in good faith.

84.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) was later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)]… does not affect the validity of a sale… to an entity that purchased… such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale… were stayed pending appeal.

> 11 U.S.C. §363(m).  *See also, Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m)… provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").  The Bankruptcy Code does not define good faith but, the Second Circuit has held:Good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good   faith finding may not be made.   A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'

*Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997) (citations omitted)); *see also Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997); *In re General Motors, Corp.* 407 B.R. 463, 494 (Bankr. S.D.N.Y. 2009);, *Bace v. Babbitt*, 2008 U.S. Dist. LEXIS 23004, at *6 (S.D.N.Y. 2008); *Oren v. Kass*, 2005 U.S. Dist. LEXIS 25965, at *10(E.D.N.Y. 2005); *In re Charalabos Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

85.     The Purchaser here is not an "insider" of the Debtors under section 101(31) of the Bankruptcy Code, and the Debtors, have satisfied the requirements of section 363(m).  The APA is the result of extended arm's-length, good faith negotiations between the Debtors and the Purchaser, who were each represented by professional advisors.  Accordingly, the Purchaser is a

"good-faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and should be entitled to its protection.  Therefore, the Debtors request that the Court make a finding that the Purchaser is entitled to the protections of section 363(m) of the Bankruptcy Code.

86.    If the Purchasers are not the Successful Bidder(s) at the Auction, the Debtors will seek a finding from the Court at the Sale Hearing that the Successful Bidder is a good faith purchaser and entitled to the protections of section 363(m) of the Bankruptcy Code, as well as the same finding with regard to the Backup Bidder.

### iv)    The Asset Sale Should be Free and Clear of Liens

87.    The ultimate sale of the Purchased Assets should be free and clear of liens, claims, encumbrances and other interests pursuant to Section 363 of the Bankruptcy Code. Bankruptcy Code § 363(f) provides that a debtor may sell property free and clear of any interest in such property of an entity other than the estate, only if:

    (1)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

    (2)    such entity consents;

    (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)    such interest is in bona fide dispute; or

    (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11  U.S.C. § 363(f).

88.    All parties holding liens on the Purchased Assets will be provided notice of the proposed Sale and shall be granted an opportunity to object to the relief requested in this Motion and any such entity that does not object to the sale shall be deemed to have consented.

*See, e.g., Futuresource LLC v. Reuters, Ltd.,* 312 F.3d 281, 285-86 (7th Cir. 2002) (standing for the proposition that the lack of an objection to a proposed sale of assets counts as consent); *Hargrave v. Township of Pemberton (In re Tabone, Inc.),* 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(0(2)); *In re Elliot*, 94 B.R. 343, 345 (E.D.Pa. 1988) *citing to In re Gabel*, 61 B.R. 661 (Bankr. W.D. La. 1985). *See also, In re Enron Corp.,* 2003 WL 21755006 at *2 (AJG) (Bankr. S.D.N.Y 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)).

89.     Thus, to the extent any parties holding a Lien on the Purchased Assets fails to object to the relief requested herein, a sale of the Purchased Assets free and clear of all Liens, with the exception of any Assumed Liabilities and Permitted Exceptions, satisfies section 363(f)(2) of the Bankruptcy Code.

90.     Alternatively, section 363(f)(5) is also satisfied and provides adequate cause for granting authorization to conduct the Sale free and clear of Liens.   Under the Asset Purchase Agreement, any party holding a Lien may be compelled to accept a monetary satisfaction of its lien.   The Asset Purchase Agreement also provides that Liens on the Assets shall attach to the proceeds of the Sale, subject to any claims and defenses the Debtors may have with respect thereto.   Liens which cannot be satisfied through a monetary judgment (if any) are included among the Permitted Exceptions or Assumed Liabilities and will not attach to the proceeds of the Sale.   Therefore, it is submitted that section 363(f)(5) can be deemed satisfied upon a sale of the Assets being conducted free and clear of all Liens.

**V)      No Successor Liability**

91.      The Debtors are seeking to sell the Purchased Assets free and clear of any successor liability claims.  Notwithstanding reference to the conveyance free and clear of "any interest" in section 363(f), that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims as well.  *See, e.g., In re Gen. Motors Corp. (n/k/a Motors Liquidation Corp.),* Case No. 09-50026 (REG) (Bankr. S.D.N.Y. Jul. 5, 2009) (authorizing the sale of assets free and clear of successor liability claims); *In re Old Carco LLC (f/k/a Chrysler LLC)*, Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Jun. 1, 2009) (same); *see also In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program).

92.      The ability of the Debtors to transfer the Purchased Assets free and clear from successor liability is critical to the sale transaction.  In order to dispose of their assets and induce any ultimate Successful Bidder to proceed with the Sale, the Debtors must be able to convey the assets free and clear of potential successor liability claims.  Absent such assurance, the ultimate Successful Bidder may be unwilling to proceed and significant value for the Debtors' estates may be lost.  *See Licensing by Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380, 387 (2d. Cir. 1997) (stating that a sale pursuant to § 363 of the Bankruptcy Code "maximizes the purchase price of assets because without this assurance of finality, purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property").

93.      In addition, '[u]nder both New York law and traditional common law, a corporation that purchases the assets of another corporation is generally not liable for the seller's

liabilities.  Both New York law and traditional common law, however, recognize certain exceptions to this rule.  Hence, a buyer of a corporation's assets will be liable as its successor if: (1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations.  *New York v. Nat'l Serv. Indus.*, 460 F.3d 201, 209 (2d Cir. 2006). None of those exceptions is applicable to the proposed Asset Sale between the Debtors and the Stalking Horse and therefore a finding by this Court that the transfer is free and clear of any successor liability is proper.  *See Douglas v. Stamco*, 363 Fed. Appx. 100, 102-03 (2d Cir. 2010) ("to the extent that the "free and clear" nature of the sale (as provided for in the Asset Purchase Agreement ("APA") and § 363(f)) was a crucial inducement in the sale's successful transaction, it is evident that the potential  chilling effect of allowing a tort claim subsequent to the sale would run counter to a core aim of the Bankruptcy Code, which is to maximize the value of the assets and thereby maximize potential recovery to the creditors.").

94.      Accordingly, based on the foregoing, the Debtors respectfully submit that the Acquired Assets should be transferred to the Successful Bidder free and clear of all liens, claims, encumbrances and other interests, including rights or claims based on successor liability.

> **vi)      Sale is Exempt from Transfer Taxes**

95.      Pursuant to N.Y. Tax Law §1405(b)(8),the Sale is exempt from New York State real estate transfer tax because it is being consummated under the Bankruptcy Code.  In addition, the transfer of the Purchased Assets is exempt from county and municipal real property transfer tax because the Debtors are not-for-profit corporations.  Accordingly, the

Debtors respectfully request that the Court find that these exemptions apply and that the Debtors' estates are exempt from real estate transfer taxes.

**vii)        Waiver of Bankruptcy Rule 6004(h)**

96.        Under Rule 6004(h) of the Bankruptcy Code, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order, unless otherwise ordered by the Court. Fed. R. Bankr. P. 6004(h).  The Debtors request that the Court waive the 14 day stay period required under Rule 6004(h) so that the Successful Bidder can immediately start seeking the necessary state and federal regulatory approvals so that the Sale can be consummated as soon as possible. *See In Re Borders Grp., Inc.*, 453 B.R. 477, 486 (S.D.N.Y. 2011) (The rule permits a court to waive all or part of the 14-day stay); *see also* 10 Collier on Bankruptcy ¶ 6004.11.  ("[B]ecause the purpose of the rule is to protect the rights of an objecting party, the court should eliminate the 14-day stay period and allow the sale or other transaction to close immediately in all cases where there has been no objection to the procedure.  Second, if an objection has been filed and is overruled, the court should eliminate or reduce the 14-day stay period only upon a showing that there is a sufficient business need to close the transaction within the 14-day period and the interests of the objecting party, taking into account the likelihood of success on appeal, are sufficiently protected.").

**viii.)      Sale Complies with Applicable Non-Bankruptcy Law**

97.        Sections 363(d) and 541(f) of the Bankruptcy Code require that the transfer of property by a not-for-profit corporation comply with applicable nonbankruptcy law governing such a transfer.  More specifically, section 363(d) provides that "[t]he trustee may use, sell or lease property under subsection (b) or (c) of this section -- in the case of a debtor

that is a [not-for-profit], only in accordance with nonbankruptcy law applicable to the transfer

of property by a debtor that is such a [not-for-profit corporation]."

98.     Section 541(f) of the Bankruptcy Code further provides that "property that is

held by a debtor that is a corporation described in section 501(c)(3) of the Internal Revenue

Code of 1986 and exempt from tax under section 501(a) of such Code may be transferred to an

entity that is not such a corporation, but only under the same conditions as would apply if the

debtor had not filed a case..."

99.     Section 511 of the New York State Not-for Profit Corporation Law ("N-PCL")

sets forth the requirements for judicial approval of a not-for-profit corporation seeking to

dispose of all or substantially all its assets, which includes providing notice of the transaction to

the New York State Attorney General (the "AG"), a proper party-in-interest for this Motion,

and who has received notice of this Motion.  N-PCL § 511 (b).

100.     Additionally, section 511 of the N-PCL requires "[a] description, with

reasonable certainty, of the assets to be sold. . .or a statement that it is proposed to sell. . .all or

substantially all the corporate assets . . ., a statement of the fair value of such assets, and the

amount of the corporation's debts and liabilities and how secured," which has been provided in

the APA.   N-PCL § 511(a)(4).

101.     Further, section 511 of the N-PCL requires that the sale be "fair and reasonable."

N-PCL §511(a)(6).  The proposed sale represents fair and reasonable value, as required by

Bankruptcy Code section 363(b), N-PCL 510 and N-PCL 511.  As noted above, the proposed

sale will be subject to competitive bidding through the Auction.  It is well-recognized that the

sale of assets pursuant to court- approved auction procedures establishes the fair and reasonable

value for such assets.  *See In re Gen. Motors. Corp.*, 407 B.R. 463, 496 (Bankr. S.D.N.Y. 2009)

("The value generated through the Court approved auction process reflects the market value of [the] assets and the conversion of the assets into cash is the contemplated result under § 363(b).") (*citing In re Trans World Airlines, Inc.*, 2001 Bankr. LEXIS 980, at *11 (Bankr. D. Del. 2001)).   Here, the value that will be generated from the sale of the Purchased Assets is greater (or equal to) fair market value and all of the net sale proceeds will be used to pay the allowed claims of creditors in these cases.   Further, there will be no excess funds available after payment of those allowed claims.

102.    Section 511 of the N-PCL also requires the sale will promote the interests of the corporation's members.   N-PCL §511(a)(6*). See also, 64th Assocs., L.L.C. v. Manhattan Eye, Ear, and Throat Hosp.*, 2 N.Y.3d 585, 590 (2004).   The Court "should be guided primarily by whether those ends would be realized in light of conditions prevailing at the time the issue is presented to the court." *Church of God v. Fourth Church of Christ, Scientist*, 76 A.D.2d 712, 717 (2d Dept. 1980); *see also, Manhattan Theatre Club, Inc. v. Bohemian Benevolent & Literary Ass'n of City of N.Y.*, 120 Misc. 2d 1094, 1097, 467 N.Y.S.2d 143, 146 (Sup. Ct. N.Y. County 1983).   Here, the proposed sale is in the best interest of the corporation and the community it benefits.

103.    First, the prevailing conditions are that the Debtor is insolvent and, together with its affiliates, is winding up its business affairs through these Chapter 11 cases. All of the net proceeds from the proposed sale will be applied to reduce the valid, allowed claims of creditors as part of the Chapter 11 cases.   Second, the proposed sale provides for a going-concern sale of the Debtor's health care services.   The sale benefits most importantly patients by providing for continuity of  health  care  services, and not only the creditors by paying down the debts. Failure  to  approve  the  sale would  likely  result  in  a liquidation of the business and

piecemeal disposition of its assets – resulting in potentially lower net sale proceeds and, importantly, negatively affecting patient care.   These adverse consequences would not be in the best interest of the corporation or its beneficiaries.

104.   The standards of the Bankruptcy Code in evaluating a transaction of this nature is consistent with the standards required by the N-PCL.  While the Debtors are in the process of submitting a petition to the New York Supreme Court seeking approval of the transaction, the Debtors reserve their right to have the Court decide all issues related to the transaction, including the Debtors' compliance with the N-PCL.  Section 1221(e) (uncodified) of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCA")  explicitly states that "[n]othing in this section shall be construed to require the court in which a case under chapter 11 of title 11, United States Code, is pending to remand or refer any proceeding, issue, or controversy to any other court or to require the approval of any other court for the transfer of property." Pub. L. No. 109-8, § 1221(e) (2005); *see also* 3-363 COLLIER ON BANKRUPTCY ¶ 363.04.  Accordingly, this Court has the jurisdiction to resolve any issues regarding the Debtors' compliance with N-PCL.

105.   In order to obtain the requirements of waiver of notice and a hearing (and thus proceed on an ex parte basis) before the New York state court, the Debtors will serve the notice of this Motion and the sale in the form attached hereto  as Exhibit D  (the  "Notice of Sale")  on all  known  creditors  listed  on  the schedules of liability for St. Francis' Hospital, St. Francis Home Care Services Corporation, and  St. Francis Health Care Foundation, which are the applicable Debtors that own the not-for- profit assets being sold.

## **NOTICE**

106.    No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases.  The Debtors have provided notice of this Motion by either electronic mail, facsimile or overnight mail to the Notice Parties and all other parties identified on the Master Service List.

104.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

**WHEREFORE**, the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: December 17, 2013
New York, New York

_/s/ Christopher M. Desiderio_____
Daniel W. Sklar
Lee Harrington
Christopher M. Desiderio
NIXON PEABODY LLP
437 Madison Avenue
New York, NY 10022
Telephone: (212) 940-3000
Facsimile: (212) 940-3111

*Proposed Counsel to the Debtors*
*and Debtors in Possession*