UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
: 
In re: : Chapter 11
: 
ST. FRANCIS' HOSPITAL, : Case No. 13-37725
POUGHKEEPSIE, NEW YORK, *et al.*,[1] :
: (Jointly Administered)
Debtors. :
------------------------------------------------------------x

### ORDER AUTHORIZING AND APPROVING SALE PROCEDURES IN CONNECTION WITH PROPOSED SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND GRANTING OTHER RELATED RELIEF

Upon the motion, dated December 17, 2013 (the "Motion"),[2] of St. Francis' Hospital, Poughkeepsie, New York ("St. Francis") and its affiliated debtors, as debtors in possession (collectively, the "Debtors") for an Order (A) authorizing and approving bid procedures in connection with the proposed sale of substantially all of the Debtors' assets, (B) authorizing the sale of those assets free and clear of all liens, claims, encumbrances and interests, (C) authorizing the assumption and assignment of certain contracts and establishing procedures to determine cure amounts, and establishing deadlines for objections for certain contracts and leases to be assumed and assigned by the Debtors, (D) scheduling a hearing on the proposed sale of those assets, and (E) granting related relief; the Court having reviewed pleadings filed by counsel to the Debtors; based on all of the evidence, including any evidence proffered at a hearing regarding the sale procedures held this date (the "Sale Procedures Hearing"), representations and offers of proof made by counsel, and argument of counsel; and on the entire

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number include: St. Francis' Hospital, Poughkeepsie, New York (8503), Saint Francis Home Care Services Corporation (3842), SFH Ventures, Inc. (0024), Saint Francis Health Care Foundation, Inc. (5066), and Saint Francis Hospital Preschool Program (1079).

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

0

record of the Sale Procedures Hearing; and any objections having been filed having been resolved, withdrawn, resolved on the terms of this Order or overruled, and there appearing good cause therefor:

IT IS HEREBY FOUND AND CONCLUDED, pursuant to Bankruptcy Rules 7052 and 9014, that:

A.     On December 17, 2013 (the "Petition Date"), the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

B.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     ~~The Debtors have provided notice of the relief sought with respect to the Sale Procedures and the other relief requested in the Motion to: (a) the Notice Parties as set forth in the Motion (b) all parties known to have asserted liens against the Purchased Assets; (c) federal and state taxing authorities offices which have a reasonably known interest in the relief requested in the Motion; (d) counsel to the Stalking Horse; (e) the office of the United States Trustee; and (f) all parties who have filed notices of appearance requesting service of notices and pleadings in this case and any party that has expressed to the Debtors an interest in a transaction with respect to the Purchased Assets (the "Core Notice Parties"). The notice and opportunity to be heard with respect to the Sale Procedures was proper, timely, adequate, and sufficient, and meets the requirements of the Bankruptcy Code and Bankruptcy Rules, is reasonably calculated to give actual notice of the relief contemplated hereby, is appropriate under the circumstances, and no further notice is required. A reasonable opportunity to object~~

1

~~or be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice.~~

  D. The approval of the Sale Procedures is in the best interest of the estates, their creditors, and other parties in interest. The Debtors' determination to propose and to agree to such provisions is within the reasonable business judgment of the Debtors. The Sale Procedures are reasonable and reasonably calculated to enhance the process of competitive bidding for, and maximize recovery with respect to, the Debtors' assets and are beneficial to the estates and creditors.

  E. It is in the best interest of the bankruptcy estate to proceed expeditiously with the proposed asset sale to best preserve and protect the value of such assets for the benefit of the estates and creditors.

  WHEREUPON, IT IS HEREBY ORDERED THAT:

  1. The relief sought in the Motion concerning the Sale Procedures is granted on the terms set forth herein. To the extent that there is any conflict between the provisions of this Order and the provisions of the Motion or the Asset Purchase Agreement, the terms of this Order shall control.

  2. The sale procedures in the form attached hereto as **Exhibit A** (the "Sale Procedures") and Notice of Sale, attached hereto as **Exhibit B**, as such Sale Procedures and notice may be amended appropriately to conform with the provisions of this Order, shall be, and hereby are, approved.

  3. Upon entry of this Order, the following notice shall be given:

    (a) The Debtors shall serve by first-class mail, postage pre-paid, by December 20, 2013: (i) this Order, the Sale Procedures, and the Notice of Sale upon the

  Core Notice Parties, and (ii) the Notice of Sale upon all other persons entitled to notice pursuant to Bankruptcy Rule 2002(a)(2);

 (b) the Debtors shall also serve by first-class mail, postage pre-paid, by December 27, 2013 a copy of this Order and the Assigned Contract Notice in the form attached hereto as **Exhibit C**, as such notice may be amended appropriately to conform with the provisions of this Order on all non-debtor parties to all executory contracts that may be assigned as a condition to, or in connection with, the closing of the Asset Purchase Agreement ("Assigned Contracts"); and

 (c) the Bond Trustee is directed to, by December 20, 2013, deliver a copy of the Notice of Sale or a notice indicating the availability of the Notice of Sale to the Depository Trust Company for delivery to holders of the Existing Bonds and cause the posting of the Notice of Sale or notice indicating the availability of the Notice of Sale to the Electronic Municipal Market Access (EMMA) service.

4. ~~The foregoing notice is calculated to provide notice of the intended sale, notice of the terms of the proposed sale and the procedures for submitting competing bids, and notice to parties in interest, including Bondholders, of the relevant objection and other deadlines associated with the sale. Notice as set forth herein provides recipients with ample notice of the relief requested, the relative impact that such relief may have on the recipient, and the procedures that a recipient must follow if such recipient wishes to respond, participate in the Auction, or otherwise object to the relief requested, as the case may be.~~

5. ~~The form and manner of notice set forth herein are reasonable and sufficient to~~

3

~~provide effective notice to all interested parties and shall be, and hereby are, approved as sufficient notice of the Sale Procedures, the Sale Hearing, the Motion, and all relief (not granted or otherwise addressed by this Order) contemplated thereby.~~

6. Pursuant to Bankruptcy Rule 9014, any party in interest that desires to object to the Motion with respect to the Break-Up Fee, Expense Reimbursement, or Minimum Overbid or sale to the Stalking Horse Bidder (collectively, the "Economic Bid Procedure Issues"), including any holder of the Revenue Bonds, shall ensure that such objection: (a) be in writing; (b) state the legal and factual basis for such objection; (c) comply with the Bankruptcy Rules and the Local Rules; (d) be filed with the Clerk of the Bankruptcy Court; and (e) be served on (i) bankruptcy counsel to the Debtors, Nixon Peabody LLP, 900 Elm Street Manchester, New Hampshire 03101, Attn: Daniel W. Sklar, Esq. and Nixon Peabody LLP, 437 Madison Avenue, New York, New York 10022, Attn: Christopher Desiderio, Esq.; (ii) counsel to Stalking Horse, Iseman, Cunningham, Riester & Hyde, LLP, 9 Thurlow Terrace, Albany, New York 12203, Attn: Robert H. Iseman, Esq.; (iii) counsel to MidCap Financial LLC, Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, TN 37219-8966, Attn: Katie G. Stenberg and; (v) counsel to the Bond Trustee, Mintz Levin Cohn Ferris Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: Daniel S. Bleck, and (vi) the other Notice Parties as set forth in the Motion (collectively, the "Service Parties") so as to be received no later than 5:00 p.m. (Prevailing Eastern Time), on January 14, 2014 (the "Objection Deadline") in the event the Debtors fail to receive a single timely and compliant Expression of Interest.

7. In the event that the Debtors receive one or more timely and compliant Expression of Interest's then the Objection Deadline to any proposed sale shall be February 11,

2014, at 5:00 p.m. (Prevailing Eastern Time). Any objection not filed and served strictly in compliance with the preceding two (2) paragraph(s) shall be overruled.

8. With respect to the Assigned Contracts, any interested party seeking to object to the assumption and assignment to the Successful Bidder or to the validity of any cure amount which is set forth in the Assigned Contract Notice, or to otherwise assert that any amounts, defaults, conditions, or pecuniary losses as of the Petition Date (including accrued but not yet due obligations) must be cured or satisfied under any of the Assigned Contracts in order for such contract to be assumed and/or assigned (collectively, a "Cure Obligation"), must file and serve an objection (a "Cure Objection") setting forth with specificity any and all Cure Obligations or conditions which such party asserts must be cured or satisfied with respect to such Assigned Contract. Each Cure Objection shall be served so that it is received by the Service Parties no later than 5:00 p.m. (Prevailing Eastern Time), on January 14, 2014 (the "Cure Objection Deadline") assuming the Debtors fail to receive a single timely and compliant Expression of Interest, *provided however*, in the event that the Debtors receive one or more timely and compliant Expression of Interest's then the, the Cure Objection Deadline shall be February 11, 2014 at 5:00 p.m. (Prevailing Eastern Time).

9. Unless a Cure Objection is filed and served by the Cure Objection Deadline, all interested parties who have received actual notice hereof shall be deemed to have waived and released any right to assert a Cure Objection, and shall be forever barred and estopped from asserting or claiming against the Debtors, the Successful Bidder, or any other assignee of the relevant assigned contract that any additional amounts are due, or that defaults exist, or that additional conditions to assignment must be satisfied.

10. Cure Objections shall set forth the cure amount or rejection damages, as

applicable that the objector asserts is due, the specific types and dates of the alleged defaults, pecuniary losses and conditions to assignment, and the support therefor and for all other objections to assumption and assignment.

11. Hearings with respect to Cure Objections may be held (a) at the Sale Hearing, or (b) at such other date as the Court may designate, provided that if the subject Assigned Contract is assumed and assigned prior to resolution of any Cure Objection, the cure amount asserted by the objecting party (or such lower amount as may be fixed by the Court) shall be deposited by Successful Bidder, pursuant to the Asset Purchase Agreement or the Modified Purchase Agreement, to be held in a segregated account maintained by the Debtors or such other person as the Court may direct pending further order of the Court or mutual agreement of the parties.

12. Any non-debtor party to any Assigned Contract that does not object to the assumption and assignment of such Assigned Contract strictly in accordance with this Order shall be deemed to have given the consent contemplated by Sections 365(c)(1)(B) and 365(f)(1) of the Bankruptcy Code to the assumption and assignment of such Assigned Contract pursuant to the Asset Purchase Agreement, upon payment of cure amounts, if any, as specified in the Assigned Contract Notice.

13. This Order shall not be deemed to have established the Cure Obligation for any Assigned Contract as to which a party thereto timely files a Cure Objection with the Court and serves such objection so as to be received by the Service Parties not later than the Cure Objection Deadline.

14. In the event no timely and compliant Expression of Interest is received by the Notice Parties, the Court shall conduct a sale hearing (the "Sale Hearing") at the United States Bankruptcy Court, 355 Main Street, Poughkeepsie, New York 12601, at 11:00 a.m. on January

21, 2014.

15. In the event a timely and compliant Expression of Interest is received by the Notice Parties, the Court shall conduct (a) a hearing with respect to the Economic Bid Procedure Issues at 11:00 a.m. on January 21, 2014 (the "Economic Bid Procedures Hearing") and (b) a Sale Hearing at 11:00 a.m. on February 18, 2014 *provided further* that (x) Qualified Bids (as to be determined at the Economic Bid Procedures Hearing) shall be due by February 10, 2013 and (y) an Auction shall be held on February 13, 2013.

16. In order for an auction to take place, at least one Potential Bidder must submit a timely and compliant Expression of Interest to the Notice Parties so as to be received by no later than January 10, 2014 at 5:00 p.m. (Eastern Prevailing Time) (the "Expression of Interest Deadline"). Thereafter, in order to bid on the Debtors' assets, a Potential Bidder must submit a Bid Package to said counsel so as to be received by no later than February 10, 2014. If no timely and compliant Expression of Interest is received on or before the Expression of Interest Deadline, the Stalking Horse shall proceed through the sale process as the Successful Bidder.

17. Each bid must comply with the Sale Procedures and include (collectively, the "Bid Package"): (i) a written and signed irrevocable offer stating that (x) the bidder offers to consummate a sale transaction on terms and conditions no less favorable than in the Asset Purchase Agreement and in an amount at least equal to the Minimum Bid (as defined below), (y) confirming that the bid will remain irrevocable until the earlier of (i) sixty (60) days following entry of the final Sale Order (as defined below), and (ii) closing with the Successful Bidder and (z) that the Bidder has had the opportunity to conduct due diligence prior to its offer and does not require further due diligence, has relied solely upon its own independent review and investigation and did not rely on any written or oral representation except as expressly

7

provided in the Modified Purchase Agreement (as defined below); (ii) an executed copy of the Asset Purchase Agreement as modified by the bidder in accordance with its bid (the "Modified Purchase Agreement"); and (iii) an electronic markup clearly showing the revisions in the Modified Purchase Agreement to the Asset Purchase Agreement. The Debtors shall determine, in consultation with the Bond Trustee and any Committee, whether any Modified Purchase Agreement that modifies the Asset Purchase Agreement in any respect beyond the identity of the purchaser and the purchase price under the Agreement is a Qualified Bid.

18. The amount of the purchase price in such bid must provide for net cash (or cash equivalent as determined by the Debtors in consultation with the Bond Trustee and any Committee but otherwise in their sole discretion) that is at least in the amount of: $24,150,000, plus the amount of the Break-Up Fee plus the maximum amount of the Expense Reimbursement Fee, plus $200,000.00 (collectively, the "Minimum Overbid").[3]

19. The Bid Package must contain such financial and other information, including but not limited to financial statements, that will allow the Debtors in consultation with the Bond Trustee and any Committee to make a determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Purchase Agreement, including any proposed conditions to Closing and adequate assurance of such bidder's ability to perform under any Assigned Contracts (and to pay all cure amounts required to assume and assign any such Assigned Contracts).

20. The bid must not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment.

---

[3] For the purposes of clarity, the Economic Bid Procedures Issues have not been approved by the Court at this time. In the event, a timely and compliant Expression of Interest is received, the Court will consider such issues at the Economic Bid Procedures Hearing on January 21, 2014 at 11:00 a.m.

21. Each Potential Bidder must fully disclose the identity of each entity that will be bidding for the Purchased Assets, as well as disclose the organization, form and the business conducted by each entity and what, if any, connection the Potential Bidder has with the Debtors. Potential Bidders shall be required to provide such additional information as the Debtors may require regarding a bidder's ability to satisfy the requirements of the transaction contemplated by the Modified Purchase Agreement.

22. With the exception of the contingencies listed in section 9.2 of the Asset Purchase Agreement, the bid must not contain any contingencies of any kind, including, among others, obtaining (i) financing; (ii) shareholder, board of directors or other approval; or (iii) the outcome or completion of due diligence but excluding state or federal regulatory approvals. Each Potential Bidder must also affirmatively acknowledge that the Potential Bidder (i) had an opportunity to conduct due diligence regarding the Purchased Assets prior to making its offer and does not require further due diligence, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Purchased Assets in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith except as expressly stated in these Sale Procedures.

23. Each Potential Bidder must represent that it obtained all necessary organizational (not regulatory) approvals to make its competing bid and to enter into and perform the Modified Purchase Agreement.

24. A Potential Bidder must deposit an amount equal to the Deposit described in section 3.2 of the Asset Purchase Agreement with the Debtors in the form of a certified check or

wire transfer on or before the Bid Deadline. The Potential Bidder or the Backup Bidder (as defined below) shall forfeit the Deposit if (i) the Potential Bidder or Backup Bidder is determined to be a Qualified Bidder and withdraws or modifies its bid other than as provided herein before the Bankruptcy Court approves the Debtors' selection of the Successful Bidder, or (ii) the bidder is a Successful Bidder (defined below) and (x) modifies or withdraws the bid without the Debtors' consent before the consummation of the sale contemplated by the bid, or (y) breaches any of the terms of the Modified Purchase Agreement. The Deposit shall be returned to each bidder (i) as soon as practicable if the bidder is not determined to be a Qualified Bidder or the Backup Bidder (ii) no later than five (5) business days after entry of the Sale Order if the bidder is a Qualified Bidder (who has not otherwise forfeited its Deposit) but is not the Successful Bidder or the Backup Bidder, provided, however, in the event the Stalking Horse is not the Successful Bidder, its Deposit shall be returned to it promptly upon termination of the Asset Purchase Agreement but in no event later than five (5) business days from such termination. The Debtors will maintain any Deposit in a non-interest bearing Debtor account.

25. Any Modified Purchase Agreement must provide that the Sale will be on an "as is, where is" basis and without representations or warranties of any kind except and solely to the extent expressly set forth in the Modified Purchase Agreement of the Successful Bidder. Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its bid and that it has relied solely upon its own independent review and investigation in making its bid.

26. The Debtors will have the right, in consultation with the Bond Trustee and any Committee, but otherwise in their sole discretion, to determine that a bid is not a Qualified Bid if the terms of the bid are more burdensome or conditional than the terms of the Asset Purchase

Agreement and are not offset by a material increase in purchase price, which determination may take into consideration: (1) whether the bid requires any indemnification of such Qualified Bidder; (2) whether the bid does not provide sufficient cash consideration to repay all amounts owed under any debtor-in-possession financing agreement, reserve for post-closing accrued administrative expenses, pay transfer taxes, cure costs or other cash costs of the transaction (including accrued professional fees, the Breakup Fee, and the Expense Reimbursement Fee) (each bid must include sufficient cash consideration to fully fund (i) the cash amounts necessary to retire the debtor in possession financing at closing, (ii) any required administrative expense payments pursuant to a feasible plan of liquidation or reorganization, and (iii) any necessary and actual reserve amounts for wind down costs, pursuant to a wind down budget agreed to by the Bond Trustee and Seller that would not be otherwise satisfied by assets of the estates, in accordance with a feasible plan of liquidation or reorganization.); (3) whether the bid includes a non-cash instrument or similar consideration that is not freely marketable or is of a materially lower credit quality than the non-cash consideration being proposed under the Asset Purchase Agreement; or (4) any other factors the Debtors may deem relevant.  For avoidance of doubt, the Stalking Horse Bid pursuant to the Asset Purchase Agreement is deemed a Qualified Bid, and the Stalking Horse is deemed a Qualified Bidder.

27.     Bidding at the Auction shall start at the purchase price stated in the highest or otherwise best Qualified Bid, as determined by the Debtors, in consultation with the Bond Trustee and any Committee, but otherwise in their sole discretion, and as announced to all Qualified Bidders before the commencement of the Auction.  For this purpose, Stalking Horse will have added to its bid the amount of the Break-Up Fee and the Expense Reimbursement Fee. Subsequent bidding may be by open cry auction or by sealed bid, as may be determined by the

11

Debtors in their sole discretion and in consultation with their advisors. At the Auction, Qualified Bidders may increase their bids in increments of not less than $100,000.

28. At the conclusion of the Auction, if any, the Debtors will after consultation with the Bond Trustee and any Committee announce the highest or best Qualified Bid (the "Successful Bid") and the party submitting the Successful Bid shall be the "Successful Bidder."

29. At the conclusion of the Auction, the Debtors will also after consultation with the Bond Trustee and any Committee announce the second highest or otherwise best bid from among the Qualified Bids submitted at the Auction (the "Backup Bid"). The bidder submitting such Backup Bid shall become the "Backup Bidder," and subject to the rights of the Successful Bidder, shall have such rights and responsibilities of the Stalking Horse, as set forth in the Modified Purchase Agreement or the Asset Purchase Agreement, as applicable.

30. The Backup Bid shall remain open and irrevocable until the earlier of (x) sixty (60) days following entry of the Sale Order and (y) closing of the Sale, provided, however, if the Stalking Horse's bid is deemed the Backup Bid, the Stalking Horse's rights and obligations with respect to such bid shall be subject to the terms of the Asset Purchase Agreement.

31. All Bid Deposits shall be held by the Debtors in a trust account, and to the extent it does earn interest, all such interest shall accrue to the benefit of the party submitting the Proposed Bid. Within five (5) business days of the Auction, Bid Deposits (and, in the case of the Stalking Horse, the Deposit) shall be returned to the bidders, except the bidder that is selected as the Successful Bidder or the Backup Bidder. The Successful Bidder's Bid Deposit shall be held until the closing on the sale of the Purchased Assets and applied in accordance with the terms of the Successful Bidder's accepted bid. The Backup Bidder's Deposit will be returned by the Debtors upon consummation of the Sale of the Acquired Assets to the

Successful Bidder or will be otherwise applied in accordance with the terms of the Backup Bidder's bid or forfeited as provided for herein.

33. <u>Schedule 1</u> annexed hereto contains a summary of the Sale Procedures set forth herein which is fully incorporated herein by reference.

33. The Debtors are authorized and empowered to take or perform such actions and expend such funds as may be necessary to effectuate the terms of this Sale Procedures Order.

SO ORDERED.

No Objection:
/s/ Eric J. Small, Esq.
Eric J. Small, Esq.
United States Trustee's Office
Region 2



**Dated: December 19, 2013**
    **Poughkeepsie, New York**

**/s/ Cecelia G. Morris**
_____
**Hon. Cecelia G. Morris**
**Chief U.S. Bankruptcy Judge**