NIXON PEABODY LLP  
Daniel W. Sklar  
Lee Harrington  
Christopher M. Desiderio  
437 Madison Avenue  
New York, NY 10022  
Telephone: (212) 940-3000  
Facsimile: (212) 940-3111  

*Counsel to the Debtors*  
*and Debtors in Possession*

Hearing Date: February 18, 2014 at 11:00 a.m.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
: 
In re: : Chapter 11
: 
ST. FRANCIS' HOSPITAL, : Case No. 13-37725 (CGM)
POUGHKEEPSIE, NEW YORK, *et al.*,[1] :
: (Jointly Administered)
Debtors. :
---------------------------------------------------------------x

**DEBTORS' (I) NOTICE OF CANCELLATION OF AUCTION AND (II) SUPPLEMENT TO MOTION FOR ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS; AND (C) GRANTING OTHER RELATED RELIEF**

TO THE HONORABLE CECELIA G. MORRIS:

St. Francis' Hospital, Poughkeepsie, New York ("St. Francis") and its affiliated debtors, as debtors in possession (collectively, the "Debtors"), respectfully supplement (the "Supplement") their motion (the "Motion") for entry an order pursuant to 11 U.S.C. §§ 105, 363, and 365 (A) authorizing and approving bid procedures in connection with the proposed

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number include: St. Francis' Hospital, Poughkeepsie, New York (8503), Saint Francis Home Care Services Corporation (3842), SFH Ventures, Inc. (0024), Saint Francis Health Care Foundation, Inc. (5066), and Saint Francis Hospital Preschool Program (1079).

1

sale of substantially all of the Debtors' assets, (B) authorizing the sale of those assets free and clear of all liens, claims, encumbrances and other interests, (C) authorizing the assumption and assignment of certain contracts and establishing procedures to determine cure amounts and establishing deadlines for objections for certain contracts and leases to be assumed and assigned by the Debtors, (D) scheduling a hearing on the proposed sale of those assets, and (E) granting related relief [Dkt. No 18] as set forth more fully below.[2] In further support of the Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      For the reasons more fully set forth below, the Debtors give notice that the Auction scheduled for February 13, 2014 is cancelled and that the Debtors intend to seek the approval of a sale of substantially all of their assets to Westchester Country Health Care Corporation (or its Designee) ("WMC") pursuant to that certain Asset Purchase Agreement dated as of February 10, 2014 (the "WMC APA") at the Sale Hearing scheduled for February 18, 2014.

2.      As more fully described herein, the terms of the WMC APA are substantially and materially better than those provided for in the Stalking Horse APA for all parties in interest.  Moreover, the Stalking Horse could not provide any bid which would be both higher and better then the WMC APA because of substantial closing risks associated with a transaction with the Stalking Horse.  In light of the regulatory hurdles to approve a sale to the Stalking Horse arising from the existence of an alternative bid, the Debtors determined that it would be in the best interests of the Debtors' estates and their creditors to negotiate an arm's-length sale

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2

of the Debtors' businesses to WMC, rather than take the risks that described below that are inherent in an Auction process wherein the Stalking Horse is a participant.

3.      Importantly, based upon conversations with both the Federal Trade Commission and the New York State Office of the Attorney General (collectively, the "Regulators") it is apparent to the Debtors and their professionals that the Stalking Horse would either never be permitted to close a sale with the Debtors, or would face significant difficulties in doing so, in light of the fact that the Debtors received a bid for the Purchased Assets from a party other than the Stalking Horse.  In light of these obstacles, the Debtors determined that accepting the WMC APA as the "highest and best" offer for the Purchased Assets absent an auction was appropriate, and indeed necessary.  Further, the prospect of holding a "sham" auction between two bidders (one of whom, in the Debtors' opinion, could not obtain the requisite regulatory approvals – i.e. the Stalking Horse) would be a tremendous waste of time and estate resources.

4.      For the reasons set forth herein, the Debtors request that the Court enter an order approving a sale of the Purchased Assets to WMC pursuant to the WMC APA at the Sale Hearing.

## BACKGROUND

### Procedural Background

5.      On December 17, 2014 (the "Petition Date"), the Debtors commenced voluntary cases (the "Bankruptcy Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3

6. On the Petition Date, the Debtors filed their Motion, seeking, among other things, the approval of the Stalking Horse Bid and bidding and sale procedures in connection with the sale of the Purchased Assets.

7. On December 19, 2014, this Court entered its Order Authorizing and Approving Sale Procedures in Connection with Proposed Sale of Substantially All of the Debtors' Assets and Granting Other Related Relief (the "Sale Procedures Order") [Dkt. No. 36].

8. Pursuant to the Sale Procedures Order, the Court established certain deadlines for the sale process. Among other things, the Sale Procedures Order provided that if an "Expression of Interest" (as defined in the Sale Procedures Order) was received by the Debtors by January 10, 2014 an extended sales process would be set in to motion.

9. Upon the receipt of an Expression of Interest, parties would have until February 10, 2014 (the "Bid Deadline") to submit Qualified Bids to the Debtors. The Sale Order provided that if one or more Qualified Bids were received by the Debtors by the Bid Deadline an auction would be held on February 13, 2014. Moreover, the Sale Procedures Order scheduled a Sale Hearing for February 18, 2014.

10. On February 5, 2014, the Court entered its Supplemental Order Authorizing and Approving Sale Procedures in Connection with Proposed Sale of Substantially all of the Debtors' Assets and Granting Other Related Relief (the "Supplemental Sale Order") [Dkt. No. 234]. Pursuant to the Supplemental Sale Order, the Court approved a $1,000,000.00 Break-Up Fee and Expense Reimbursement (in the aggregate) for the Stalking Horse.

**The Sale Process**

11.   On January 9th and 10th, the Debtors received three (3) Expressions of Interest. *See* Notices of Receipt of Expressions of Interest [Dkt. Nos. 104 and 111]. More particularly, WMC submitted a timely and compliant Expression of Interest.[3]

12.   On January 29, 2014, the Debtors published a notice of the bankruptcy and sale in the Wall Street Journal. *See* Affidavit of Publication [Dkt. No. 213]. On January 30, 2014, the Debtors published the same notice in USA Today. *See* Affidavit of Publication [Dkt. No. 228]. Moreover, notices were published in Beckers Hospital Review and Modern Healthcare on January 31, 2014 and February 3, 2014, respectively. The Debtors did not receive any inquires relating to any of these notices.

13.   Upon the receipt of the Expressions of Interest, the Debtors worked diligently to provide due diligence to various parties. In fact, after the submission of the Expressions of Interest several other parties approached the Debtors and conducted due diligence with respect to parts of the Debtors' assets (relating to the home health care and preschool lines of business). Other than WMC and the Stalking Horse, however, no other party expressed interest in purchasing all of the Purchased Assets.

14.   After extensive marketing efforts by the Debtors and their advisors, prior to the Bid Deadline, the Debtors received a Qualified Bid by WMC. The Debtors did not receive any other Qualified Bids or any non-qualifying bids.

---

[3]   The remaining two Expressions of Interest were submitted by parties who stated they were only interested in the Debtors' assets related to their home health care line of business. Whether or not these Expressions of Interest, on their own, would have been considered both timely and compliant by the Debtors was rendered moot by the submission of WMC's Expression of Interest as only a single Expression of Interest was necessary to trigger the extended sale procedures under the Sale Procedures Order. However, these additional Expressions of Interest were filed in order to give notice of the known parties who would be potentially interested in bidding on all, or part of, the Debtors' assets.

5

## The WMC APA

15.     Since the inception of the Bankruptcy Cases, the Regulators have been in frequent contact with the Debtors, as well as with parties potentially interested in submitting a bid.  As discussed in detail below, during the course of discussions with the Regulators, it became apparent that there was a significant risk that the Stalking Horse would be unable to close on any offer it made, regardless of the purchase price.  Such obstacles became evident to WMC as well and, as a result WMC informed the Debtors that it intended to submit only the Minimum Overbid at the Auction, and that it would not add any further consideration during the auction because it believed that the Debtors would determine, under their business judgment, that any bid submitted by WMC would be "better" than the Stalking Horse's bid, regardless of whether or not it was higher.

16.     Receiving only a Minimum Overbid would have had a devastating impact on the Debtors' estates because, for the reasons cited below, it was not clear to the Debtors that the Stalking Horse could ever provide a "higher and better" offer than WMC at the Auction and therefore, there was no viability for a competitive auction process.  Accordingly, the Debtors and WMC began negotiations for an arm's length sale to WMC, and such negotiations resulted in the bid contained in the WMC APA.

17.     The Debtors and WMC entered into the APA, a true and correct copy of which is attached as **Exhibit A**.  The APA contemplates the sale of substantially all of the Debtors' assets (collectively, the "Purchased Assets").

6

18. The Debtors view this offer as materially better than the Stalking Horse Asset Purchase Agreement in all respects. Specifically, on a side by side comparison the two offers provide:[4]

|  | HealthQuest | Westchester Medical Center |
|---|---|---|
| **Direct Consideration** | <ul><li>Assumed Liabilities <u>plus</u></li><li>Additional Consideration<ul><li>Cash of $18,620,000 **OR**</li><li>Exchange Bonds (2 options)<ul><li>$22,150,000 @ 4.00 % **OR**</li><li>$19,150,000 @ 5.25 %</li></ul></li><li>Issuance and rating costs to be paid by the Seller</li></ul></li></ul> | <ul><li>Assumed Liabilities plus</li><li>Cash<ul><li>$3,500,000 at closing to cover break-up fee ($1,000,000) and Administrative Costs ($2,500,000)</li></ul></li><li>Exchange Bonds<ul><li>$27,352,000 @ 5.00%</li><li>Issuance and rating costs to be paid by the Buyer</li><li>The Exchange Bond Obligations shall constitute full satisfaction and discharge of all of the Debtors' obligations under the Existing Bonds and the Bond Documents, and neither the Bond Trustee nor any holder of the Existing Bonds shall have any remaining claims against the Debtors or the bankruptcy estates, including, but not limited to, any deficiency claims arising from any difference between the face amount of the Existing Bonds and the beginning principal amount of the Exchange Bond Obligations</li><li>All adequate protection payments made to the Bond Trustee pursuant during the Bankruptcy Cases (which will aggregate over $1.3M) and the $1.3M operating reserve fund replenishment shall have been transferred, in full, to the Debtors' estates</li></ul></li></ul> |
| **Cure Cost** | <ul><li>Coverage for Cure Costs capped at $2,000,000<ul><li>$1,500,000 cap for capital leases</li><li>$500,000 cap for all other contracts and agreements; If Cure Costs are less than $500,000, that amount less than $500,000 shall be paid as additional consideration</li></ul></li><li>Consideration will be reduced up to $500,000 for Cure Costs above the $500,000 estimate</li></ul> | <ul><li>Coverage for Cure Costs capped at $8,000,000<ul><li>If Cure Costs are less than $2,000,000, the difference between the $2,000,000 minimum and the actual Cure Costs will be added to the Cash Consideration</li><li>If Cure Costs exceed $8,000,000, the amount above $8,000,000 will be paid by the estate</li></ul></li></ul> |

---

[4] This summary is intended solely as an overview of the terms of the WMC APA. In the event of any inconsistency between the summary provided herein and the actual provisions of the Asset Purchase Agreement, the terms of the WMC APA shall control.

7

| | | |
|---|---|---|
| **Assumed Liabilities** | • All liabilities for contracts and leases assumed, beginning on or after the closing date.<br>• Pre-closing obligations covered as part of Cure Costs<br>• Assumed leases and contracts exclude Dell, Meditech, and significant portions of the Atrium and MAP | • All liabilities relating to Assumed Contracts and Assumed Leases, which obligations accrue (or arise form events occurring) on or after the Closing Date.<br>• Pre-closing obligations covered as part of Cure Costs<br>• All obligations and Liabilities assumed by Buyer pursuant to the Government Payor Contingent Liability Assumption Documents |
| **Excluded Assets** | • Accounts Receivable | • Accounts Receivable<br>• SFH interest (85.5%) in Hudson Valley Center<br>• Certain owned real estate:<br>  • 42/40 West Cedar St.<br>  • 50 West Cedar St.<br>  • 3 medical office condos located at 243 North Rd. (Condos 1A, 1B & 1C) |
| **Labor** | • HQ to hire SFH employees at their discretion<br>• No commitment to organized labor | • Commitment to hire at Closing full complement of SFH staff<br>• Commitment to negotiate in good faith with Local 1199 SEIU<br>• Employees get credit for unused PTO<br>  • Up to WMC current limit<br>  • Limited cash out options |
| **Maintenance of Services** | • "Clinical Realignment" plan gives HQ full discretion to move services<br>• Stated plan to move Level II trauma center to Vassar Brothers<br>• Possible relocation of services from Vassar Brothers to SFH<br>• Continued support for behavioral services at SFH | • Commitment to maintain as many services as possible at SFH campus<br>• WMC has expressed intent to retain inpatient psychiatric beds and emergency mental health services, chemical dependency and detox, Level II Trauma emergency services on the Saint Francis campus itself and pre-school and early intervention in the local community where it currently exists; the goal is to add services to the Saint Francis campus, giving the best opportunity for additional growth in the local community |
| **Additional Unquantified Benefits** | | • Significantly reduces costs the estate will incur to secure Exit Financing and Wind Down services<br>• Exit Financing and Wind Down services provided at bleow-market rates<br>• Management support to improve operations during pre-closing period |

8

| | | |
|---|---|---|
| **Exit Financing** | • If Exit Financing has not been arranged before closing, HQ will shift Additional Consideration from bonds to cash, up to the limits of the Cash amount ($18,620,000), with any funds applied to Administrative Costs or Exit Financing to be deducted from the Additional Consideration paid to SFH | • WMC will loan or arrange for the loan of funds to retire the DIP at closing, up to a limit of $17,600,000, secured by the Accounts Receivable<br>  • Any DIP obligation in excess of $17,600,000 will be paid by the estate<br>  • Rate = LIBOR plus 600 basis points<br>• WMC will provide a loan in the amount of $250,000 as a "Final Payment" on Bonds to be used to initially capitalize the liquidating trust of the Estate<br>  • Financed with Accounts Receivable collections<br>  • Added to Exit Loan<br>• WMC or lender will be paid origination fee of $400,000, to be added to the Exit Loan amount, and paid with the first dollars collected from the Accounts Receivable. |
| **Regulatory Issues** | • FTC is investigating the HQ bid for SFH and has express the potential for action forcing divestiture or rescission if HQ prevails. | • Based upon preliminary review, the Regulators would support approval of the WMC acquisition of SFH |
| **Wind Down Process** | • HQ makes no provisions for assistance in the winding down process | • Along with providing Exit Financing to retire the DIP loan, WMC will collect, or assist SFH personnel in the collection of the Accounts Receivable, the proceeds from which will be used to pay off the Exit Financing.<br>• WMC has provided a management services agreement (MSA) to provide support up through the closing date<br>• WMC has provided a transition services agreement (TSA) to perform certain post closing functions such as final payroll, final cost reports, etc. |

19.    Importantly, WMC has advised the Debtors that they have every intent to retain inpatient psychiatric beds and emergency mental health services, chemical dependency and detox, Level II Trauma emergency services on the Saint Francis campus itself and pre-school and early intervention in the local community where it currently exists. The goal is to add services to the Saint Francis campus, giving the best opportunity for additional growth in the local community. This pledge has a tremendous benefit to the Dutchess County community as it will ensure the continuity of services at the Saint Francis campus, with minimal disruption.

9

20. In addition, as noted above, WMC has agreed to provide a comprehensive management services agreement, as an independent contractor for the Debtors, to provide oversight, support, advice and additional resources to supplement those areas of the Debtors' business functions which require remediation including but not limited to IT systems, revenue cycle, and patient accounting areas. In concert with the existing management and local board of directors, who shall retain final legal authority over business and clinical matters, the Debtors believe this is essential in turning the business office operations around to reduce the cash burn until the closing, further inuring to the benefit of the Debtors' creditor constituencies.

21. Each of these items help provide a clear strategy and path to emerging from Chapter 11, none of which were available under the Stalking Horse Asset Purchase Agreement.

## Cancelation of the Auction

22. As referenced above, prior to the Petition Date, and throughout the entire sale process, the Debtors have been in regular contact with the Regulators and other authorities (such as the New York Department of Health and New York Charities Bureau) that must give their approval of any transaction for the Debtors' assets.

23. Throughout the Debtors' discussions with the Regulators, the Regulators expressed deep concern about the potential anti-competitive and monopoly implications if the Stalking Horse Bidder were the ultimate purchaser of the Debtors' assets. *See e.g.* Nov. 12, 2013 email from Susan Raitt to Peter Millock annexed hereto as **Exhibit B.**

24. In fact, the Debtors and the Stalking Horse Bidder were previously parties to a transaction that was broken up by the New York State Office of the Attorney General in 2000 due to antitrust violations. As a result, both the Debtors and the Stalking Horse were required to pay New York State approximately $500,000 and forced to unwind the transaction that was

10

proposed at the time. *See State of New York v. Saint Francis Hospital et al.*, Stipulated Motion of the State, Saint Francis Hospital, Vassar Brothers Hospital, and Mid-Hudson Health in Support of the Final Consent Judgment (S.D.N.Y. June 29, 2000), annexed hereto as **Exhibit C**. Much of the personnel at the Regulators who will be reviewing the sale of the Debtors' assets consist of the <u>very same people</u> that reviewed the previous transaction.

25. In order to address these concerns (which were shared by both the Debtors and the Stalking Horse themselves) and in order to get some assurance that the Stalking Horse Bidder could close a transaction, the Stalking Horse Bidder requested confirmation from the Regulators that in the event the Stalking Horse Bidder <u>was the only</u> bidder on the Debtors' assets, the Regulators would allow the Stalking Horse Bidder to assert the "flailing and failing" business doctrine which would except the Stalking Horse Bidders' purchase from the anti-trust review of the of the Regulators. Copies of these emails are annexed hereto as **Exhibit D**. As made apparent by these emails, the Regulators would only accept this defense in the event that the Stalking Horse Bidder was in fact the <u>only</u> bidder.

26. This is no longer the case in light of the WMC APA, and therefore, this defense is no longer available to the Stalking Horse if any transaction with the Stalking Horse were to be reviewed by the Regulators.

27. When the Debtors became aware the WMC was likely to submit a bid, the Debtors asked the Regulators whether they would approve a sale to the Stalking Horse if WMC submitted a bid. The Federal Trade Commission expressed concern about the Stalking Horse's ability to receive regulatory approval in light of WMC's bid. *See* February 10, 2014 letter from Susan E. Raitt to Peter Millock annexed hereto as **Exhibit E**. In addition, the Federal Trade Commission has served the Debtors and the Stalking Horse with information requests related to

the transaction. This confirms the Debtors understanding of the Regulators' perspective based on almost weekly meetings regarding the sale process.

28. If the Debtors were to select the Stalking Horse's offer at an Auction, the Debtors would be assuming an enormous risk that a transaction could not close due to the Regulators' concerns. If either Regulator blocked the Stalking Horse from closing the transaction, it would likely mean that the Debtors would have to close their doors as a result of the tremendous cash burn and no other alternative buyer would be available at that time.[5] Accordingly, if the Stalking Horse failed to obtain the necessary regulatory approvals the Debtors would be forced to convert these cases to ones under chapter 7 and cease its operations under a plan of closure. This would be a catastrophe not only for the Debtors' creditors, but also for entire the Hudson Valley community which receives services from the Debtors.

29. As a result of the Regulators' concerns and the extreme downside risk in accepting an offer by the Stalking Horse in light of the availability of a superior alternative transaction, the Debtors do not believe that the Stalking Horse could close a transaction no matter the amount or terms of their ultimate bid. In other words, although the Stalking Horse could have conceivably offered a "higher" bid in pure economic terms, it could never have been declared the "better" bid because of the serious regulatory concerns and closing risk that such offer would entail when compared to WMC's offer.

30. In addition to the Regulators' concerns regarding anti-trust issues, the Debtors have other concerns with respect to the Stalking Horse's ability to close which are squarely addressed and rectified by the WMC APA. First, under the Stalking Horse Asset Purchase

---

[5] In connection with the Auction process, WMC requested that the requirement that it agrees to be appointed as a "Back-Up Bidder" be waived due to its concerns about the Stalking Horse Bidder's ability to close and the potential deterioration of the Debtors assets that would occur during the time between the Sale Hearing and when the Stalking Horse was denied regulatory approval to close.

Agreement, the Stalking Horse will not assume Medicaid and Medicare liabilities. Based on the Debtors' professionals' experience, this could be a significant roadblock to closing in a timely manner. In the Debtors estimation, WMC's assumption of Medicaid and Medicare liability provides a more clean, clear and consistent path for additional regulatory approvals.

31. Second, the Stalking Horse Asset Purchase Agreement anticipates a "clinical realignment." The Debtors have still not been provided with a clear answer as what this means for the Saint Francis campus, its employees, or its patients. In comparison, WMC's retention of essentially all programs and services on the Saint Francis campus provides a more clean, clear and consistent path for additional regulatory approvals.

32. Third, WMC as part of its current operations (i) has an extensive mental health program (ii) is designated as a Level I Trauma Center, and (iii) has been working with a specialized mental health consultant and has extensive regulatory familiarity with ACS Trauma designation. Accordingly, it appears that WMC already has extensive familiarity with emergency and inpatient psychiatric care, including adolescent psychiatric care and trauma services facilitates the closing, transition and continuity of services in the local community on the SFH campus. Each of these factors not only indicate that the WMC APA is superior to the Stalking Horse APA, but also solidify the Debtors' belief that there is significantly less closing risk in a transaction with WMC then the Stalking Horse.

33. Further, no other bids for substantially all of the Debtors' assets were submitted by the Bid Deadline and therefore, the Debtors cannot hold an auction with a true competitive bidding process. As such, it would be a waste of estate resources to hold an Auction (with the attendance of numerous estate professionals) when the Debtors could not accept a bid from the Stalking Horse and no other viable alternative bidder exists. When faced with this dilemma, the

Debtors had no option but accept the WMC APA (which is materially better than the Stalking Horse Asset Purchase Agreement in all respects), cancel the auction, and proceed with the Sale Hearing. Accordingly, the Debtors, in their business judgment, canceled the Auction.

### RELIEF REQUESTED

34. By this Supplement, the Debtors request an order substantially in the form of the order attached hereto as (the "Sale Order") (i) canceling the Auction, (ii) approving a sale to WMC, (iii) approving the WMC APA, (iii) authorizing the Debtors (a) to sell the Purchased Assets, free and clear of all liens, claims, encumbrances, and interests (other than certain specified assumed liabilities), and (b) to establish further procedures to assume and assign to WMC certain executory contracts associated with the Debtors' business (the "Assigned Contracts"); and (iv) granting related and ancillary relief.

### THE COURT SHOULD APPROVE THE SALE OF SUBSTANIALLY ALL OF THE DEBTORS' ASSETS AND GRANT RELATED RELIEF

40. Section 363 (b)(1) of the Bankruptcy Code provides that "[a debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Moreover, section 105(a) of the Bankruptcy Code provides that bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). At the Sale Hearing, the Debtors will request that the Court approve the WMC APA.

41. The proposed Sale pursuant to the WMC APA is supported by sound business justifications and, at the Sale Hearing, should be approved. For the reasons set forth above the WMC APA is significantly superior to the Stalking Horse Asset Purchase Agreement and the fact that the Debtors could not accept an offer from the Stalking Horse in light of the WMC bid

14

because of well-founded concerns regarding the Stalking Horse's inability to close the sale the Court should approve the sale to WMC without an Auction.

42.     The Debtors otherwise fully incorporate herein by reference the arguments presented in the Motion with respect to the approval of the WMC APA.

### THE COURT SHOULD APPROVE AMENDED PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS

43.     The WMC APA contemplates the assumption by the Debtors and assignment by the Debtors to WMC of certain executory contracts and unexpired leases.  As the Debtors are seeking to assign contracts to WMC instead of the Stalking Horse, the Debtors believe it is necessary to revise the assumption procedures set forth in the Sale Procedures Order in order to provide contract counterparties adequate notice and opportunity to be heard with respect to the assumption and assignment of the Assumed Contracts.

44.     On December 27, 2013, the Debtors sent cure notices to their contract counterparties.  In accordance with the Sale Procedures Order, the Debtors provided, among other things:

> PLEASE TAKE FURTHER NOTICE that objections, if any, to the potential proposed assumption and assignment of any Proposed Assigned Contract to the Stalking Horse, or to the validity of the cure amount determined by the Debtors, as set forth on Exhibit A hereto, or to otherwise assert that any additional amounts, defaults, conditions, or pecuniary losses must be cured or satisfied under any of the Proposed Assigned Contracts, in order for such contract to be assumed and/or assigned (a "Cure Objection") must (a) be in writing; (b) state the legal and factual basis for such objection; (c) comply with the Bankruptcy Rules and the Local Rules; (d) be filed with the Clerk of the Bankruptcy Court; and (e) be served on (i) bankruptcy counsel to the Debtors, Nixon Peabody LLP, 900 Elm Street Manchester, New Hampshire 03101, Attn: Daniel W. Sklar, Esq. and Nixon Peabody LLP, 437 Madison Avenue, New York, New York 10022, Attn: Christopher Desiderio, Esq.; (ii) counsel to Stalking Horse, Iseman, Cunningham, Riester & Hyde, LLP, 9 Thurlow Terrace, Albany, New York 12203, Attn: Robert H. Iseman, Esq.; and (iii) the Notice Parties as set forth in the Motion (collectively, the "Service Parties"), so as to be received no later than 5:00 p.m. (Prevailing Eastern Time), on February 11, 2014.

45. As a result, the Debtors submit that any parties that received a Cure Notice and failed to file a Cure Objection by the objection deadline be bound by the Cure Amount set forth in the applicable Cure Notice which was sent out in December 2013. However, the Debtors seek to implement addition notice and objection procedures that would be applicable to the extent (i) WMC seeks to assume any contracts with counterparties that did not receive a Cure Notice, (ii) the Debtors believe a cure amount is actually lower than that originally noticed in the Cure Notice as a result of its records reconciliation done in connection with preparing their Schedules of Statements of Financial Affairs, or (iii) any contract counterparty seeks to object to the assumption and assignment to WMC on grounds other than (a) those relating to the validity of the cure amount asserted in the Cure Notice, and (b) any other assertions that additional amounts, defaults, conditions, or pecuniary losses must be cured or satisfied. In addition, the Debtors will adjourn the hearing on any Cure Objections which are asserted by February 11, 2014 until the omnibus hearing scheduled for **April 30, 2014 at 11:00 a.m**.

46. The Debtors propose that they shall file a schedule (the "Assumption Schedule") of the contracts to be assumed and assigned by the Debtors (the "Assigned Contracts") with the Court no later than March 28, 2014, and shall concurrently serve notice of such schedule upon all counterparties to the Assigned Contracts and the Notice Parties. The Assumption Schedule shall identify the proposed Assigned Contracts and the corresponding Cure Amounts required by section 365 of the Bankruptcy Code, if any, to the extent such Cure Amounts have not been previously provided or have, since the prior notice, been amended to be lower than the previously provided amount. All non-Debtor parties to the Assigned Contracts shall have thirty (30) days after service of the Assumption Schedule to file an objection (an "Assumption Objection") to the assumption and assignment of the Assigned Contracts listed on the

16

Assumption Schedule to which they are parties, and/or to the Cure Amounts listed for those Assigned Contracts provided that they had not been previously provided adequate notice of their Cure Amount. Any party filing an Assumption Objection shall state with specificity the basis of the objection and what Cure Amount it asserts if it disputes the listed Cure Amount, and shall include appropriate documentation in support thereof.

47. The Debtors, with the consent of WMC, shall have the right to amend the Assumption Schedule up to five (5) days before the Closing of the Sale to add additional Assigned Contracts thereto. The Debtors shall file and serve notice of any such amendment (an "Amendment Notice") on all non-Debtor parties to the Assigned Contracts added to or removed from the Assumption Schedule by that amendment. All non-Debtor parties to the Assigned Contracts added to the Assumption Schedule pursuant to this paragraph shall have until fifteen (15) days after the date of service of the applicable Amendment Notice to file an Assumption.

48. If an Assumption Objection is timely filed and not consensually resolved, this Court may hold a hearing with respect to such Assumption Objection April 30, 2014 Omnibus Hearing or at such other date as this Court shall designate (the "Assumption Hearing"). If an Assumption Objection relates only to the Cure Amount of an Assigned Contract, that Assigned Contract may be assumed by the Debtors and assigned to WMC, provided, however, that the amount asserted by the objecting party as the proper Cure Amount, or a different amount set by this Court, shall be either (i) be deposited by WMC into an escrow account held by the Debtors to the extent the total cure obligations do not exceed the Cure Cap or (ii) be withheld from the Purchase and held in escrow for any Cure Amounts which exceed the Cure Cap and in either instance pending further order of this Court or mutual agreement of the parties as to the proper

Cure Amount for that Assigned Contract. WMC, with the consent of the Debtors,[6] is hereby authorized to settle, compromise, or otherwise resolve any disputed Cure Amounts with the relevant non-Debtor party to any Assigned Contract without Court approval or notice to any party.

49.     If no Assumption Objection is timely filed and served, the non-Debtor party to such Assigned Contract will be deemed to have consented to its assumption and assignment as provided to the WMC, and subject to entry of an Order by this Court at Assumption Hearing, the Cure Amounts set forth in the Assumption Schedule, as amended, shall be controlling notwithstanding anything to the contrary in such Assigned Contracts, and the non-Debtor parties to the Assigned Contracts shall be barred from asserting against the Debtors any other claim arising from the applicable Assigned Contracts or against the WMC any claim arising before the Closing under the applicable Assigned Contracts. Notwithstanding anything set forth herein, to the extent that a contract counterparty has agreed to a renegotiated Cure Amount prior to the receipt of the Assumption Schedule or the deadline for the Assumption Objection, such renegotiated amount shall be binding.

50.     The effective date of any assumption and assignment of any Assigned Contract shall be the date on which the Sale closes. Any Cure Amounts to be paid under any Assigned Contract shall be paid by WMC (to the extent provided for in the WMC APA) either prior to, upon, or promptly following the closing of the Sale or as otherwise agreed to by the parties to the Assigned Contract.

51.     The Debtors submit that the Court should approve these amended procedures relating to the assumption and assignment of executory contracts and unexpired leases.

---

[6]     The Debtors have given WMC authority to negotiate the Cure Amounts associated with contracts that WMC wishes to have assigned to it in connection with the WMC APA.

18

**WHEREFORE**, the Debtors respectfully request entry of an order granting the relief requested in the Motion as amended by this Supplement and such other and further relief as is just.

Dated: February 10, 2014
New York, New York

/s/ Christopher M. Desiderio
Daniel W. Sklar
Lee Harrington
Christopher M. Desiderio
NIXON PEABODY LLP
437 Madison Avenue
New York, NY 10022
Telephone: (212) 940-3000
Facsimile: (212) 940-3111

*Counsel to the Debtors
and Debtors in Possession*