**ASSET PURCHASE AGREEMENT**

**Dated as of February 10, 2014**

**by and among**

**ST. FRANCIS' HOSPITAL**

**ST. FRANCIS HOME CARE SERVICES CORPORATION**

**ST. FRANCIS HEALTH CARE FOUNDATION, INC.**

**SFH VENTURES, INC.**

**SAINT FRANCIS HOSPITAL PRESCHOOL PROGRAM**

**as Sellers**

**and**

**WESTCHESTER COUNTY HEALTH CARE CORPORATION (OR ITS DESIGNEE)**

**as Buyer**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made as of February 10, 2014  (the "Effective Date") by and among St. Francis' Hospital, Poughkeepsie, New York, a New York not-for-profit corporation ("Hospital"), St. Francis Home Care Services Corporation, a New York not-for-profit corporation ("Home Care"), St. Francis Health Care Foundation, Inc., a New York not-for-profit corporation ("Health Care Foundation"), Saint Francis Hospital Preschool Program, a New York educational corporation chartered by the New York State Board of Regents ("Preschool"), and SFH Ventures, Inc., a New York corporation ("Ventures") (the Hospital, Home Care, Health Care Foundation, Preschool, and Ventures are referred to, individually and collectively, as "Seller"), and Westchester County Health Care Corporation (or its designee), a New York public benefit corporation ("Buyer").  Capitalized terms used in this Agreement have the meanings set forth in Article 1 or in the applicable section cross-referenced in Article 1.

## RECITALS

**WHEREAS**, Seller owns and operates a general acute care hospital and related facilities in Poughkeepsie, New York, and other businesses incident to the operation of the hospital, which provide a variety of medical and educational services to citizens of Dutchess County, New York and the surrounding community (collectively, the "Business");

**WHEREAS**, Seller desires to sell to Buyer substantially all of Seller's assets except those that are expressly excluded as provided herein, and Buyer desires to purchase from Seller such assets and assume certain specified liabilities of Seller and no others, upon the terms and conditions set forth herein;

**WHEREAS**, Buyer and Seller intend to effectuate the transactions contemplated by this Agreement through a sale pursuant to Sections 363 and 365 of the Bankruptcy Code in the context of a voluntary Chapter 11 filing (the "Filing") pending in the United States Bankruptcy Court for the Southern District of New York, Poughkeepsie division (the "Bankruptcy Court");

**WHEREAS**, as a material inducement to Buyer's entering into this Agreement, the Bond Trustee has represented to Buyer that the holders of a majority in principal amount of the Existing Bonds, as secured creditors of Seller, are aware of the existence of this Agreement, the general terms hereof and the transactions contemplated hereby, and in general approve Seller entering into this Agreement and the transactions contemplated hereby; and

**WHEREAS**, the execution and delivery of this Agreement, Seller's ability to consummate the transactions set forth in this Agreement, and Buyer's obligations hereunder, are subject, among other things, to the Sale Order being entered by the Bankruptcy Court.

**NOW THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows.

## AGREEMENT

## ARTICLE I

## DEFINITIONS

1.1    **Definitions**.    In this Agreement, the following terms have the meanings specified or referred to in this Section 1.1 and shall be equally applicable to both the singular and plural forms.  Any agreement referred to below shall mean such agreement as amended, supplemented and modified from time to time to the extent permitted by the applicable provisions thereof and by this Agreement.

"Accounts Receivable" means all accounts, notes, interest and other receivables of Seller, and all claims, rights, interests and proceeds related thereto, including all accounts and other receivables, and cost report settlements related thereto, arising from the rendering of services to inpatients and outpatients, billed and unbilled, recorded and unrecorded, for services provided by Seller whether payable by private pay patients, private insurance, third party payors, Medicare, Medicaid or by any other source.

"Action" means any legal action, suit or arbitration, or any inquiry, audit, proceeding or investigation, by or before any Governmental Authority.

"Affected Assets" has the meaning specified in Section 7.4.

"Affiliate" has the meaning set forth in Section 101(2) of the Bankruptcy Code.

"Agreement" has the meaning specified in the preamble.

"Ancillary Documents" means the Bill of Sale, Deeds, Assignment and Assumption Agreement, and the Records Custody Agreement.

"Approving Order" shall mean the written order from the New York State Supreme Court pursuant to Sections 510 and 511 of the Not-For-Profit Corporation Law authorizing the sale of the Purchased Assets in accordance with the terms hereof.

"Asserted Cure Costs" means, in the aggregate, all Cure Costs asserted by any counterparty to an Assumed Contract or Assumed Lease that, as of the Closing Date, are not Determined Cure Costs.

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement in substantially the form of Exhibit A.

"Assumed Contracts" has the meaning specified in Section 2.1(c).

"Assumed Leases" has the meaning specified in Section 2.1(f).

"Assumed Liabilities" has the meaning specified in Section 2.3.

"<u>Avoidance Actions</u>" means any and all claims for relief of Seller under Chapter 5 of the Bankruptcy Code.

"<u>Bankruptcy Case</u>" means the cases jointly administered under Chapter 11 of the Bankruptcy Code captioned *In re St. Francis' Hospital, Poughkeepsie, New York, et al.* pending before the Bankruptcy Court for the Southern District of New York (Case No. 13-37725).

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, Sections 101 et. seq.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Beginning Principal Amount</u>" has the meaning specified in <u>Schedule 3.1</u>.

"<u>Benefit Plan</u>" means all employee benefit plans as defined by Section 3(3) of ERISA.

"<u>Bill of Sale</u>" means the Bill of Sale substantially in the form of <u>Exhibit C</u>.

"<u>Bond Documents</u>" means that certain Indenture of Trust dated as of March 1, 2004 between the Bond Trustee and the Dutchess County Industrial Development Agency and that certain Second Supplemental Indenture of Trust between the Dutchess County Industrial Development Agency and the Bond Trustee, and all other documents evidencing or securing the Existing Bonds or Seller's obligations with respect to the Existing Bonds.

"<u>Bond Trustee</u>" means Manufacturers and Traders Trust Company, as bond trustee for the Existing Bonds, and its successors and permitted assigns.

"<u>Budget</u>" means the budget approved under any Cash Collateral Order and/or any Order entered in the Bankruptcy Case authorizing the Seller to obtain and use advances under a debtor-in-possession loan facility.

"<u>Business</u>" has the meaning specified in the recitals.

"<u>Business Day</u>" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"<u>Business Intellectual Property</u>" means all Intellectual Property owned or licensed by Seller and used in the Business.

"<u>Buyer</u>" has the meaning specified in the preamble.

"<u>Buyer's Discretion</u>" means the discretion of Buyer, reasonably exercised, based on the Buyer's business goals and objectives in pursuing the mission set forth in its organizational documents.

"<u>Buyer's Option</u>" means in the Buyer's sole discretion after consultation with the Bond Trustee.

"Cash Collateral Order" means any Order, whether interim or final, allowing the use by Seller during the Bankruptcy Case of cash collateral (as such term is defined in Section 363(a) of the Bankruptcy Code) of the Bond Trustee.

"Cash Consideration Amount" has the meaning specified in Section 3.1.

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code, including all rights, claims, causes of action, defenses, debts, demands, damages, rights of setoff, recoupment rights, obligations and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereof.

"Closing" has the meaning specified in Section 4.1.

"Closing Date" has the meaning specified in Section 4.1.

"CMS" means Centers for Medicare & Medicaid Services.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreement" means any contract or other binding agreement or arrangement (written or oral) with any labor union or organization, collective bargaining agent or other similar employee representative.

"CON Approval" has the meaning specified in Section 7.2.

"Contract" means any agreement, contract, obligation, promise, instrument, undertaking or other arrangements (whether written or oral) that is legally binding, other than a Lease, to which Seller is party.

"Cure Cost Cap" has the meaning specified in Section 2.5(b).

"Cure Cost Minimum" has the meaning specified in Section 2.5(b).

"Cure Costs" has the meaning specified in Section 2.5.

"Deeds" means the deeds transferring title to any Owned Real Property that is a Purchased Asset to Buyer to be delivered pursuant to Section 4.4(a).

"Department of Education" or "DOE" means the New York State Department of Education.

"Department of Health" or "DOH" means the New York State Department of Health and, when applicable, the Public Health and Health Planning Council of the State of New York.

"Deposit" has the meaning specified in Section 3.2.

"Determined Cure Costs" means, in the aggregate, all Cure Costs that have been determined pursuant to a Final Order or pursuant to an agreement between Buyer and the counterparty to the applicable Assumed Contract or Assumed Lease, as further described in Section 3.4.

"DIP Credit Agreement" means, collectively, (i) the Debtor in Possession Revolving Credit and Security Agreement dated December 20, 2013 by and between Seller and Midcap Financial LLC and (ii) and the Debtor in Possession Term Loan Credit and Security Agreement dated December 20, 2013 by and between Seller and Midcap Financial LLC, along with all other agreements or documents executed in connection therewith.

"Disclosure Schedule" has the meaning specified in the preamble of Article V.

"Documents" means, in any form, paper, electronic, or otherwise, all books, records, files, invoices, Inventory records, documents, patient records, medical reports, patient lists, all other medical and financial information regarding patients, cost and pricing information, supplier lists, business plans, catalogs, patient literature, advertising and marketing materials, medical and administrative libraries, quality control records and manuals, policies and procedures, research and development files, records and laboratory books, operating materials, personnel and employee records and financial records (including all data and other information stored on discs, tapes or other media) to the extent used in or to the extent relating to the assets, properties (including the Intellectual Property and the Permits), business or operations of the Business.

"DRG Payments" has the meaning specified in Section 8.3(b).

"Effective Date" has the meaning specified in the Preamble of this Agreement.

"Encumbrance" means, to the extent not considered a Lien, any security interest, lien, collateral assignment, right of setoff, debt, pledge, levy, charge, encumbrance, option, right of refusal, restriction (whether on transfer, disposition or otherwise), other similar agreement terms tending to limit any right or privilege of Seller under any Contract, conditional sale contract, title retention contract, mortgage, lease, deed of trust, hypothecation, indenture, security agreement, easement, license, servitude, proxy, voting trust, transfer restriction under any shareholder or similar agreement, or any other agreement, arrangement, contract, commitment or binding obligation of any kind whatsoever, whether oral or written, or imposed by any applicable law, equity or otherwise.

"Environment" means all air, water vapor, surface water, groundwater, drinking water supply or land, including land surface or subsurface, and includes all fish, wildlife, biota and all other natural resources.

"Environmental Laws" means all foreign, federal, state or local environmental, land use, health, chemical use, safety and sanitation laws, statutes, ordinances, regulations or rule of common law (including with respect to the Business, specific Environmental Permits and Orders), as in effect on the date hereof, relating to the protection of the Environment or governing the discharge of pollutants or the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances, including but not limited to the Resource Conservation and Recovery Act of 1976, as amended, the Clean Air Act, as

5

amended, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Toxic Substances Control Act, as amended, the Occupational Safety and Health Act of 1970 and state and foreign statutes similar to or based upon the foregoing, as the same are in effect on the date hereof.

"Environmental Permits" means all permits, licenses, certificates, approvals, authorizations, consent or registrations issued by a Governmental Authority pursuant to an Environmental Law.

"Equipment" means all furniture, fixtures, equipment, computers, operating systems software, registry software, machinery, apparatus, appliances, implements, spare parts, signage, supplies, and all other tangible personal property of every kind and description in which Seller has an interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exchange Bond Obligations" means bonds issued by Westchester County Health Care Corporation having the terms set forth on Schedule 3.1.

"Excluded Assets" has the meaning specified in Section 2.2.

"Excluded Liabilities" has the meaning specified in Section 2.4.

"Existing Bonds" means, collectively, the $19,275,000 Dutchess County Industrial Development Agency Civic Facility Revenue Refunding Bonds, Series 2004A (St. Francis' Hospital, Poughkeepsie, New York Civic Facility), $8,760,000 Dutchess County Industrial Development Agency Civic Facility Revenue Bonds, Series 2004B (St. Francis' Hospital, Poughkeepsie, New York Civic Facility), and $9,430,000 Civic Facility Revenue Bonds, Series 2007 (St. Francis' Hospital, Poughkeepsie, New York, Civic Facility).

"Exit Cap" has the meaning specified in Section 3.3.

"Exit Financing" has the meaning specified in Section 3.3.

"Exit Financing Controlled Account Agreement" means the deposit account control agreement executed by Buyer, Seller and a depository bank in a form reasonably satisfactory to Buyer and Seller.

"Exit Financing Documents" means the Exit Financing Note, the Exit Financing Security Agreement, the Exit Financing Controlled Account Agreement and all other agreements, instruments and documents now or hereafter executed by or on behalf of Seller and delivered to Buyer pursuant to any of the foregoing, as now in effect or as at any time amended, modified or changed, in connection with the Exit Financing.

"Exit Financing Note" means the promissory note executed by Seller in favor of Buyer in connection with the Exit Financing in a form reasonably satisfactory to Buyer and Seller.

"Exit Financing Lender" means Buyer or another lender designated by Buyer.

"Exit Financing Security Agreement" means the exit financing security agreement executed by Buyer and Seller in a form reasonably satisfactory to Buyer and Seller pursuant to which Seller will grant to Buyer a first priority lien on all Accounts Receivable of Seller to secure repayment of the Exit Financing Note.

"Filing" has the meaning specified in the recitals.

"Final Order" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for stay, new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay, new trial, reargument, or rehearing has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a stay, new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a stay, new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure may be, but has not been, filed with respect to such order shall not cause such order not to be a Final Order.

"Final Payment" has the meaning specified in Section 3.1.

"Government Payor Contingent Liability Assumption Documents" means all necessary applications for Medicare and Medicaid certifications, including but not limited to a CMS Form 855 for each Provider Entity and a Medicaid Affidavit for each Provider Entity pursuant to Schedule 4B of the New York State Department of Health Certificate of Need Application, required by CMS or DOH in connection with the assumption by Buyer of Liabilities of each Provider Entity to the extent provided by CMS Form 855 or the Medicaid Affidavit pursuant to Schedule 4B of the New York State Department of Health Certificate of Need Application.

"Government Programs" has the meaning specified in Section 5.10.

"Governmental Authority" means any United States federal, state or local governmental authority, regulatory or administrative authority or any court, tribunal or judicial body having jurisdiction.

"Hazardous Substance" means any "pollutant", "contaminant", "solid waste", "hazardous waste", "hazardous material" or "hazardous substance" as defined under any Environmental Law, including medical wastes, toxic or hazardous air or water pollutants or any other toxic, infectious or noxious substances or any waste or recycled products thereof or asbestos or mold (including biological agents, such as mold or fungi that can or are known to produce mycotoxins or other bioaerosols such as antigens, bacteria, amoebae and microbial volatile organic compounds).

"Hired Employees" has the meaning specified in Section 8.2(b).

"Hospital" has the meaning specified in the preamble.

"HSR Approval" has the meaning specified in Section 7.2.

"Insurance Policies" has the meaning specified in Section 5.8.

"Intellectual Property" means all intellectual property rights of any kind, throughout the world, all rights of privacy and rights to personal information, all telephone numbers and Internet protocol addresses, all documentation and media constituting, describing or relating to the above, including memoranda, manuals, technical specifications and other records wherever created throughout the world, all rights in the foregoing and in other similar intangible assets, and all rights and remedies (including the right to sue for and recover damages, profits and any other remedy for past, present, or future infringement, misappropriation or other violation relating to any of the foregoing.

"Interest" means "interest" as that term is used in Section 363(f) of the Bankruptcy Code.

"Inventory" has the meaning specified in Section 2.1(a).

"IRS" means the Internal Revenue Service.

"Issuer" has the meaning specified in Schedule 3.1.

"Knowledge" means with respect to any matter in question, if any of Seller's or Buyer's (as applicable) officers have actual knowledge, or with respect to which Seller or Buyer (as applicable) has received actual written notice, of the matter in question (but without imposing any requirement or obligation on any of the executives not either a party to this Agreement or a director, officer or employee of Seller or Buyer).

"Leased Real Property" has the meaning specified in Section 5.4(b).

"Leases" has the meaning specified in Section 5.4(b).

"Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, rule, statute or treaty.

"Liability" means any liability or obligation (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted).

"Lien" has the meaning ascribed to such term in Section 101(37) of the Bankruptcy Code.

"Local 1199 SEIU" means Service Employees International Union, 1199 Healthcare Workers East.

"Loss" has the meaning specified in Section 7.4.

"Management Services Agreement" means the agreement for the provision by Buyer to Seller of management services substantially in the form of Exhibit B, with such changes therein as Buyer and Seller shall mutually agree.

"Material Adverse Effect" means any fact, condition, change, violation, inaccuracy, circumstance or event, individually or in the aggregate, that, in Buyer's Discretion, (i) has, or is reasonably likely to have, an adverse effect on or impairs the Purchased Assets or the Business, in each case that has an impact, result, effect, loss or value that individually or in the aggregate exceeds $500,000, (ii) results in the Business ceasing or closing all or any material portion of its operations, including inpatient services, or otherwise impairs or causes any material licenses to lapse, or (iii) materially impedes or delays, or is reasonably likely to materially impede or delay, the consummation of the transactions contemplated by this Agreement, in each case except to the extent that any such fact, condition, change, violation, inaccuracy, circumstance or event results from or arises out of changes in general economic, legal or financial conditions or changes affecting the industry in which the Business operates generally (except to the extent that such developments have a disproportionate effect on the Purchased Assets or the Business).

"Material Contract" means any Contract or Lease to which Seller is a party or by which any of the Purchased Assets are bound and to which any of the following apply: (a) which is outside of the ordinary course of business of Seller; (b) which is with any health maintenance organization, insurance program, preferred provider organization or other third-party payor, (c) which is for the construction, renovation, ownership, servicing, maintenance, occupancy or operation of the Purchased Assets; (d) which any significant supplier is a party; (e) pursuant to which Seller would be required to make payments in excess of $100,000 from and after the date hereof; (f) which relates to the generation, transportation or disposal of Hazardous Substances; (g) which is a physician contract, an employment agreement or severance agreement; (h) which creates a joint venture or partnership or which otherwise involves the sharing of profits, losses, costs or liabilities with any other Person; (i) which is an Assumed Contract or Assumed Lease; or (j) to which any officer or director of Seller, or any Affiliate of any such officer or director, is a party.

"Medicaid" has the meaning specified in Section 5.10.

"Medicare" has the meaning specified in Section 5.10.

"Net Bond Amount" means an amount equal to Twenty-Seven Million Three Hundred Fifty Two Thousand Dollars ($27,352,000).

"OASAS" means New York State Office of Alcoholism and Substance Abuse Services.

"OMH" means New York State Office of Mental Health.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority.

"Owned Real Property" has the meaning specified in Section 5.4(a).

"Party" or "Parties" means, individually or collectively, Buyer and Seller.

"<u>PEO</u>" means a professional employment organization designated by Buyer.

"<u>Periodic Taxes</u>" has the meaning specified in <u>Section 8.1(a)</u>.

"<u>Permitting Process</u>" has the meaning specified in <u>Section 7.2(a)</u>.

"<u>Permits</u>" means all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates of need, certificates of exemption, accreditations, registrations, approvals, clearances and orders of any Governmental Authority which are necessary or customary for Seller to own, lease and operate its properties and assets or to carry on the Business as it is now being conducted or proposed to be conducted.

"<u>Permitted Encumbrances</u>" means (a) statutory liens for current property Taxes and assessments not yet due and payable, including, without limitation, liens for *ad valorem* Taxes and statutory liens not yet due and payable arising other than by reason of any default by Seller, provided, however, that Buyer shall have receive a credit towards the Purchase Price an account of all such Taxes paid by Buyer, (b) Taxes, assessments, fees and other charges being contested in good faith by a Seller or Affiliate of a Seller in appropriate proceedings, provided, however, they do not create a lien or encumbrance on the property that would survive the Sale Order, and (c) easements, covenants, conditions, restrictions and other similar matters of record on real property, leasehold estates or personalty that do not in any material respect detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the present use of the property subject thereto by Seller, or otherwise make title to such property unmarketable.

"<u>Person</u>" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization or Governmental Authority.

"<u>Petition Date</u>" means December 17, 2013.

"<u>Post-Closing Tax Period</u>" has the meaning specified in <u>Section 8.1(a)</u>.

"<u>Pre-Closing Tax Period</u>" has the meaning specified in <u>Section 8.1(a)</u>.

"<u>Proceeding</u>" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"<u>Provider Entity</u>" means an entity included in Seller that is a licensed provider of clinical health care services.

"<u>PTO Credit</u>" has the meaning specified in <u>Section 8.2(a)</u>.

"<u>Purchased Assets</u>" has the meaning specified in <u>Section 2.1</u>.

"<u>Purchased Deposits</u>" means all deposits related to the Purchased Assets (including customer deposits and security deposits for rent, electricity, utilities and otherwise) and prepaid

charges and expenses of Seller.  For clarity, Purchased Deposits do not include any monies, securities, funds or accounts established under or held by the Bond Trustee pursuant to the Bond Documents.

"Purchase Price" has the meaning specified in Section 3.1.

"RCRA" means the Resource Conservation and Recovery Act of 1976, as amended.

"Records Custody Agreement" means the agreement, in the form mutually agreed to by Buyer and Seller under which, among other things, at the Closing (i) Seller will transfer to Buyer custody of certain of Seller's medical records, education records, and related business and administrative records that Buyer, in Buyer's Discretion, determines will be needed by Buyer to utilize the Purchased Assets on a going forward basis; (ii) Buyer and Seller will agree to maintain records for as long as retention is mandated by law; and (iii) Buyer and Seller will each permit the other, and individuals with rights to access such records, to access records in their respective possessions.

"Regents' Approval" has the meaning specified in Section 7.2.

"Release" means any past or present spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the Environment (including the abandonment or discharging of barrels, containers and other closed receptacles containing any Hazardous Substance).

"Representative" means with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants and financial advisors.

"Sale Order" means an Order of the Bankruptcy Court, in form and substance acceptable to Buyer in its sole and absolute discretion, pursuant to, inter alia, Bankruptcy Code sections 363 and 365, authorizing and approving, among other things, (1) the sale of the Purchased Assets to Buyer on the terms and conditions set forth herein, free and clear of all Liens, Claims, Interests and Encumbrances, to the fullest extent permissible under the Bankruptcy Code, (2) the assumption and assignment of the Assumed Liabilities, (3) the assumption and assignment of the Assumed Contracts and Assumed Leases to Buyer and (4) entry into the Management Services Agreement.

"Seller" has the meaning specified in the preamble.

"Services Agreement" means the services agreement executed by Buyer and Seller at the Closing for the provision by Buyer to Seller after the Closing of accounts receivable collection services, billing services with respect to services rendered by Seller prior to the Closing (other than to Transition Patients) and certain other services, substantially in the form attached hereto as Exhibit D.

"Services Fee" has the meaning specified in the Services Agreement.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code), natural resources, real property, personal property, *ad valorem*, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar taxes, duty, levy or other governmental charge or assessment or deficiencies thereof (including all interest and penalties thereon and additions thereto whether disputed or not), (ii) any liability as a transferee, successor by contract or otherwise in respect of any items described in clause (i) hereof, and (iii) experience ratings maintained by taxing authorities, including unemployment boards.

"Tax Return" means any return, report or similar statement filed or required to be filed with respect to any Taxes (including any attached schedules), including any information return, claim for refund, amended return or declaration of estimated Tax.

"Transfer Taxes" has the meaning specified in Section 8.1(b).

"Transition Patient" has the meaning specified in Section 8.3(b).

"Treasury Regulations" means the regulations promulgated by the U.S. Treasury Department pursuant to the Code.

"WARN Act" means the Worker Adjustment and Retraining Notification Act, and any similar state or local law relating to plant closings and layoffs.

**1.2    Other Definitional and Interpretive Matters**.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

(iii)    Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)    Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)    Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(vi)    Herein.  The words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    Including.  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    No Strict Construction.  The Parties participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE

2.1    **Purchased Assets**.  Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Seller shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, free and clear of all Liens, Claims, Interests and Encumbrances (other than Permitted Encumbrances and Assumed Liabilities) to the fullest extent permissible under Section 363(f) of the Bankruptcy Code, all right, title and interest of Seller in all of the properties and assets of Seller (other than the Excluded Assets) of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use in or relating to the Business (herein, collectively referred to as the "Purchased Assets"), including all right, title and interest of Seller in, to and/or under:

(a)    all inventories of medical supplies, drugs and pharmaceuticals, food, janitorial and office supplies and other disposables and consumables relating to the Business and maintained, held or stored by or for Seller in connection with the Business (the "Inventory");

(b)    all Equipment owned by Seller;

(c)    all Contracts listed or described in Schedule 2.1(c), other than those that may be excluded pursuant to the penultimate paragraph of this Section 2.1, but including any Contracts that may be added pursuant to the penultimate paragraph of this Section 2.1, as determined by Buyer, in its sole discretion (the "Assumed Contracts");

(d)    All owned real property of Sellers including without limitation the Owned Real Property listed on Schedule 2.1(d), but excluding the Owned Real Property listed on Schedule 2.2(s);

(e)    each of Seller's Permits (other than Seller's Article 28 operating license) that are assignable pursuant to applicable law and pending applications therefor;

(f)    all Leases listed or described in Schedule 2.1(f), other than those that may be excluded pursuant to the penultimate paragraph of this Section 2.1, but including any Leases that may be added pursuant to the penultimate paragraph of this Section 2.1, as determined by Buyer in its sole discretion (the Leases described in Schedule 2.1(f) and the real property Leases described in Schedule 2.1(m), collectively, the "Assumed Leases");

(g)    [Reserved];

(h)    all Business Intellectual Property (including all goodwill associated therewith or symbolized thereby);

(i)    all Documents;

(j)    all telephone, telex and telephone facsimile numbers, remote access portals and other directory listings used in connection with the Business;

(k)    all Purchased Deposits;

(l)    all insurance policies, and rights to proceeds thereof, relating or allocable to any Purchased Asset or Assumed Liability, in each case to the extent assignable to Buyer;

(m)    the real property leases listed or described on Schedule 2.1(m);

(n)    the operating licenses, if any, identified on Schedule 2.1(n);

(o)    the Hospital's 49% interest in Hudson Valley Oncology Associates, PLLC, which is held through a nominee agreement;

(p)    all other or additional privileges, rights and interests associated with the Purchased Assets of every kind and description and wherever located that are used or intended for use in connection with, or that are necessary to the continued operation of, the Business; and

(q)    all goodwill associated with the Business or the Purchased Assets.

At any time at least five (5) days prior to the Closing Date, Buyer, in its discretion by written notice to Seller, may (i) exclude from being assigned pursuant hereto any Contracts or Leases, and such Contracts or Leases shall not constitute Assumed Contracts or Assumed Leases, and Buyer shall not acquire any rights or assume any Liabilities with respect thereto, and (ii) include as being assigned pursuant hereto any Contracts or Leases, and such Contracts or Leases shall constitute Assumed Contracts or Assumed Leases, any Buyer shall acquire all rights and assume Liabilities with respect thereto.   Upon Buyer's reasonable request, Seller shall provide additional detailed information as to the Liabilities under the Contracts and Leases sufficient for Buyer to make an informed assessment whether to accept an assignment of such Contracts or Leases hereunder.

At any time prior to three (3) Business Days prior to the Closing Date, Buyer may, in its discretion by written notice to Seller, designate any of the Purchased Assets as additional Excluded Assets, which notice shall set forth in reasonable detail the Purchased Assets so designated.   Buyer acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to designate any Purchased Assets as Excluded Assets.   Notwithstanding any other provision hereof, the Liabilities of Seller under or related to any Purchased Asset excluded under this paragraph will constitute Excluded Liabilities.

     **2.2**    <u>**Excluded Assets**</u>.   Nothing contained herein shall be deemed to sell, transfer, assign or convey the Excluded Assets to Buyer, and Seller shall retain all right, title and interest to, in and under the Excluded Assets.   For all purposes of and under this Agreement, the term "<u>Excluded Assets</u>" shall mean:

     (a)    Other than Purchased Deposits, all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits (including any monies, securities, funds, or accounts established under or held by the Bond Trustee pursuant to the Bond Documents);

     (b)    any shares of capital stock or other equity interest of Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of Seller;

     (c)    all minute books, stock ledgers, corporate seals and stock certificates of Seller;

     (d)    any Contracts not listed or described in <u>Schedule 2.1(c)</u> as of the Closing;

     (e)    the Purchase Price and all rights of Seller under this Agreement;

     (f)    Benefit Plans;

     (g)    any and all rights, claims or causes of action of Seller against third parties arising out of events occurring prior to the Petition Date and any and all rights, claims or causes of action of Seller against third parties with respect to the Excluded Assets arising out of events occurring after the Petition Date;

(h)      all rights under insurance policies for any refunds for unearned premiums and all rights relating to claims for losses related exclusively to any Excluded Asset;

(i)      all Avoidance Actions (including the proceeds thereof);

(j)      all Accounts Receivable;

(k)      any deposits or prepaid charges and expenses paid prior to the Closing Date that are not Purchased Deposits;

(l)      all personnel records and other records and files that Seller is required by law to retain in its possession;

(m)      the name "Saint Francis" and "St. Francis" and any derivatives thereof and any name or phrase which includes the foregoing;

(n)      all personal property of religious significance, which shall be removed from all premises from which the Business operates prior to Closing;

(o)      any monies, securities, funds, or accounts established under or held by the Bond Trustee pursuant to the Bond Documents;

(p)      all operating licenses of Seller, except those, if any, identified in Section 2.1(n);

(q)      each Seller's Permits that are not assignable pursuant to applicable law (including Seller's article 28 operating license) and pending applications therefore;

(r)      each Seller's Medicare and Medicaid provider agreements and provider numbers;

(s)      the Owned Real Property listed on Schedule 2.2(s);

(t)      the Hospital's 85.5% interest in Hudson Valley Center at St. Francis, which is held through a nominee agreement;

(u)      all rights with respect to any Proceeding pending as of the Closing Date; and

(v)      all Documents relating exclusively to an Excluded Asset.

**2.3      Assumed Liabilities**.  Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer shall execute and deliver to Seller the Assignment and Assumption Agreement pursuant to which Buyer shall assume only the following Liabilities (without duplication) (collectively the "Assumed Liabilities") and no others:

(a)      all obligations and Liabilities of Seller under the Assumed Contracts listed or described on Schedule 2.1(c) and the Assumed Leases listed or described on Schedule 2.1(f), each only to the extent such obligations are to be initially performed, or

accrue, on or after the Closing Date and relate solely to dates of service from and after the Closing Date, and the payment or satisfaction of the applicable Cure Costs associated with such Assumed Contracts and Assumed Leases, subject to Section 2.5(b);

(b)    all obligations and Liabilities of Seller under the real property leases listed or described on Schedule 2.1(m), each only to the extent such obligations are to be initially performed, or accrue, on or after the Closing Date and relate solely to dates of service from and after the Closing Date, and the payment or satisfaction of Cure Costs associated with such real property leases, subject to Section 2.5(b); and

(c)    all obligations and Liabilities assumed by Buyer pursuant to the Government Payor Contingent Liability Assumption Documents.

**2.4    Excluded Liabilities**.  Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of Seller, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated, or otherwise, and Seller shall be solely and exclusively liable with respect to all Liabilities of Seller, other than the Assumed Liabilities (collectively the "Excluded Liabilities").  For the avoidance of doubt, the concept of Excluded Liabilities is intended to be construed as broadly as possibly under applicable law, including Section 363 of the Bankruptcy Code as interpreted, and shall include, without limitation, the following:

(a)    any Liability of Seller or its directors, officers, stockholders or agents (acting in such capacities), arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including, without limitation, all finder's or broker's fees and expenses and any and all fees and expenses of any Representatives of Seller;

(b)    any Liability relating to events or conditions occurring or existing in connection with or arising out of, the Business as operated by Seller, or the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Purchased Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business), including trade obligations (except for Cure Costs to be paid or otherwise satisfied by Buyer pursuant to Section 2.5(a)), accrued payroll and other compensation;

(c)    other than as specifically set forth herein, any Liability to any Persons at any time employed by Seller or its predecessors-in-interest at any time or to any such Person's spouses, children, other dependents or beneficiaries, with respect to incidents, events, exposures or circumstances occurring at any time during the period or periods of any such person's employment by Seller or its predecessors-in-interest, whenever such claims mature or are asserted, including without limitation, all Liabilities arising (i) under the Benefit Plans, (ii) under any employment, wage and hour restriction, equal opportunity, discrimination, plant closing or immigration and naturalization laws, (iii) under any collective bargaining laws, agreements or arrangements or (iv) in connection

with any workers' compensation or any other employee health, accident, disability or safety claims;

(d)    all Liabilities of Seller, or with respect to the Business, in connection with claims of professional malpractice or tort;

(e)    all Liabilities of Seller or with respect to the Business for violations of any Legal Requirement (other than Liabilities assumed by Buyer pursuant to the Government Payor Contingent Liability Assumption Documents);

(f)    any Liability of Seller relating to the Purchased Assets connected with, arising out of or relating to: (i) Hazardous Substances or Environmental Laws, (ii) claims relating to employee health and safety, including claims for injury, sickness, disease or death of any Person or (iii) compliance with any Legal Requirement relating to any of the foregoing;

(g)    any liability of Seller or any ERISA Affiliate under Title IV of ERISA, including with respect to any single employer plan, multiemployer plan or multiple employer plan;

(h)    any Liability of Seller under the Benefit Plans including any pension, retirement or retiree health and welfare Liability to Seller's current or former employees;

(i)    any Liability of Seller under COBRA or similar state law;

(j)    any Liability of Seller under the WARN Act or similar state law;

(k)    [Reserved];

(l)    any Liability of Seller under any Benefit Plans ever maintained or offered by Seller to its employees, including any pension, retirement, or retiree health and welfare Liability to Seller's current or former employees;

(m)    all Liabilities owed by Seller to Sellers' employees;

(n)    any Liability, known or unknown, fixed, contingent or otherwise, the existence of which is a breach of, or inconsistent with, any representation, warranty, covenant, obligation or agreement of Seller set forth in this Agreement or in any of the other Ancillary Documents;

(o)    any Liability of Seller for Taxes, including Taxes attributable to, resulting from, or otherwise arising from the transaction contemplated by this Agreement;

(p)    any Liability to any Person or Seller on account of any Action or Proceeding;

(q)    any Liability of Seller under any Collective Bargaining Agreements;

(r)      any Liability of Seller on account of any private sector cost reimbursement programs or insurance coverage;

(s)      any Liability of Seller to any Person on account of any Action or Proceeding;

(t)      any experience ratings of Seller maintained by taxing authorities such as unemployment boards; and

(u)      any Liability of Seller relating to or arising out of the ownership or operation of an Excluded Asset; including, without limitation, any Liability of Seller with respect to any Lien or Encumbrance affecting the Owned Real Property listed on Schedule 2.2(s).

**2.5      Assignments; Cure Costs**.

(a)      Seller shall transfer and assign all Assumed Contracts and Assumed Leases to Buyer, and Buyer shall assume the obligations under all Assumed Contracts and Assumed Leases from Seller, as of the Closing Date pursuant to Section 365 of the Bankruptcy Code and the Sale Order.  In connection with such assignment and assumption, Seller shall, subject to Section 2.5(b) cure, or otherwise cause to be deemed satisfied, all monetary defaults under such Assumed Contracts and Assumed Leases to the extent required by Section 365(b)(1)(A) and (B) of the Bankruptcy Code (such amounts paid or otherwise satisfied, the "Cure Costs"), as provided in Section 3.4.

(b)      Notwithstanding the provisions of Section 2.5(a), Buyer shall cure or otherwise cause to be deemed to be satisfied all Cure Costs under such Assumed Contracts and Assumed Leases up to a maximum amount of Eight Million Dollars ($8,000,000) (the "Cure Cost Cap").  To the extent the amount of Cure Costs paid or otherwise deemed satisfied pursuant to this Section 2.5(b) aggregate less than the amount of Two Million Dollars ($2,000,000.00) (the "Cure Cost Minimum"), the Cash Consideration Amount shall be increased by the difference between the Cure Cost Minimum and the amount of Cure Costs actually paid or otherwise satisfied by Buyer pursuant to this Section 2.5(b).  It is understood that Buyer may cause any Cure Costs to be deemed satisfied by agreement with the counterparty to the applicable Assumed Contract or Assumed Lease rather than by payment.  To the extent any Cure Costs are deemed satisfied pursuant to the terms of an agreement (as opposed to by the payment by Buyer of such Cure Costs in cash), only fifty percent (50%) of any amount that is deemed satisfied  in such manner shall be deemed to constitute "Cure Costs" that have been paid or satisfied by Buyer for purposes of calculating the Cure Cost Cap.  Any Cure Costs in excess of the Cure Cost Cap shall be borne by the Seller's estates.

(c)      In the case of licenses, certificates, approvals, authorizations, Leases, Contracts and other commitments included in the Purchased Assets (a) that cannot be transferred or assigned effectively without the consent of third parties, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Seller shall, subject to any approval of the Bankruptcy Court that may

be required, reasonably cooperate with Buyer, at the sole cost and expense of Buyer, in endeavoring to obtain such consent and, if any such consent is not obtained, Seller shall, subject to any approval of the Bankruptcy Court that may be required, cooperate with Buyer in all reasonable respects and at Buyer's sole cost and expense, to provide to Buyer the benefits thereof in some other manner, or (b) that are otherwise not transferable or assignable (after giving effect to the Sale Order and the Bankruptcy Code), Seller shall, subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with Buyer, at the sole cost and expense of Buyer, to provide to Buyer the benefits thereof in some other manner (including the exercise of the rights of Seller thereunder).

(d)     To the extent Seller intends to assume, assign, or reject any Contract or Lease prior to the Closing, Seller shall notify Buyer of such intent and Buyer shall have four (4) Business Days to agree to treat said Contract or Lease as an Assumed Contract or Assumed Lease.  In the event Buyer does not agree in writing to treat said Contract or Lease as an Assumed Contract or Assumed Lease within said period, Seller may assume, assign, or reject such Contract or Lease in its sole and absolute discretion at any time thereafter; provided, however, that Seller may not seek to reject any Contract or Lease that is an Assumed Contract or Assumed Lease.

**2.6**     [Reserved].

**2.7     Donor-Restricted Assets**.  To the extent Buyer is engaged in activities that would be properly supportable by Seller's donor-restricted assets, Seller will bring and fully support an appropriate Cy Pres proceeding to transfer to Buyer all of its donor-restricted assets that Buyer is willing to accept.  The donor restricted assets transferred pursuant to this Section 2.7 shall not be deemed a part of the Purchased Assets and none of the Purchase Price is allocated to them.

## ARTICLE III

## PURCHASE PRICE

**3.1     Purchase Price**.  The consideration for the sale, assignment and conveyance of Seller's right, title and interest in, to and under the Purchased Assets shall be (a) the assumption by Buyer of the Assumed Liabilities, plus (b) the payment at Closing of $3,500,000 in cash (the "Cash Consideration Amount"), plus (c) the issuance by Buyer to the holders of the Existing Bonds at Closing of Exchange Bonds in an aggregate face amount equal to the Net Bond Amount and on the terms described in Schedule 3.1 plus (d) the payment of $250,000 in cash (the "Final Payment") which Final Payment shall be paid from the first amounts of Accounts Receivable collected by Buyer on behalf of Seller after the Closing pursuant to the Services Agreement after the collection by Buyer on behalf of Seller of the first $400,000 in Accounts Receivable pursuant to the Services Agreement and the application of such collection to the obligations of Seller under the Exit Note (the amount of the Assumed Liabilities, the Cash Consideration Amount, the issuance of Exchange Bonds in an aggregate face amount equal to the Net Bond Amount, and the Final Payment,

collectively, the "Purchase Price"). Seller shall use the Final Payment to initially capitalize the Seller's post confirmation estate.

**3.2    Deposit**. On February 10, 2014, Buyer delivered to Seller by electronic transfer an amount equal to Two Million Four Hundred Fifteen Thousand Dollars ($2,415,000.00) (together with all interest to accrue thereon, the "Deposit"), to be held by Nixon Peabody LLP (the "Escrow Agent"), in an interest bearing escrow account of Escrow Agent until the Closing in accordance with the terms of an escrow agreement dated as of February 10, 2014, by and between the Parties. If the Closing takes place as provided herein, then the Deposit shall be a credit in favor of Buyer against the Cash Consideration Amount paid by Buyer at Closing. If this Agreement is terminated prior to the Closing then the Deposit shall be disbursed by the Escrow Agent in accordance with Article X below.

**3.3    Provision of Exit Financing at Closing**.

(a)    Buyer shall cause the Exit Financing Lender to enter into the Exit Financing Documents pursuant to which the Exit Financing Lender will at the Closing loan to Seller an amount that is equal to the amount necessary to enable Seller to satisfy the obligations of Seller under the DIP Credit Agreement as of the Closing Date up to a maximum amount equal to Seventeen Million Six Hundred Thousand Dollars ($17,600,000) (the "Exit Cap"). Pursuant to the Exit Financing Documents, at Closing, the Exit Financing Lender shall be paid an origination fee equal to Four Hundred Thousand Dollars ($400,000), which the Exit Financing Lender shall advance as an additional component of the Exit Financing over and above the amount that would otherwise constitute the amount of the Exit Financing (even if such additional advance causes the aggregate amount of the Exit Financing to exceed the Exit Cap). Pursuant to the Services Agreement, a component of the Services Fee will be paid by increasing the amount of the Exit Financing over and above the amount that would otherwise constitute the amount of the Exit Financing (even if such additional advance causes the aggregate amount of the Exit Financing to exceed the Exit Cap). Pursuant to the Exit Financing Security Agreement, the Exit Financing shall be secured by a first priority security interest in and lien on all Accounts Receivable of Seller. The Exit Financing Documents shall provide that the Exit Financing Note will bear interest at a floating rate per annum equal to six hundred (600) basis points above the six (6) month LIBOR rate of interest. For the avoidance of doubt, the Parties agree that the obligations of Seller in respect of the Exit Financing will be recourse only to the Seller's interest in the Accounts Receivable of Seller.

(b)    [Reserved].

(c)    [Reserved].

(d)    Notwithstanding anything contained herein, in no event shall Buyer have any obligation or liability to fund, and neither Seller nor Seller's estates created pursuant to the Bankruptcy Code shall have any claim, cause of action or other right, in law or equity, against Buyer in connection with, any administrative, wind-down, reserve or other

costs or expenses of Seller or Seller's estates (other than such costs or expenses that are expressly set forth herein).

**3.4    Cure Costs**.  Subject to Section 2.5(b), Seller shall pay or otherwise satisfy all Determined Cure Costs in respect of Assumed Contracts and Assumed Leases for which all necessary consents and/or Bankruptcy Court approval to transfer have been obtained.  In consultation with and at the direction of Buyer, Seller shall file and prosecute any pleadings with the Bankruptcy Court to determine the amount of any Asserted Cure Cost that should be payable pursuant to Section 365(b) of the Bankruptcy Code.  As and when any Asserted Cure Costs associated with an Assumed Contract or an Assumed Lease becomes a Determined Cure Cost pursuant to a Final Order, the amount of such Determined Cure Costs shall be paid or otherwise satisfied by Seller, subject to Section 2.5(b).  Notwithstanding anything set forth herein to the contrary, to the extent any counterparty has filed a timely objection with the Bankruptcy Court relating to the Cure Costs under such counterparty's Assumed Lease or Assumed Contract, if Seller and such counterparty cannot resolve such objection, such objection must be resolved pursuant to a Final Order of the Bankruptcy Court and any difference between the Asserted Cure Cost and the Determined Cure Cost in such circumstance shall not be deemed to constitute a Cure Cost that has been paid or satisfied by Buyer for purposes of the calculation of the Cure Cost Cap.

**3.5    Withholding**.  Buyer shall be entitled to deduct and withhold from all payments made pursuant to this Agreement such amounts (if any) as Buyer is required to deduct and withhold under the Code or any provision of state, local or foreign law.  To the extent that amounts are so withheld and paid over to the appropriate Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to Seller from which such deduction and withholding was made.

**3.6    Allocation of Purchase Price**.  The Purchase Price shall be allocated among the Purchased Assets in a manner prescribed by Buyer by notice given to Seller at or prior to the Closing.

**ARTICLE IV**

**CLOSING**

**4.1    Closing Mechanisms.**

(a)    Buyer and Seller intend to consummate Buyer's purchase of the Purchased Assets and assumption of the Assumed Liabilities pursuant to Sections 363 and 365 of the Bankruptcy Code, which includes at the Closing:

(i)  the payment of the Purchase Price as provided in Section 3.3; and

(ii)  the assumption by Buyer of the Assumed Liabilities.

**4.2    Closing Date**.  Except as provided in Article X, upon the terms and subject to the satisfaction of the conditions and contingencies contained in Article IX (or the waiver thereof by the Party entitled to waive the condition), the closing of the sale of the Purchased

Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at a location and time mutually agreed upon by the Parties, in no event later than the third (3rd) Business Day following the date on which the conditions set forth in Article IX have been satisfied or waived (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions). The date and time at which the Closing actually occurs is hereinafter referred to as the "Closing Date."

   4.3   **Buyer's Additional Deliveries**.   At or prior to the Closing, Buyer shall deliver to Seller:

      (a)   the Assignment and Assumption Agreement;

      (b)   the Records Custody Agreement;

      (c)   a certificate of the Secretary of Buyer certifying, as complete and accurate as of the Closing, attached copies of the charter and by-laws of Buyer and certifying and attaching all requisite resolutions approving the execution and delivery of this Agreement, the Ancillary Documents to which Buyer is a party and the consummation of the transaction contemplated hereby;

      (d)   the certificates required to be delivered pursuant to Sections 9.3(a) and 9.3(b);

      (e)   a bulk sale notice (New York State Tax Form AU-196.10) in the form suitable for filing with the New York State Tax Department;

      (f)   the Services Agreement;

      (g)   the Exit Financing Documents to which it is a party; and

      (h)   such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Seller, as Seller may reasonably request to transfer and assign the Assumed Liabilities to Buyer.

   4.4   **Seller's Deliveries**.   At or prior to (as specified below) the Closing, Seller shall deliver to Buyer all the following:

      (a)   the Bill of Sale, Deeds, Assignment and Assumption Agreement, and the Records Custody Agreement, duly executed by Seller;

      (b)   certified copy of the Sale Order;

      (c)   the certificates required to be delivered pursuant to Sections 9.2(a) and 9.2(b);

(d)    certificates executed by Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(e)    the Services Agreement;

(f)    the Exit Financing Documents to which it is a party; and

(g)    such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as are necessary or otherwise customary to vest in Buyer all the right, title and interest of Seller in, to or under any or all the Purchased Assets and other transfer tax forms, affidavits and certificates customarily delivered in connection therewith.

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF SELLER**

As an inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, each Seller represents and warrants to Buyer that the statements contained in this Article V are correct and complete as of the Effective Date and will be correct and complete as of the Closing, except as set forth in the disclosure schedule accompanying this Agreement and initialed by the Parties (the "Disclosure Schedule"). The Disclosure Schedule will be arranged in sections corresponding to the lettered and numbered sections and subsections contained in this Article V.

5.1    **Organization of Seller**.  Each Seller is duly organized and validity existing and in good standing under the laws of the State of New York and has the requisite authority to own the Purchased Assets owned by it and to carry on its respective business as the same is now being conducted.  Each Seller has full corporate power and authority to own or lease and to operate and use the Purchased Assets and to carry on the Business as now conducted, subject to the Bankruptcy Code.

5.2    **Authority of Seller**.

(a)    Seller has full power and authority to execute, deliver and, subject only to the approval of the Bankruptcy Court and the entry of the Sale Order, the Approving Order, the Regents' Approval, the CON Approval and HSR Approval, perform this Agreement and each of the Ancillary Documents to which Seller is a party.   The execution, delivery and performance of this Agreement and such Ancillary Documents by Seller have been duly authorized and approved by Seller's board of directors (or similar governing body), is in accordance with the Bankruptcy Code and, subject to the entry of the Sale Order, the Approving Order, the Regents' Approval, the CON Approval and HSR Approval, does not require any authorization or consent of Seller's shareholders or members that has not been obtained.  This Agreement has been duly authorized, executed and delivered by Seller and, subject to the entry of the Sale Order, the Approving Order, the Regents' Approval, the CON Approval and HSR Approval, is the legal, valid and binding obligation of Seller enforceable in accordance with its terms, and each of the

Ancillary Documents to which Seller is a party has been duly authorized by Seller and upon execution and delivery by Seller and subject to the entry of the Sale Order, the Approving Order, the Regents' Approval, the CON Approval and HSR Approval, will be a legal, valid and binding obligation of Seller enforceable in accordance with its terms.

(b)    Subject to the entry of the Sale Order, the Approving Order, the Regents' Approval, the CON Approval and HSR Approval, neither the execution and delivery of this Agreement or any of the Ancillary Documents or the consummation of any of the transactions contemplated hereby or thereby nor compliance with or fulfillment of the terms, conditions and provisions hereof or thereof will conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default or an event of default, or permit the acceleration of any Liability or obligation, under (i) any charter (or similar governing instrument) or by-laws (or similar governing document) of Seller, (ii) any Permits, (iii) any Order to which Seller is bound or any Purchased Asset is subject, (iv) any Legal Requirement affecting Seller or the Purchased Assets, or (v) any Assumed Contract or Assumed Lease (subject to Buyer's compliance with Section 3.4).

**5.3**    **Subsidiaries and Investments**.  Except as set forth in Schedule 5.3, Seller does not, directly or indirectly, own, of record or beneficially or through a nominee agreement, any outstanding voting securities, membership interests or other equity interests in any Person.

**5.4**    **Real Property**.

(a)    Schedule 5.4(a) lists and sets forth a legal description of real property owned by Seller (collectively, the "Owned Real Property").

(i)    Except for the Liens, Claims, Interests and Encumbrances described in Schedule 5.4(a): (A) Seller has good and marketable title in fee simple to such parcel, together with good and marketable title to all rights, privileges, interests, easements and appurtenances now or hereafter belonging or in any way pertaining to such real property, subject only to Permitted Encumbrances; (B) all buildings and other improvements situated on the Owned Real Property form a part of the Owned Real Property and are owned in fee by Seller subject only to Permitted Encumbrances; and (C) no Person, other than Seller as the owner, has any occupancy or use rights with respect to the Owned Real Property and no option, right of first refusal or any other right to purchase exists, or has been granted, with respect to the Owned Real Property.

(ii)    Seller has not received written notice, nor is there pending or, to Seller's Knowledge, is there threatened any (A) condemnation, eminent domain, expropriation or similar proceeding affecting the Owned Real Property, (B) proceeding to change the zoning classification of any portion of the Owned Real Property, (C) imposition of any special assessments for public betterments affecting the Owned Real Property, or (D) stop work order or other notice of violation of applicable building, land use or zoning codes.

(iii)    To the Knowledge of Seller, the Owned Real Property and the present uses of the Owned Real Property by Seller are in compliance with, and not in default under or in violation of (A) any building, zoning, land use, public health, public safety, sewage, water, sanitation or other Legal Requirement, and (B) the terms and provisions of any restrictive covenants, easements, or agreements affecting the Owned Real Property.

(iv)    To the Knowledge of Seller, the Owned Real Property is assessed by local property assessors as a Tax parcel or parcels separate from all other Tax parcels.

(b)    Schedule 5.4(b) lists, as of the date of this Agreement, all leases, subleases, licenses or other use or occupancy agreements to which Seller is a party as lessee, sublessee, tenant, subtenant or in a similar capacity (collectively, "Leases" and each a "Lease") and sets forth the address of each parcel of real property and the improvements thereon that is the subject of any Lease (the "Leased Real Property"). Upon entry of the Sale Order and payment of the Cure Costs, (i) Seller will not be in breach or default of its obligations under any of the Assumed Leases, (ii) no condition exists that with notice or lapse of time or both would constitute a default under any of the Assumed Leases, and (iii) to Seller's Knowledge, no other party to any of the Assumed Leases is in breach or default thereunder.

(c)    Except as set forth in Schedule 5.4(c), to Seller's Knowledge,

(i)    Seller has all Environmental Permits necessary for the lawful operation of the Business.

(ii)    the current activities of the Business comply with, and are not subject to any Order with respect to, any Environmental Permits or Environmental Laws, and Seller has not received notice of, or is aware of facts in connection with the activities of the Business that would constitute a violation or claim under, any Environmental Laws.

(iii)    there has been no Release of any Hazardous Substances at, on or under any of the Owned Real Property or the Leased Real Property, and none of such properties has been used by any Person as landfill or storage, treatment or disposal site for any type of Hazardous Substance or non-hazardous solid wastes as defined under RCRA.

(iv)    Seller has not voluntarily assumed any environmental liabilities affecting any of the Owned Real Property with any party.

(v)    there are no claims, suits or Proceedings by any employee pending or threatened, against Seller that are premised on the exposure to asbestos or asbestos-containing material in any of the Owned Real Property that constitutes a Purchased Asset.

(vi)    any storage tanks that have existed or presently exist on, at or under any of the Owned Real Property were or have been operated and maintained in accordance with all Environmental Laws and none of them has or is Releasing any Hazardous Substance.

(vii)    no Lien, Claim, or Encumbrance has been imposed or asserted on any Owned Real Property by any Governmental Authority or other Person in connection with any Environmental Law.

(viii)    Seller has provided Buyer with copies of all material documents, records and information in Seller's possession concerning the condition of the Environment at any of the Owned Real Property that constitutes a Purchased Asset, whether generated by Seller or others, including environmental audits and environmental site assessments.

### 5.5    <u>Title to Purchased Assets</u>.

(a)    Immediately prior to the Closing, Seller will have, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by <u>Section 4.4</u>, and subject to the terms of the Sale Order, Seller will thereby transfer to Buyer, good and marketable title to, or, in the case of property leased or licensed by Seller, a valid leasehold or licensed interest in, all of the Purchased Assets, free and clear of all Liens, Claims, Interests and Encumbrances (other than Permitted Encumbrances and Assumed Liabilities).

(b)    To the Knowledge of Seller, all of the tangible personal property and real property (including buildings and improvements located thereon) comprising the Purchased Assets used or held for use in connection with the Business is in good operating condition and repair, free of defects and in the state of good maintenance, ordinary wear and tear excepted.

### 5.6    <u>Taxes</u>.    Seller is, and has been, since its incorporation, an entity exempt from federal income Tax as an organization described in Section 501(c)(3) of the Code, and has not and does not now, carry on its activities in such a manner that has required (or would require) the filing of any Tax Return and the payment of any Taxes under Section 511 of the Code and the comparable provision of New York law (or any similar provision of state, local or foreign Tax law).  Except as set forth on <u>Schedule 5.6</u>, Seller has (a) timely filed all Tax Returns required to be filed with the appropriate Governmental Authority in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted, or to be obtained on behalf of, Seller), which were complete and accurate in all material respects, (b) all Taxes due with respect to the periods covered by such Tax Returns have been paid, and (c) there are no liens for Taxes against any of the Purchased Assets (other than liens for current Taxes not yet due and payable).

### 5.7    <u>Contracts</u>.

(a)    Seller has made available to Buyer true and complete copies of each of the Material Contracts (including all amendments thereto and assignments thereof).

(b)     Except (i) as otherwise provided in the Bankruptcy Code, (ii) for events of default arising as a result of the Filing, (iii) for general principles of equity that may limit the specific performance of particular provisions, or (iv) as set forth on Schedule 5.7(b), each Material Contract is in full force and effect and is a valid and binding obligation of Seller and, to Seller's Knowledge, the other parties thereto, in accordance with its terms and conditions, except as such enforceability may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights generally.  Upon entry of the Sale Order and payment or satisfaction of the Cure Costs, (x) Seller will not be in breach or default of its obligations under any Material Contract that is an Assumed Contract or Assumed Lease, (y) no condition exists that with notice or lapse of time or both would constitute a default under any of Material Contract that is an Assumed Contract or Assumed Lease, and (z) to Seller's Knowledge, no other party to any Material Contract that is an Assumed Contract or Assumed Lease is in breach or default thereunder.

(c)     Except as disclosed on Schedule 5.7(b), (i) Seller has the right to assign to Buyer each of the Material Contracts on the Closing Date under Section 365 of the Bankruptcy Code and upon such assignment at Closing in the manner contemplated by this Agreement, Buyer shall have all of the rights of Seller thereunder and (ii) no Material Contract to which Seller is a party may be terminated by any other party thereto as a result of the transactions contemplated by this Agreement.

**5.8**     **Litigation**.  Except (a) for the Filing, and any and all Proceedings pending in the Bankruptcy Court arising therefrom or related thereto, (b) as set forth in Schedule 5.8, and (c) to the extent that any Action or Proceeding constitutes an Excluded Liability, as of the date hereof there is no pending Action or Proceeding by or against Seller or relating to the Business or any of the Purchased Assets, or, to Seller's Knowledge, threatened against or affecting Seller and relating to the Business or any of the Purchased Assets.  None of the Actions set forth on Schedule 5.8 would have an adverse effect on the Business or any of the Purchased Assets after taking into account the operation of the Sale Order.

**5.9**     **Insurance**.  Set forth on Schedule 5.9 is an accurate and complete list of each insurance policy and insurance arrangement, including any that covers Seller's businesses properties, assets (including the Purchased Assets), Liabilities (including Assumed Liabilities) or employees or others providing services (including medical malpractice insurance, self-insurance, but excluding insurance policies providing benefits under Benefit Plans) of or with respect to the Business (the "Insurance Policies").  Except as set forth on Schedule 5.9, the Insurance Policies are in full force and effect, all premiums thereon have been paid, and Seller is otherwise in compliance in all material respects with the payment and other terms and provisions of such policies. Seller is not in default under any of the Insurance Policies (or any policy required to be set forth on Schedule 5.9) and there exists no event, occurrence, condition or act (including the purchase of the Purchased Assets hereunder) that, with the giving of notice, the lapse of time of the happening of any other event or condition, would become a default thereunder. Except as set forth on Schedule 5.9, Seller has not received any notice of cancellation or non-renewal of any such Insurance Policies nor has the termination of any such Insurance Policies been threatened, and there exists no event, occurrence, condition or act (including the purchase of the Purchased Assets hereunder) that,

with the giving of notice, the lapse of time or the happening of any other event or condition, would entitle any insurer or administrator of such Insurance Policy to terminate or cancel any such Insurance Policies. Each of the Insurance Policies is of a type and in such amount and covers such risks as are consistent with customary practice and standards of companies engaged in businesses and operations similar to the Business.  There has not been, nor is there pending or to Seller's Knowledge is there threatened, any material adverse change in Seller's relationship with its insurers, in the premiums payable, or the coverage provided pursuant to such Insurance Policies. Buyer has been provided an electronic file containing a list of all pending claims and the claims history with respect to the Business during the past five (5) years (including with respect to insurance obtained but not currently maintained).

### 5.10    Accreditation; Medicare and Medicaid; Third Party Payors.

(a)    The Hospital is currently accredited as described on Schedule 5.10(a), with no material contingencies. Without limiting the generality of the foregoing, the facilities, Equipment, staffing and operations of the Hospital satisfy the accreditation standards.  Seller has previously delivered to Buyer true, correct and complete copies of: (i) the Hospital's most recent accreditation survey report, and deficiency list; (ii) the Hospital's fire marshal's surveys for the past two (2) years and list of deficiencies, if any; and (iii) the Hospital's boiler inspection reports for the past two (2) years and list of deficiencies, if any.  Seller has taken all reasonable steps to correct all such deficiencies and a description of any uncorrected deficiency is set forth in Schedule 5.10(a).  The most recent accreditation survey report resulted in continued accreditation of the Hospital and did not require the capital expenditures aggregating in excess of $10,000 be made in order to ensure continued accreditation.

(b)    Except as set forth on Schedule 5.10(b), the Hospital is eligible to receive payment without restriction under Title XVIII of the Social Security Act ("Medicare") and Title XIX of the Social Security Act ("Medicaid") and is a "provider" with valid and current provider agreements and with one or more provider numbers with the federal Medicare, all applicable state Medicaid and successor programs (the "Government Programs") through intermediaries. Except as set forth on Schedule 5.10(b), each part of the Business that historically has received Medicare or Medicaid reimbursement is eligible to receive payment without restriction under Medicare and Medicaid and is a "provider" with a valid and current provider agreement and with one or more provider numbers with the Government Programs through intermediaries or carriers, as applicable.  Except as set forth on Schedule 5.10(b), the Business (including the Hospital) is a "provider" with valid and current provider agreements and with one or more provider numbers. The Business (including the Hospital) is in compliance with the conditions of participation for the Government Programs in all material respects. Without limiting the generality of the foregoing, the facilities, Equipment, staffing and operations of the Hospital satisfy all conditions of Medicare and Medicaid participation.  There is not pending, or to Seller's Knowledge, threatened any proceeding or investigation under the Government Programs involving Seller or any of the Purchased Assets.  Seller has satisfied all Hill Burton obligations.

(c)    To Seller's Knowledge, no employee or independent contractor of Seller or any of its Affiliates (whether an individual or entity), has been excluded from participating in any federal health care program and neither the Business (including the Hospital), nor Seller's or any of its Affiliates' officers, directors, agents or managing employees has been excluded from

Medicare or any federal health care program or been subject to sanction or been convicted of a crime involving health care Legal Requirements.

**5.11**    **Medical Staff**.  To Seller's Knowledge, there are no pending or threatened appeals, challenges, disciplinary or corrective actions, or disputes involving applicants to the Hospital's medical staff, current members of the Hospital's medical staff or affiliated health professionals.  True and correct copies of Hospital's Medical Staff Bylaws, Medical Staff Rules and Regulations, and Medical Staff Hearing Procedures, all as presently in effect, have been delivered to Buyer.

**5.12**    **Affiliate Transactions**.  Except as disclosed on Schedule 5.12, no Affiliate of Seller (a) is an officer, director, employee, consultant, competitor, creditor, debtor, customer, distributor, supplier or vendor of Seller, (b) is a party to any Contract with Seller, (c) has any Proceeding against Seller, or (d) has a loan outstanding from Seller.

**5.13**    **No Broker**.  Except as described on Schedule 5.13, no broker, investment banker, financial advisor or other Person other than Deloitte Corporate Finance LLC is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated by this Agreement, based upon arrangements made by or on behalf of Seller or any of its respective Affiliates.  Seller is solely responsible for the compensation of Deloitte Corporate Finance LLC in connection with Deloitte Corporate Finance LLC's role with respect to the transactions contemplated by this Agreement or otherwise.

**5.14**    **Absence of Certain Developments**.  Other than as a result of the Filings, since the Petition Date: (a) Seller has conducted the Business in the ordinary course of the Business; (b) there have not occurred any changes, effects or circumstances constituting, or which would be reasonably likely to result in, individually or in the aggregate, a Material Adverse Effect; and (c) Seller has not taken any action described in Section 7.3(b).

**5.15**    **Employment Matters**.

(a)    To the Seller's Knowledge, Seller is in compliance in all material respects with all applicable law respecting employment and employment practices, terms and conditions of employment and wages and hours.

(b)    To the Seller's Knowledge, Seller is not engaged in any unfair labor practice or other unlawful employment practice.  Except as disclosed on Schedule 5.15(b), there are no unfair labor practice charges or other employee-related complaints or claims against Seller pending or, to Seller's Knowledge, threatened before the National Labor Relations Board, the Equal Employment Opportunity Commission, the Occupational Safety and Health Review Commission, the Department of Labor or any other Governmental Authority by or concerning the employees, independent contractors or consultants of Seller, that if decided adversely would reasonably be expected to have a Material Adverse Effect. Except as disclosed on Schedule 5.15(b), Seller has not (i) been notified by any Governmental Authority of any alleged violation by Seller of applicable law that remains unresolved respecting employment, employment practices or terms and

conditions of employment, or (ii) received any notice of the intent of any Government Authority to conduct an investigation of Seller and, to Seller's Knowledge, no such investigation is in progress.

(c)      Except as provided on <u>Schedule 5.15(c)</u>, Seller is not party to any Collective Bargaining Agreement

(d)      There are no strikes, slowdowns or work stoppages pending or, to Seller's Knowledge, threatened with respect to Seller's employees, nor has any such strike, slowdown or work stoppage occurred or, to Seller's Knowledge, been threatened within three (3) years prior to the date hereof. There are no material arbitrations, grievances or other labor disputes pending or, to Seller's Knowledge, threatened with respect to Seller's employees.

(e)      Seller has not promised any of its management or other employees that any of such persons will be employed or engaged subsequent to the date hereof or the Closing Date. The execution of this Agreement and the consummation of the transactions contemplated hereby will not result in the breach or other violation of any employment agreement, consulting agreement or other labor-related agreement to which Seller is a party.

(f)      All material levies, assessments and penalties made against Seller pursuant to all applicable workers compensation legislation as of the date hereof have been paid by Seller, and Seller has not been reassessed under any such legislation.

(g)      <u>Schedule 5.15(g)</u> lists, as of the date of this Agreement, a true and complete list of each (i) deferred compensation plan, (ii) incentive compensation plan, (iii) equity compensation plan, (iv) "welfare" plan, fund or program (within the meaning of Section 3(I) of ERISA), (v) "pension" plan, fund or program (within the meaning of Section 3(2) of ERISA) (vi) "employee benefit plan" (within the meaning of Section 3(3) of ERISA, (vii) employment, termination, severance or "change in control" agreement, and (viii) other material employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by Seller or by any trade or business, whether or not incorporated (an "<u>ERISA Affiliate</u>"), that together with Seller would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA, or to which Seller or any ERISA Affiliate is party, for the benefit of any employee or director or any former employee or director of Seller (each such plan is referred to herein as a "<u>Benefit Plan</u>"). Each Benefit Plan is operated and administered in all material respects in accordance with its terms and applicable law (including ERISA and the Code), except as would not reasonably be expected to result in the imposition of any Liabilities upon Buyer. Except as set forth on <u>Schedule 5.15(h)</u>, Seller has made all payments, deposits or other monetary transfers required to be made by Seller under any Benefit Plans, including any self-insured Benefit Plans, and Buyer shall have no Liability with respect to any such exceptions set forth on <u>Schedule 5.15(h)</u>.

(h)    With respect to each Benefit Plan subject to Title IV or Section 302 of
ERISA ("Title IV Plan"), no Liability under Title IV of ERISA has been incurred by
Seller or any ERISA Affiliate that has not been satisfied in full and no condition exists,
that could reasonably be expected to result in the imposition of any Liability upon Buyer.
Except as set forth on Schedule 5.15(h), no Benefit Plan provides any medical, disability
or life insurance benefits to any employees of the Business after termination of
employment. Insofar as the representation made in this Section 5.15(h) applies to sections
4064, 4069 or 4204 of Title IV of ERISA, it is made with respect to any employee benefit
plan, program, agreement or arrangement subject to Title IV of ERISA to which Seller or
any ERISA Affiliate made, or was required to make, contributions during the five (5)
year period ending on the last day of the most recent plan year ended prior to the Closing
Date.

(i)    The PBGC has not instituted proceedings to terminate any Title IV Plan
and no condition exists that presents a material risk that such proceedings will be
instituted.

(j)    With respect to each Title IV Plan, the present value of accrued benefits
under such plan, based upon the actuarial assumptions used for funding purposes in the
most recent actuarial report prepared by such plan's actuary with respect to such plan did
not exceed, as of its latest valuation date, the then current value of the assets of such plan
allocable to such accrued benefits.

(k)    Except as provided in Schedule 5.15(k), no Title IV Plan is a
"multiemployer pension plan," as defined in Section 3(37) of ERISA, nor is any Title IV
Plan a plan described in Section 4063(a) of ERISA. Neither Seller nor any ERISA
Affiliate has made or suffered a "complete withdrawal" or a "partial withdrawal," as such
terms are respectively defined in Sections 4203 and 4205 of ERISA (or any liability
resulting therefrom has been satisfied in full).

(l)    Schedule 5.15(l) lists each Benefit Plan under which the consummation of
the transactions contemplated hereby could, either alone or in combination with another
event, (i) entitle any current or former employee, director or officer of Seller or any
ERISA Affiliate to severance pay or any other material payment, or (ii) accelerate the
time of payment or vesting, or increase materially the amount of compensation due any
such employee, director or officer. No payment or other entitlement referred to
immediately above shall result in any Liability to Buyer.

(m)    There are no pending or, to Seller's Knowledge, threatened or anticipated
claims by or on behalf of any Benefit Plan, by any employee or beneficiary covered
under any such Benefit Plan, or otherwise involving any Benefit Plan (other than routine
claims for benefits) that could reasonably be expected to result in the imposition of any
Liability upon Buyer.

**5.16    Compliance with Laws; Permits**.

(a)    Except as provided in <u>Schedule 5.16(a)</u>, to Seller's Knowledge, Seller is, and has been, in compliance, in all material respects, with all Legal Requirements applicable to its respective operations or the Business, including all appropriate health care facility licensing agencies. Except as set forth on <u>Schedule 5.16(a)</u>, since January 1, 2009, Seller has not received written notice from any Governmental Authority with respect to, or been charged with, the violation of any Legal Requirement.

(b)    <u>Schedule 5.16(b)(i)</u> sets forth a current, complete and accurate list of all Permits issued to Seller, including the expiration dates thereof, if any. True and correct copies of the Permits have previously been delivered to Buyer by Seller. Seller has all Permits required by all Legal Requirements from all applicable Governmental Authorities and any other regulatory agencies necessary or proper in order to own or lease the Purchased Assets and to conduct and operate the Business, including the Hospital and each of its departments, as presently operated. Seller previously has complied and is currently complying in all respects with its obligations under each of the Permits listed in <u>Schedule 5.16(b)(i)</u> and all such Permits are in full force and effect. No notice from any Governmental Authority or other Person in respect to the threatened, pending or possible revocation, termination, suspension or limitation of any of the Permits has been issued or given, nor is Seller aware of the proposed or threatened issuance of any such notice. There is no basis known to Seller for any such action that would have an adverse effect upon the Business, including the Hospital and each of its departments, or the Purchased Assets, or upon Seller's right to conduct and operate the Business as presently conducted and operated. The Hospital is licensed for an aggregate of 330 beds. Seller has previously delivered to Buyer true, correct and complete copies of any state licensing survey reports received by the Hospital in the two (2) year period prior to the Closing Date, as well as any statements of deficiencies and plans of correction in connection with such reports. Seller has taken all reasonable steps to correct all such deficiencies and a description of any uncorrected deficiency is set forth in <u>Schedule 5.16(b)(ii)</u>. The most current state licensing survey did not require that capital expenditures aggregating in excess of $10,000 be made in order to ensure continued licensure of the Hospital.

**5.17**    [Reserved]

**5.18**    <u>**Suppliers**</u>.  <u>Schedule 5.18</u> sets forth a true, complete and correct list of the Business' twenty (20) largest vendors for the 2013 calendar year and for the 6 month period preceding the Petition Date.

**5.19**    <u>**Medical Devices**</u>.  All medical devices sold by Seller in connection with the Business, including the Hospital, are authorized for distribution in interstate commerce by the U.S. Food and Drug Administration.

**5.20**    <u>**Inventory**</u>.  Except as set forth in <u>Schedule 5.20</u>, all Inventory of Seller is in safe condition and currently usable in the ordinary course of business

**5.21**    <u>**Disclosure**</u>.  To Seller's Knowledge, no representations or warranties by Seller in this Agreement, and no statement contained in any document (including the Financial Statements and the Disclosure Schedules), certificate, or other writing furnished or

to be furnished by Seller to Buyer or any of its Representatives pursuant to the provisions hereof or in connection with the transactions contemplated hereby, contains or will contain any untrue statement of material fact or omits or shall omit to state any material fact necessary, in light of the circumstances under which it was made, in order to make the statements herein or therein not misleading, and all of the foregoing accurately, completely and correctly present the information required or purported to be set forth herein or therein. There is no material fact or circumstance known to Seller and related to Seller or the Business which has not been disclosed in writing to Buyer.

      **5.22**   **Intellectual Property**.  There are no conditions existing which would prevent the Seller's intellectual property (other than intellectual property included in Excluded Assets) from transferring to Seller pursuant to this Agreement.

**ARTICLE VI**

**REPRESENTATIONS AND WARRANTIES OF BUYER**

      As an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer hereby represents and warrants to Seller and agrees as follows:

      **6.1**   **Organization of Buyer**.  Buyer is duly organized pursuant to the laws of the State of New York and is validly existing under the laws of the State of New York.  Buyer has full power and authority to own or lease and to operate and use its properties and assets and to carry on its business as now conducted.

      **6.2**   **Authority of Buyer**.

      (a)    Subject to the entry of the Sale Order, the Approving Order, the Regents' Approval, the CON Approval and HSR Approval, DOE approval, OASAS approval, and CMS approval, Buyer has full power and authority to execute, deliver and perform this Agreement and all of the Ancillary Documents to which it is a party.  The execution, delivery and performance of this Agreement and such Ancillary Documents by Buyer have been duly authorized and approved by Buyer's governing body and do not require any further authorization or consent of Buyer or its members.  This Agreement has been duly authorized, executed and delivered by Buyer and is the legal, valid and binding agreement of Buyer enforceable against Buyer in accordance with its terms, and each Ancillary Document to which Buyer is a party has been duly authorized by Buyer and upon execution and delivery by Buyer, subject to the entry of the Sale Order, the Approving Order, the Regents' Approval, the CON Approval and HSR Approval, will be a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as (i) enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and (ii) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses.

(b)    Subject to the entry of the Sale Order, the Approving Order, the Regents' Approval, the CON Approval and HSR Approval, neither the execution and delivery of this Agreement or any of such Ancillary Documents or the consummation of any of the transactions contemplated hereby or thereby nor compliance with or fulfillment of the terms, conditions and provisions hereof or thereof will:

(i)    conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, or an event of default under (1) Buyer's organizational documents, (2) any Order to which Buyer is a party or by which it is bound or (3) any Legal Requirement affecting Buyer; or

(ii)    require the approval, consent, authorization or act of, or the making by Buyer of any declaration, filing or registration with, any Person, other than filings with the Bankruptcy Court or under anti-trust or competition laws.

**6.3    No Finder**.  Neither Buyer nor any Person acting on its behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement for which Seller is liable, and Buyer shall hold harmless and indemnify Seller from any claims with respect to any such fees or commissions.

**6.4    Litigation**.  Neither Buyer nor any Person acting on its behalf is a party to any suit, action, arbitration or legal, administrative, governmental or other proceeding or investigation pending or to the Knowledge of Buyer or any Person acting on behalf of Buyer threatened, which could adversely affect or restrict its ability to consummate the transactions contemplated by the Agreement.

**6.5    Financing**.  The purchase by Buyer of the Purchased Assets is not conditioned upon obtaining financing.  Buyer has sufficient immediately available funds and/or borrowing capacity, available at Closing, to pay the required amounts due hereunder.

**6.6    NO OTHER WARRANTIES**.  EXCEPT AS PROVIDED IN THIS AGREEMENT, INCLUDING SECTION 5.21, BUYER HEREBY ACKNOWLEDGES AND AGREES THAT NO SELLER MAKES ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATED TO THE PURCHASED ASSETS OR THE BUSINESS (INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED FROM OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS; THE PHYSICAL CONDITION OF THE PURCHASED ASSETS; THE VALUE OF THE PURCHASED ASSETS; THE FITNESS OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE OR USE; THE ACCURACY, COMPLETENESS OF THE PURCHASE ASSETS OR ANY DOCUMENTS OR OTHER MATERIALS FURNISHED TO BUYER WITH RESPECT TO THE PURCHASED ASSETS OR THE BUSINESS (OR ANY PORTION THEREOF OR THE PROFITABILITY OF THE BUSINESS); OR ANY OTHER MATTER OR THING RELATED TO THE PURCHASED ASSETS OR THE BUSINESS).  BUYER FURTHER ACKNOWLEDGES THAT IT HAS CONDUCTED OR WAIVED THE RIGHT TO CONDUCT AN INDEPENDENT INSPECTION AND

INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATED TO OR AFFECTING THE PURCHASED ASSETS AND THE BUSINESS, AS BUYER DEEMED NECESSARY OR APPROPRIATE, AND BUYER IS ACQUIRING THE PURCHASED ASSETS BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS OR BUYER'S INDEPENDENT INSPECTIONS AND INVESTIGATIONS OR BUYER'S INDEPENDENT JUDGMENT.  ACCORDINGLY, OTHER THAN AS EXPRESSLY SET FORTH THEREIN, BUYER HEREBY ACCEPTS THE PURCHASED ASSETS "AS IS," "WHERE IS" AND "WITH ALL FAULTS".

## ARTICLE VII

## ACTION PRIOR TO THE CLOSING DATE

**7.1    Third Party Consents; Permits**.  Seller will reasonably cooperate with Buyer to secure, before the Closing Date, any third party consents that Buyer reasonably deems necessary to consummate the transactions contemplated hereby,  to the extent such consents are not provided for or satisfied by the Sale Order; provided that neither Seller nor Buyer shall have any obligation to offer or pay any consideration in order to obtain any such consents, approvals or waivers except for such amounts as Buyer shall, subject to Section 2.5(b), be obligated to pay, or otherwise satisfy, as a condition to any such assignment and assumption (including the payment or satisfaction of Cure Costs) pursuant to Section 365(b) of the Bankruptcy Code.  The Parties will cooperate with each other so that each provides all necessary CHOW notices, if applicable, pursuant to governing regulations.

**7.2    Governmental Approvals**.

(a)    Commencing as of the date of entry of the Sale Order, Buyer shall file any required applications with Governmental Authorities, as may be necessary (i) for Buyer to obtain all Permits necessary to operate the Business conducted by the Seller, including submitting to the DOH a Certificate of Need application (the "CON Approval") seeking establishment and licensure of Buyer as the operator of the Business and submitting to the DOE and the New York State Board of Regents all necessary applications and documents to obtain any and all approvals required by applicable law to operate the Preschool (the "Regents' Approval"), and submitting to OASAS applications for licensure, and (ii) to enable Buyer to obtain, on or as soon as practicable after the Closing Date, any additional licenses, permits, approvals, consents, certificates, registrations, and authorizations (whether governmental, regulatory, or otherwise) as may be necessary for the lawful operation of the Business from and after the Closing Date (the actions described in the foregoing clauses (i) and (ii) being referred to herein as the "Permitting Process").  Any filing or other fees and other out-of-pocket expenses associated with the Permitting Process and for obtaining the HSR Approval shall be paid by Buyer.

(b)    Seller shall submit the Approving Order within ten (10) days of receipt of the approvals referenced in Section 7.2(a).  Any filing or other fees and other out-of-pocket expenses associated with Seller obtaining the Approving Order shall be paid by

Seller.  Seller shall take no action prior to the Closing that might prevent the issuance of the Approving Order.

(c)     During the period prior to the Closing Date, Seller and Buyer shall act diligently and reasonably, and shall cooperate with each other, to do or cause to be done, all things necessary, proper or advisable consistent with applicable Legal Requirements to cause the contingencies and conditions precedent to the Closing to be satisfied and to cause the Closing to occur, including, to secure any consents and approvals of any Governmental Authority required to be obtained by them under anti-trust or competition laws including as required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Approval"), as may be applicable, in order to assign, transfer or obtain any Permits issued by any Governmental Authority, to permit the consummation of the transactions contemplated by this Agreement or to otherwise satisfy the conditions set forth in Article IX, in each case as necessary to the extent such consents are not provided for or satisfied by the Sale Order.  Buyer shall act diligently and reasonably to cooperate with Seller, to the extent commercially reasonable, to obtain the consents and approvals contemplated by this Section 7.2.  Notwithstanding anything to the contrary herein, any delay of the Buyer in obtaining approvals from any Governmental Authority shall not constitute a breach of this Agreement.

(d)     To the extent practicable, Seller and Buyer (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other Party to review in advance any proposed written communication or information submitted to any such Governmental Authority in response thereto.  In addition, neither Party shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement, or the transactions contemplated hereby, notification or request for approval, unless it consults with the other Party in advance and, to the extent permitted by any such Governmental Authority, gives the other party the opportunity to attend and participate thereat, in each case to the maximum extent practicable.  Subject to any restrictions under applicable laws, rules or regulations, each Party shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval.  Each Party shall also furnish the other party with such necessary information and assistance as such other party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.  Seller and Buyer shall prosecute all required requests for approval with all necessary diligence and otherwise use their respective reasonable best efforts to obtain the grant thereof by an Order as soon as possible.

Notwithstanding anything to the contrary herein, any failure to comply with this <u>Section 7.2(d)</u> shall not constitute a breach of this Agreement.

(e)    Commencing as of the date of entry of the Sale Order, Buyer shall file all necessary Government Payor Contingent Liability Assumption Documents.

**7.3    <u>Operations Prior to the Closing Date</u>.**

(a)    Prior to the Closing, Seller shall maintain the Purchased Assets and operate and carry on the Business only in the ordinary course consistent with past practice in conformance with all Legal Requirements, except as otherwise expressly provided in this Agreement.  Consistent with the foregoing and to the extent permitted or required by the Bankruptcy Case, Seller shall use best efforts to continue operating the Business as a going concern, and to maintain the business organization of the Business intact.

(b)    Except as otherwise expressly provided in this Agreement or in a Cash Collateral Order or post-petition financing Order in the Bankruptcy Case, or in any Order of the Bankruptcy Court (unless with the express written approval of Buyer), and except for the DIP Credit Agreement, prior to the Closing, Seller shall not, except as may be required by applicable law:

(i)    make any capital expenditures inconsistent with  the Budget or enter into any Contract or commitment therefor, except in each case in the ordinary course of Business pursuant to existing Contracts;

(ii)    enter into any Contract for or relating to the Business that cannot be assigned to Buyer or a permitted assignee of Buyer under <u>Section 11.4</u>;

(iii)    enter into any Contract for the purchase of real property;

(iv)    enter into any lease of real property;

(v)    other than the use of Inventory in the ordinary course of the Business consistent with past practice, sell, lease (as lessor), transfer or otherwise dispose of (including any transfer from the Business to any Affiliates of Seller), or impose or suffer to be imposed, any Lien, Claim, Interest or Encumbrance (other than Assumed Liabilities) on any of the Purchased Assets;

(vi)    other than in the ordinary course of the Business consistent with past practice, purchase any assets inconsistent with the Budget;

(vii)    cancel or settle any material debts owed to or material claims held by the Business (including the settlement of any claims or litigation) or deviate from the terms of any existing contract;

(viii)    compromise, settle, or consent to judgment in, any one or more Actions or Proceedings or institute any Action or Proceeding, including concerning any Intellectual Property;

(ix)    enter into, or agree to enter into, any sale-leaseback transactions;

(x)    delay or accelerate payment of any account payable or other liability of the Business beyond or in advance of its due date, except in the ordinary course of the Business consistent with past practice;

(xi)    institute any new, or any increase (including any increase in coverage) in any existing, profit-sharing, bonus, incentive, deferred compensation, severance insurance, pension, retirement, medical, hospital, disability, welfare or other employee benefit plan with respect to directors, officers or employees of Seller;

(xii)    change outside of the ordinary course of business and the requirements of the Bankruptcy Code the compensation (including salary, bonus or incentive compensation) of the directors, officers, employees of, or independent contractors or consultants to, Seller;

(xiii)    enter into any Collective Bargaining Agreement (except as otherwise required by law and acknowledging Seller's obligation to bargain in good faith), physician contract, employment, deferred compensation, severance, consulting, independent contractor, nondisclosure, non-competition or similar agreement (or amend any such agreement) to which Seller is a party or involving any of its directors, officers or employees in his or her capacity as a director, officer or employee of Seller; notwithstanding the foregoing, Seller may seek to engage estate professionals in the Bankruptcy Case and may enter into additional or amended physician contracts in the ordinary course of business, provided that in each instance such engagements or contacts must receive the prior approval of the Bankruptcy Court;

(xiv)    make or rescind any material election in relation to Taxes;

(xv)    enter into or amend (A) any third party payor contract or (B) any other agreement (or incur any commitment) that involves or may involve total annual expenditure or revenues (individually or in the aggregate) in excess of $50,000;

(xvi)    except pursuant to the Cash Collateral Order and DIP Credit Agreement, incur any indebtedness for borrowed money, enter into any material guarantee, indemnity or other agreement to secure any obligation of a third party or create any Lien, Claim, Interest or Encumbrance for the benefit of a third party over any of the Purchased Assets;

(xvii)    make any payment, or otherwise remit any monies, to any of its Affiliates outside of the ordinary course of business;

(xviii) incur any material Liability except in the ordinary course of the Business consistent with past practice;

(xix)    change any accounting policy or practice except in the ordinary course of the Business;

(xx)    amend the certificate of incorporation or by-laws or comparable organization documents of Seller in any material respect;

(xxi)    other than in the ordinary course of the Business consistent with past practice, (i) modify or terminate any Assumed Contract or any Assumed Lease, or (ii) enter into or modify any Contract or Lease containing material penalties which would be payable as a result of, and upon the consummation of, the transaction contemplated by this Agreement;

(xxii)   fail to maintain any of its business records in accordance with past practice;

(xxiii) allow Inventory level to decline below the safety stock level necessary for the continued operation of the Business;

(xxiv) fail to maintain the Purchased Assets in materially the same condition as the date of the execution of this Agreement, reasonable wear and tear excepted; or

(xxv) enter into any agreement or commitment to take any action prohibited by this Section 7.3.

(c)    Effective as of the date of entry of the Sale Order, (i) Seller and Buyer, or its designated manager, shall enter into the Management Services Agreement pursuant to which Buyer (or its designated manager) will agree to provide management services to Seller at Buyer's cost of the provision of such services (as further defined in the Management Services Agreement), provided, however, that Seller shall not be required to pay Buyer for any services rendered under the Management Services Agreement for any period after May 9, 2014, and (ii) Seller shall cause the Budget to be amended with the consent of Midcap Financial LLC and the Bond Trustee to include the amount of the compensation to be paid to Buyer pursuant to the Management Services Agreement.

**7.4**    **Insurance; Damage; Destruction**.    Until the Closing, Seller shall maintain (including necessary renewals thereof) insurance policies against risk and liabilities to the extent and in the manner and at the levels heretofore maintained by Seller with respect to the Business and the Purchased Assets.  Until the Closing, the Purchased Assets shall remain at the risk of Seller.  In the event of any material damage to or destruction of any Purchased Asset (other than normal wear and tear) after the date hereof and prior to the Closing (in any such case, a "Loss"), Seller shall give notice thereof to Buyer.  If any such Loss is covered by policies of insurance, all right and claim of Seller to any proceeds of insurance for such Loss shall be assigned and (if previously received by Seller and not used prior to the Closing Date to repair any damage or destruction) paid to Buyer at Closing, and Buyer shall complete the

transactions contemplated by this Agreement without any reduction in the Purchase Price with respect to such Loss, though Buyer shall receive a credit against the Purchase Price of any uninsured or underinsured amounts and any deductible.  If any such Loss is not recovered by policies of insurance, Buyer shall have the right to reduce the Purchase Price by an amount equal to (i) the estimated cost to repair or restore the Purchased Assets affected by such Loss (the "Affected Assets") to substantially repair or restore their condition immediately prior to the occurrence of such Loss or (ii) if such Affected Assets are destroyed or damaged beyond repair, the replacement cost of the Affected Assets and, in either case Buyer shall complete the transactions contemplated by this Agreement and all compensation payable on account of such Loss shall be retained by Seller; provided, however, at no time shall the Purchase Price be reduced by greater than Eight Million Dollars ($8,000,000).  If such event causes a reduction in the Purchase Price greater than Eight Million Dollars ($8,000,000), Buyer's sole remedy is to terminate this Agreement.  If Buyer elects to reduce the Purchase Price pursuant to this Section 7.4, Seller and Buyer shall negotiate in good faith in an effort to agree upon the amount of such reduction.  If the Parties are unable to reach agreement within five (5) Business Days after notice of the Loss is given by Seller, then the amount of the reduction shall be determined by an independent, qualified insurance adjuster selected by the Parties (or, if they are unable to agree on such selection, one appointed by the Bankruptcy Court upon application of either Party).

7.5    **Confidentiality**.    The Parties agree and acknowledge that the Purchased Assets include confidential information of the Business which will be transferred to Buyer at the Closing.  Subject to the requirements of the Bankruptcy Code or as may be imposed by the Bankruptcy Court, from and after the Closing: (a) Seller shall, and shall cause its Affiliates to, hold in confidence all confidential information (including patient information, marketing plans and pricing information) included in the Purchased Assets and transferred to Buyer; (b) in the event that Seller or its Affiliate shall be legally compelled to disclose any such information, Seller shall provide Buyer with prompt written notice of such requirement so that Buyer may seek a protective order or other remedy; and (c) in the event that such protective order or other remedy is not obtained, Seller or its Affiliates shall furnish only such information as is legally required to be provided.

7.6    **Bankruptcy Court Matters**.

(a)    Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval.

(b)    Seller shall use reasonable best efforts to obtain entry of the Sale Order, in form and substance acceptable to Buyer in its sole and absolute discretion, approving this Agreement and the transactions contemplated herein, granting, among other things, that (a) such sale shall be, to the fullest extent permitted by the Bankruptcy Code, pursuant to Sections 105, 363(b) and 363(f) of the Bankruptcy Code, free and clear of all Claims, Liens, Interests and Encumbrances, other than Permitted Encumbrances and Assumed Liabilities; (b) all Contracts and Leases required to be assumed by Sellers and assigned to Buyer are so assumed and assigned free and clear of all Claims, Liens, Interests and Encumbrances, other than Permitted Encumbrances and Assumed Liabilities, to the fullest extent permitted by Section 365 of the Bankruptcy Code; (c) Buyer is deemed to

have purchased the Purchased Assets in good faith pursuant to Section 363(m) of the Bankruptcy Code and that the provisions of section 363(n) of the Bankruptcy Code have not been violated; and (d) Seller is authorized and directed to execute, upon request by Buyer, one or more assignments in form, substance, and number reasonably acceptable to Buyer, evidencing the conveyance of the Purchased Assets and Assumed Liabilities to Buyer and/or its designees.

(c)      From and after the date hereof, Seller shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Sale Order.

(d)      Subject to its obligations as a debtor-in-possession, Seller shall promptly make any filings, take all actions and use reasonable best efforts to obtain any and all relief from the Bankruptcy Court that is necessary or appropriate to consummate the transactions contemplated by this Agreement. Seller shall provide Buyer with drafts of any and all pleadings and proposed orders to be filed or submitted in connection with this Agreement for Buyer's prior review and comment and shall cooperate with Buyer to make reasonable changes. In the event the entry of the Sale Order is appealed, Seller shall diligently defend such appeal and any stay pending appeal that may be filed in connection therewith. Notwithstanding the foregoing, any resulting changes to this Agreement or any other Ancillary Agreement or any resulting changes to the Sale Order shall be subject to Buyer's approval in its sole and absolute discretion.

**7.7** **Bankruptcy Filings**. From and after the date hereof, Seller shall use its reasonable efforts to provide such prior notice as may be reasonable under the circumstances before filing any papers in the Bankruptcy Case that relate, in whole or in part, to this Agreement or Buyer, and shall consult in good faith with Buyer regarding the content of such materials prior to any filing.

**7.8** **Notification of Breach; Disclosure**. Seller shall promptly notify Buyer of (a) any event, condition or circumstance of which Seller becomes aware after the date hereof and prior to the Closing Date that would constitute a violation or breach of this Agreement (or a breach of any representation or warranty contained in this Agreement) or, if the same were to continue to exist as of the Closing Date, would constitute the non-satisfaction of any of the conditions set forth in Article IX, as the case may be or (b) any event, occurrence, transaction or other item of which Seller becomes aware which would have been required to have been disclosed on any scheduled attached hereto had such event, occurrence, transaction or item existed as of the date hereof. During the period prior to Closing Date, Seller will promptly advise Buyer in writing of any written notice from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement.

## ARTICLE VIII

## ADDITIONAL AGREEMENTS

**8.1** **Taxes**.

(a)     To the extent applicable, all real and personal property Taxes and similar ad valorem obligations levied with respect to the Purchased Assets, whether imposed or assessed before or after the Closing Date ("Periodic Taxes") for a taxable period that includes (but does not end on) the Closing Date (a "Straddle Period"), shall be apportioned between Seller and Buyer as of the Closing Date based on the number of days of such taxable period included in the period ending with and including the Closing Date (together with periods ending before the Closing Date, the "Pre-Closing Tax Period"), and the number of days of such taxable period beginning after the Closing Date (together with any periods beginning after the Closing Date, the "Post-Closing Tax Period").  At the Closing, (x) Seller shall pay to Buyer an amount equal to excess, if any, of the (i) unpaid Periodic Taxes attributable to Pre-Closing Periods over (ii) Periodic Taxes paid by Seller but apportioned hereunder to Buyer for Straddle Periods (each determined in accordance with the foregoing principles), or (y) Buyer shall pay to Seller an amount equal to Periodic Taxes apportioned to Buyer with respect to Straddle Periods but previously paid by Seller, as applicable.  Seller shall have no further responsibility to Buyer for any Periodic Taxes, and Buyer shall be responsible for the payment of unpaid Periodic Taxes (whether or not delinquent as of the Closing Date) to the applicable Governmental Authority.  Buyer shall also be responsible for preparing and filing all Periodic Tax returns required to be filed after the Closing Date.

(b)     Any sales Tax, use Tax, real property transfer or gains Tax, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Purchased Assets and not exempted under the Sale Order or by Section 1146(a) of the Bankruptcy Code ("Transfer Taxes") shall be borne by Seller.  Seller and Buyer shall use reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Purchased Assets from any such Transfer Taxes.  Seller shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes; provided, however, that in the event any such Tax Return requires execution by Buyer, Seller shall prepare and deliver to Buyer a copy of such Tax Return at least ten (10) days before the due date thereof, and Buyer shall promptly execute such Tax Return and deliver it to Seller, which shall cause it to be filed.

(c)     Seller or Buyer, as the case may be, shall provide reimbursement for any Tax paid by one Party all or a portion of which is the responsibility of the other Party in accordance with the terms of this Section 8.1.  Within a reasonable time prior to the payment of any said Tax, the Party paying such Tax shall give notice to the other of the Tax payable and each Party's respective liability therefor, although failure to do so will not relieve the other Party from its liability hereunder.

(d)     Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claims, suit or proceeding relating to any Tax; provided, however, that neither Buyer nor Seller shall be required to disclose the contents of its income tax

returns to any Person.    Any expenses incurred in furnishing such information or assistance pursuant to this <u>Section 8.1(d)</u> shall be borne by the Party requesting it.

**8.2**    <u>**Employees and Employee Benefit Plans**</u>.

(a)    The PEO (or in the case of physicians, a professional corporation or other authorized entity designated by Buyer) shall at the time of the Closing offer employment to a number of full-time equivalent employees that is not less than the number of full-time equivalent employees of Seller as of the Closing.    Employment terms offered would be consistent with Buyer's standard salary, wage and benefit programs.    To the extent that the PEO hires employees that were employed by Seller immediately prior to the Closing, the PEO shall award those employees credit for any accrued and unused paid time off that the employees have with the Seller at the time of the Closing (the "<u>PTO Credit</u>"); provided, however that (i) the PTO Credit shall not exceed any cap that Buyer places on the accrual of paid time off for its employees, and (ii) except to the extent required by applicable law, such hired employees shall not have the option to receive cash in respect of the PTO Credit.    Any potential employees shall be required to be in good standing with Seller and, to the extent previously employed by Buyer,  shall also have been in good standing at Buyer prior to their termination.    Any selection for employment opportunities shall be conducted in accordance with Buyer's standard employment screening policies and procedures.    Any such offers of employment to Seller's employees shall be on such terms as the applicable employer deems appropriate in its sole discretion.    Those employees who accept the applicable employer's offer of employment and commence working for the applicable employer on the Closing Date shall hereafter be referred to as "<u>Hired Employees</u>."

(b)    For periods prior to the Closing, with respect to employees, Seller shall retain the sole responsibility for all matters relating to the maintenance of personnel and payroll records and the withholding and payment of federal, state and local income and payroll Taxes.    At all times, Seller shall retain responsibility for (i) any severance and for any employees who do not become Hired Employees, and (ii) any payment (including any acceleration of payments or rights) that may be triggered by the consummation of the transactions contemplated hereby. With respect to Hired Employees, Buyer and Seller shall use the standard procedure set forth in Revenue Procedure 2004-53, 2004-2 C.B. 320, for purposes of employment tax reporting.

(c)    Nothing contained in this Agreement shall be construed to require the employment of (or prevent the termination of employment of) any individual, require minimum benefit or compensation levels or prevent any change in the employee benefits provided to any Hired Employee.    No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of Seller or any other Person or entities (including any beneficiary or dependent thereof) of any nature or kind whatsoever, including without limitation, in respect of continued employment (or resumed employment) for any specified period.

(d)    Effective as of the Closing Date, Seller shall cease to maintain any employee benefit plan which is a "group health plan" for purposes of Section 4980B of

the Code. On and after the Closing Date, Seller will be responsible and liable for providing any required notices under Section 4980B of the Code and for providing "COBRA continuation coverage" (as defined in the regulations issued under Section 4980B of the Code) to all individuals who are "M&A qualified beneficiaries" (as defined in the regulations issued under Section 4980B of the Code) under its existing plans (as opposed to Seller's plans) as a result of the transactions contemplated by this Agreement. Seller warrants and covenants that, with respect to all "qualifying events" (as defined in the regulations issued under Section 4980B of the Code, and including those events resulting from the transactions contemplated by this Agreement) that occur prior to or on the Closing Date, Seller will offer to each of the "M&A qualified beneficiaries" the opportunity to elect "COBRA continuation coverage" under its existing plans, and will provide "COBRA continuation coverage" to "M&A qualified beneficiaries" who are receiving "COBRA continuation coverage" as of the Closing Date or who elect to receive "COBRA continuation coverage" on or after the Closing Date all at no expense to Buyer.

(e)      The PEO shall negotiate in good faith with Local 1199 SEIU to enter into Collective Bargaining Agreements with the bargaining unit of Seller that is currently represented by Local 1199 SEIU and bargaining units of Seller that in 2013 voted to be represented by Local 1199 SEIU.

**8.3      Collections on Purchased Assets.**

(a)      If, after the Closing Date, Seller shall receive payment with respect to any Purchased Assets, Seller shall immediately deliver such funds or assets to Buyer and take all steps necessary to vest title to such funds or assets in Buyer. Seller hereby designates Buyer and its respective officers as Seller's true and lawful attorney-in-fact, with full power of substitution, to execute and endorse for the benefit of Buyer all checks, notes or other documents received by Seller in payment of or in substitution or exchange for any of the Purchased Assets. Seller hereby acknowledges and agrees that the power of attorney set forth in the preceding sentence in favor of Buyer is coupled with an interest, and further agrees to execute and deliver to Buyer from time to time any documents or other instruments reasonably requested by Buyer to evidence such power of attorney. If after the Closing Date, Buyer shall receive payment with respect to any Excluded Assets, Buyer shall immediately deliver such funds or assets to Seller.

(b)      To compensate Seller for services rendered on or before the Closing Date to individuals who are in-patients of the Business on or before the Closing Date but who are not discharged until after the Closing Date ("Transition Patients"), and for whom payment for their care is made by Medicare, Medicaid, or other healthcare insurance or reimbursement programs on a diagnostic related group or other "all-inclusive" or "global" fee basis ("DRG Payments"), the Parties shall take the following actions:

(i)      As soon as practicable after the Closing Date, Seller shall deliver to Buyer a statement identifying the Transition Patients who are receiving services that will be paid by a DRG Payments to Buyer after the Closing for a period that straddles the Closing Date. With respect to such Transition Patients, unless an alternative cut-off procedure can be arranged with the payers that

produces a more accurate result, Buyer shall, unless otherwise required by Law, allocate to Seller a portion of the DRG Payments received by Buyer after the Closing on account of Transition Patients by multiplying such DRG Payments by a fraction, the numerator of which shall be the number shall be the number of in-patient days for the Transition Patient prior to the Closing Date, and the denominator of which shall be the total number of in-patient days the Transition Patient was an-inpatient (as calculated in accordance with Medicare/Medicaid regulations).

(ii)   Immediately prior the Closing Date, Seller shall prepare cut-off billings for all then patients of the Business not covered by Section 8.3(b).

**8.4   Real Property Proration**.  At the Closing, all items of income and expense with respect to the Owned Real Property listed on Schedule 2.1(d) and the Leased Real Property that is leased pursuant to an Assumed Lease shall be prorated by the parties as of 12:01 a.m. on the Closing Date.  With respect to any amounts that have not yet been billed or otherwise determined, Seller and Buyer shall prorate such amounts based on the most recent ascertainable bill.

**8.5   Access to Excluded Assets and Excluded Liabilities.**  From time to time during the period following the Closing, upon no less than two (2) Business Day's prior request specifying the scope of the access, Buyer shall provide Seller with reasonable access to the Purchased Assets and Buyer's personnel during normal business hours to assist Seller in the administration, settlement, collection, payment and disposition of the Excluded Assets and the Excluded Liabilities, as applicable.  Such access shall not interfere with the operation of the Hospital or the Business and shall be at Seller's sole cost and expense for any out-of-pocket costs or charges.  Seller acknowledges that Buyer shall have no obligation to maintain or continue any Contracts, Leases, Intellectual Property or other Purchased Assets after the Closing for any such purposes of Seller.

**8.6   Government Payor Contingent Liability Assumption Documents**.  Seller shall fully cooperate in the completion and processing of all Government Payor Contingent Liability Assumption Documents.

**8.7   Programs and Services**.  As of the Closing, to the fullest extent permitted by law, Buyer shall offer programs and services using the Purchased Assets that are substantially the same as those offered by the Seller immediately prior to the Closing.

**8.8   Services Agreement**.  Effective as of the Closing Date, Seller and Buyer shall enter into the Services Agreement.  Until the time at which all obligations of Seller with respect to the Exit Financing are repaid in full, Buyer shall have the right to cause any funds received through collection of the Accounts Receivable after the Closing (after deduction of Buyer's fees in connection with such collection) to be deposited in an account in the name of Seller that is subject to an Exit Financing Controlled Account Agreement and (subject to the provisions of Section 3.1) to cause such funds to be applied to the repayment of the Exit Financing.

## ARTICLE IX

## CONDITIONS AND CONTINGENCIES TO CLOSING

**9.1**    **Conditions and Contingencies to Obligations of Each Party**.    The respective obligations of each Party under this Agreement, including the obligation to effect the sale and purchase of the Purchased Assets, shall be subject to the fulfillment on or prior to the Closing Date, of the following conditions and contingencies:

(a)    all requisite authorizations or consents from Governmental Authorities (including the Approval Order, the Regents' Approval, the CON Approval and the HSR Approval) or waiting periods following governmental filings, if applicable, shall have been obtained or expired; and

(b)    no Governmental Authority shall have enacted, issued, promulgated or entered any Order that is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement that has not been withdrawn or terminated.

**9.2**    **Conditions and Contingencies to Obligations of Buyer**.    The obligation of Buyer under this Agreement, including the obligation to effect the purchase of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the following additional conditions and contingencies:

(a)    the representations and warranties of Seller contained in this Agreement must be true and correct in all material respects on and as of the date hereof and the Closing date, except that any such representations or warranties which expressly relate only to an earlier date need only have been accurate in all material respects as of such date, and Buyer shall have received a certificate of Seller to such effect signed by a duly authorized officer thereof;

(b)    each covenant and obligation that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects, and Buyer shall have received a certificate of Seller to such effect signed by a duly authorized officer thereof;

(c)    since the date hereof, there shall not have occurred any changes, effects or circumstances constituting, or which would reasonably likely to result in, individually or in the aggregate, a Material Adverse Effect;

(d)    the Bankruptcy Court shall have approved and authorized the assignment and assumption of the Assumed Contracts and Assumed Leases;

(e)    Buyer shall have received (i) policies of title insurance on forms of, and issued by, a title company acceptable to Buyer, in Buyer's Discretion, in amounts and otherwise in form acceptable to Buyer, in Buyer's Discretion, insuring the title of Buyer to the Owned Real Property described in Schedule 2.1(d), which policies shall be subject only to such exceptions as are reasonably satisfactory to Buyer, in Buyer's Discretion,

and shall include such endorsements as Buyer, in Buyer's Discretion, shall request, and (ii) surveys that are satisfactory to Buyer, in Buyer's Discretion, sufficient to allow the removal of any survey exceptions from any title insurance policies that Buyer obtains on the Owned Real Property described in Schedule 2.1(d);

(f)    The Bankruptcy Court shall have entered the Sale Order in the Bankruptcy Case in form and substance acceptable to the Buyer in its sole and absolute discretion, and as of the Closing, the Sale Order shall not have been reversed, stayed, vacated, modified or amended without the prior written consent of the Buyer;

(g)    Seller shall not have sold, transferred, or made any other disposition, directly or indirectly, of any material portion of the Business in connection with the closure, liquidation or winding up of the Business, nor shall Seller have sought any relief from the Bankruptcy Court permitting it to do any of the foregoing;

(h)    The Bankruptcy Case shall not have been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(i)    a trustee under Chapter 11 of the Bankruptcy Code shall not have been appointed for Seller and rejected the transactions contemplated by this Agreement;

(j)    each of the deliveries required to be made to Buyer pursuant to Section 4.4 shall have been so delivered;

(k)    Buyer and the appropriate parties shall have entered into written agreements with the owners or lessors of real estate interests currently leased by or to Seller with respect to Buyer's continued use of such real estate interests in form and substance and with terms satisfactory to Buyer, in Buyer's Discretion;

(l)    Buyer shall have obtained the concurrences of the necessary Governmental Authorities to the effect that Buyer will not be required to comply with any additional Legal Requirements (other than those applicable to the Business on the Closing Date) concerning construction, physical plant, structural requirements and physical integrity as a result of Seller's transfer of the Purchased Assets to Buyer, and Buyer shall have obtained from all of the necessary Governmental Authorities, including the zoning board, all governmental approvals, Permits, clearances and contracts necessary or appropriate for the Buyer's operation of the Business as previously operated following the Closing;

(m)    Buyer and Seller shall have entered into a mutually satisfactory Management Services Agreement as deemed necessary by Buyer, in Buyer's Discretion, during a transition period substantially in the form set forth in Exhibit B;

(n)    CMS shall have confirmed that Buyer is eligible for the exemption provided in 42 CFR Section 413.65(d)(ii)(A) or (B);

(o)    Buyer shall have obtained the approval of the Comptroller of New York State of the terms of any Exchange Bonds or other indebtedness issued by Buyer in connection with the transactions contemplated hereby;

(p)    Buyer shall have obtained from all relevant Governmental Authorities, including the DOH, the New York State Public Health and Health Planning Council, the OMH, OASAS, the DOE, and CMS, (i) approval for the Buyer to enter into the transaction contemplated by this Agreement, (ii) and all necessary licenses, CONs, permits for Buyer to operate the Purchased Assets and business lines at their existing locations, including acute care and home care operations, behavioral health, substance abuse services, certified level II trauma center, and a pre-school certification;

(q)    Buyer shall have received a Phase I environmental survey and assessment to Buyer's satisfaction, in Buyer's Discretion, with no recognized environmental condition noted suggesting a phase II; if a reportable event is noted, all permits, licenses for the remediation shall be in place;

(r)    All Government Payor Contingent Liability Assumption Documents shall have been filed with and accepted by each Governmental Authority with jurisdiction or authority concerning such matters, and Buyer shall have obtained from each such Governmental Authority assurances reasonably satisfactory to Buyer (which may, in the sole discretion of Buyer, include oral assurances from appropriate Governmental Authorities), that Buyer will be issued Medicare and Medicaid participation approval documents sufficient to enable Buyer to bill for services rendered to Medicare and Medicaid beneficiaries using the Purchased Assets from and after the Closing Date, including tie-in letters and such other documentation as Buyer reasonably deems to be necessary;

(s)    the Charities Bureau of the Office of the New York State Attorney General shall have approved the transfer of Seller' assets to Buyer as  contemplated by this Agreement;

(t)    Buyer shall have obtained from the New York State Tax Department a Form AU-197.1;

(u)    Seller shall have executed and delivered to Buyer the Exit Financing Documents;

(v)    Seller shall have executed and delivered to Buyer the Services Agreement;

(w)    Seller shall have removed all deed restrictions existing on Seller's Owned Real Property listed on Schedule 2.1(d) that purport to prohibit the use of the Owned Real Property listed on Schedule 2.1(d)  for its current uses and for the uses intended by Buyer pursuant to this Agreement;

(x)    Buyer shall have obtained all necessary zoning approvals needed to complete the transaction contemplated by this Agreement;

(y)     Buyer shall have been provided with the opportunity to conduct a pre-Closing inspection of the Purchased Assets.

(z)     Seller shall have prepared the Schedules to this Agreement which are satisfactory to Buyer, in Buyer's Discretion, containing information which Buyer, in Buyer's Discretion finds acceptable, and the Parties have completed the Exhibits to this Agreement, acceptable to the Buyer, in Buyer's Discretion, except for the Sale Order, which shall be acceptable to Buyer in Buyer's sole and absolute discretion;

(aa)     Seller shall have obtained the approval of the Roman Catholic Church in accordance with governing Canon Law for the transaction contemplated by this Agreement;

(bb)     Buyer shall have obtained the written consent of the Bond Trustee acknowledging and agreeing that the Exchange Bond Obligations issued pursuant to this Agreement shall be in full satisfaction and discharge of all of Seller's obligations under the Existing Bonds and the Bond Documents, and neither the Bond Trustee nor any holder of the Existing Bonds shall have any remaining claims against Seller or the bankruptcy estates, including, but not limited to, any deficiency claims arising from any difference between the face amount of the Existing Bonds and the Net Bond Amount of the Exchange Bond Obligations; and all adequate protection payments made to the Bond Trustee pursuant to a Cash Collateral Order and the One Million Three Hundred Thousand Dollar ($1,300,000.00) operating reserve fund replenishment shall have been transferred, in full, to the Debtors' estates; and

(cc)     Midcap Financial LLC and the Bond Trustee shall have consented to the amendment of the Budget to include the amount of the compensation to be paid to Buyer pursuant to the Management Services Agreement.

Any condition or contingency specified in this <u>Section 9.2</u> may be waived by Buyer; provided that no such waiver shall be effective against Buyer unless it is set forth in a writing executed by Buyer. None of the conditions or contingencies in this <u>Section 9.2</u> can be subject to an implied waiver as a result of Buyer's action or inaction or otherwise.

**9.3     <u>Conditions and Contingencies to Obligations of Seller</u>**. The obligation of Seller to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the following additional conditions and contingencies:

(a)     the representations and warranties of Buyer contained in this Agreement (i) that are not qualified by "materiality" should be true and correct in all material respects on and as of the date hereof and the Closing date, and (ii) that are qualified as to "materiality" shall be true and correct on and as of the date hereof and the Closing Date without regard to any qualifiers as to "materiality," except that any such representations or warranties which expressly relate to an earlier date need only have been accurate as of such date, and Seller shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof;

(b)      each covenant and obligation that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects (except that those covenants and obligations which are qualified as to material, materiality or similar expressions, or are subject to the same or similar type exceptions, shall have been performed and complied with in all respects), and Seller shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof;

(c)      The Bankruptcy Court shall have entered the Sale Order in the Bankruptcy Case in form and substance acceptable to the Buyer in its sole and absolute discretion, and as of the Closing, the Sale Order shall not have been reversed, stayed, vacated, modified or amended without the prior written consent of the Buyer;

(d)      each of the deliveries required to be made to Seller pursuant to Section 4.3 shall have been so delivered;

(e)      Buyer shall have executed and delivered to Seller the Exit Financing Documents to which it is a party and shall have funded the full amount of the loan contemplated thereby up to but not in excess of the Exit Cap;

(f)      Buyer shall have executed and delivered the Services Agreement; and

(g)      The Purchase Price shall have been delivered as set forth in Article III.

Any condition or contingency specified in this Section 9.3 may be waived by Seller; provided that no such waiver shall be effective against Seller unless it is set forth in writing executed by Seller.

## ARTICLE X

## TERMINATION

**10.1    Termination**.    Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing Date:

(a)      by the mutual consent of Buyer and Seller;

(b)      [Reserved];

(c)      by either Party if a Governmental Authority issues a ruling or Order prohibiting the transactions contemplated hereby;

(d)      by Buyer in the event of any material breach by Seller of any of Seller's agreements, covenants, representations or warranties contained herein or in the Sale Order, and the failure of Seller to cure such breach within seven (7) days after receipt of notice thereof; provided, however, that Buyer (i) is not itself in material breach of any of its representations, warranties or covenants contained herein or in the Sale Order, (ii) notifies Seller in writing of its intention to exercise its termination rights under this

Agreement as a result of the breach, and (iii) specifies in such termination notice the representation, warranty or covenant contained herein or in the Sale Order of which Seller is allegedly in material breach;

(e)    by Seller in the event of any material breach by Buyer of any of Buyer's agreements, representations or warranties contained herein or in the Sale Order, and the failure of Buyer to cure such breach within seven (7) days after receipt of notice thereof; provided, however, that Seller (i) is not itself in material breach of any of its representations, warranties or covenants contained herein or in the Sale Order, (ii) notifies Buyer in writing of its intention to exercise its termination rights under this Agreement as a result of the breach, and (iii) specifies in such termination notice the representation, warranty or covenant contained herein or in the Sale Order of which Buyer is allegedly in material breach;

(f)    by Buyer if the Sale Order is not entered on or before February 28, 2014; (or such later date to which Buyer and Seller agree, each in its discretion);

(g)    by Buyer if (i) Seller seeks authority to withdraw, amend, modify or vacate the Sale Order or (ii) Seller ceases to operate the Business as a going concern.

(h)    by Buyer, if Buyer is not the successful bidder at the auction;

(i)    by Buyer, if Seller seeks authority from the Bankruptcy Court to sell, transfer or otherwise dispose, directly or indirectly, of any portion of the Purchased Assets, other than as provided herein;

(j)    by Buyer, if (i) the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or (ii) a trustee is appointed for Seller under Chapter 11 of the Bankruptcy Code and such trustee rejects the transactions contemplated by this Agreement;

(k)    by Buyer if (i) the DIP Credit Agreement is terminated before the Closing Date or (ii) Seller's authority to use cash collateral pursuant to any Cash Collateral Order is terminated prior to the Closing Date;

(l)    by Buyer, if any condition or contingency to the obligations of Buyer under this Agreement set forth in Sections 9.1 or 9.2 shall not have been fulfilled, as determined by Buyer, in Buyer's Discretion, other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement;

(m)    by Buyer, if an event in excess of $8,000,000 threshold occurs pursuant to Section 7.4;

(n)    by either Party, if the Closing has not occurred on or before May 9, 2014; or

(o)    By Buyer, in the event that it is not the successful bidder at the Auction, whether or not Buyer's bid is determined to be the backup bid.

**10.2**     **Effect of Termination**.

(a)     In the event of termination of this Agreement by either Party, except as otherwise provided in this Section 10.2, all rights and obligations of the Parties under this Agreement shall terminate without any liability of any party to any other party, except that nothing in this Agreement will relieve any party from liability for any willful breach of any representation, warranty, covenant or agreement set forth in this Agreement prior to such termination.  The provisions of Sections 10.2 and 11.11 shall expressly survive the expiration or termination of this Agreement.

(b)     In the event of termination of this Agreement by Buyer pursuant to Sections 10.1(a), (c), (d), (f), (g), (h) (i), (j), (k), (l), (m), (n) or (o) or Section 7.4, the Deposit shall be released to Buyer by the Escrow Agent.

(c)     In the event of termination of this Agreement by Seller pursuant to Section 10.1(e), the Deposit shall be released to Seller by the Escrow Agent in full satisfaction of all damages incurred by Seller.  Except for being allowed to keep the Deposit, Seller shall be entitled to no further direct or indirect or consequential damages, or otherwise.

**10.3**     **Specific Performance**.  In the event that the Sale Order is entered by the Bankruptcy Court, Buyer shall be entitled to seek specific performance for a breach by Seller of its obligations hereunder, as its sole remedy under this Agreement.

## ARTICLE XI

## GENERAL PROVISIONS

**11.1**     **Survival of Obligations**.  The representations and warranties respectively made by Seller and Buyer in this Agreement and in any certificate delivered hereunder will expire as of the Closing.  Subsequent to Closing, no Claim with respect to any breach of any representation or warranty contained in this Agreement and no Claim with respect to any known breach of a covenant to be performed at or prior to Closing contained in this Agreement may be pursued or maintained (either hereunder or otherwise) against any other Party.  The Parties hereto agree that the covenants contained in this Agreement to be performed after the Closing shall survive the Closing hereunder, and each Party hereto shall be liable to the other after the Closing for any breach thereof.

**11.2**     **No Public Announcement**.  Neither Seller nor Buyer shall, without the approval of the other, make any press release or other public announcement concerning the transactions contemplated by this Agreement, except as and to the extent that any such Party shall be so obligated by law, including required public notice and public hearings of Buyer and as may be required by the Bankruptcy Case, in which case the other Party shall be advised and the Parties shall use their best efforts to cause a mutually agreeable release or announcement to be issued.

**11.3**     **Notices**.  Except as otherwise expressly provided for in this Agreement, all notices or other communications required or permitted hereunder shall be in writing and shall

be given or delivered by personal delivery, or by facsimile or by a nationally recognized private overnight courier service addressed as follows:

If to Buyer, to:

Westchester County Health Care Corporation
100 Woods Road
Office of Legal Affairs
Executive Offices at Taylor Care Center, C-2
Valhalla, NY 10595
Attn: Julie Switzer, Esq., Executive Vice President and General Counsel
Fax: (914) 493-2321

with copies to (which shall not constitute notice):

Manatt, Phelps & Phillips, LLP
7 Times Square
New York, NY 10036
Attn: Peter F. Olberg, Esq.
Fax: (212) 830-7319

If to Seller, to:

St. Francis Hospital
241 North Road
Poughkeepsie, NY  12601
Attn:  Arthur Nizza
Tel:  (845) 431-8105
Fax:  (845) 485-3762

with a copy to (which shall not constitute notice):

Nixon Peabody LLP
677 Broadway
Albany, NY  12207
Attn:  Peter J. Millock, Esq.
Tel:  (518) 427-2651
Fax: (866) 947-1239

In each case, with a copy to (which shall not constitute notice):

MANUFACTURERS AND TRADERS TRUST COMPANY, as Trustee
c/o Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111
Attn:  Ann-Ellen Hornidge
       Daniel S. Bleck

Tel.:  (617) 542-6000
Fax:  (617) 542-2241

or to such other address as such party may indicate by a notice delivered to the other party hereto.

Any notice, consent, authorization, direction or other communication delivered as aforesaid shall be deemed to have been effectively delivered and received, if sent by a nationally recognized private overnight courier service, on the Business Day following the Business Day upon which it is delivered for overnight delivery to such courier service, if sent by facsimile, on the date of confirmation of transmission, or, if delivered personally, on the date of such delivery.

**11.4**    **Successors and Assigns**.

(a)    The rights of each Party under this Agreement shall not be assignable by such Party prior to the Closing without the written consent of the other Party, except that all or any portion of the rights of Buyer hereunder may be assigned prior to the Closing, without the consent of Seller, to any Affiliate of Buyer; provided that (i) the assignee shall assume in writing all of Buyer's obligations to Seller hereunder, and (ii) Buyer shall not be released from any of its obligations hereunder by reason of such assignment.

(b)    This Agreement shall be binding upon and inure to the benefit of the Parties and their successors and permitted assigns.  The successors and permitted assigns hereunder shall include any permitted assignee as well as the successors in interest to such permitted assignee (whether by merger, consolidation, liquidation (including successive mergers, consolidations or liquidations) or otherwise).  Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the parties and successors and assigns permitted by this Section 11.4 any right, remedy or claim under or by reason of this Agreement.

**11.5**    **Entire Agreement; Amendments**.    This Agreement and the Exhibits and Schedules referred to herein and the documents delivered pursuant hereto contain the entire understanding of the Parties with regard to the subject matter contained herein or therein, and supersede all prior agreements, understandings or letters of intent between or among any of the Parties.  This Agreement shall not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the Parties.

**11.6**    **Waivers**.    Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the Party entitled to the benefit thereof.  Any such waiver shall be validly and sufficiently authorized for the purposes of this Agreement if, as to any Party, it is authorized in writing by an authorized representative of such Party.  There shall be no implied waiver of any term or condition of this Agreement resulting from the action or inaction of any Party.  The failure of any Party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any Party thereafter to enforce each and every such provision.  No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

**11.7    Expenses**.  Except as otherwise provided herein, each Party will pay all costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions contained herein on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel and accountants.

**11.8    Partial Invalidity**.  Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

**11.9    Execution in Counterparts**.  This Agreement may be executed in counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more counterparts have been signed by and delivered to each of the Parties.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or portable document format (PDF) shall be effective as delivery of a manually executed counterpart of this Agreement.

**11.10    Further Assurances**.  At the Closing, and at all times thereafter as may be necessary, and subject to any approval of the Bankruptcy Court that may be required, Seller and Buyer shall execute and deliver, or cause to be executed and delivered, such other documents, including instruments of conveyance and transfer, as shall be reasonably necessary or appropriate to vest in Buyer title to the Purchased Assets free and clear of all Liens, Claims, Interests and Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), and to comply with the purposes and intent of this Agreement and the Ancillary Documents, and such other instruments as shall be reasonably necessary or appropriate to evidence the assignment by Seller and assumption by Buyer or its designee of the Assumed Contracts and Assumed Leases.  Seller and Buyer shall cooperate with one another to execute and deliver such other documents and instruments as may be reasonably required to carry out the transactions contemplated by this Agreement and the Ancillary Documents.

## 11.11   Governing Law.

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in the State of New York, without regard to conflicts-of-laws principles (whether of the State of New York or any other jurisdiction) that would require the application of the laws of any jurisdiction other than the State of New York.

(b)    Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be

connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereunder, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 11.3</u> hereof; provided, however, that, if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in White Plains, or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in Dutchess County and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section11.3</u>.

(c)    THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLER, BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

**11.12    <u>No Third Party Beneficiaries</u>**.    This Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

*[Signature page follows]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed to be effective as of the day and year first above written.

**BUYER: WESTCHESTER COUNTY HEALTH CARE CORPORATION**

**By:** _____

**Name: Gary F. Brudnicki**

**Title: Senior Executive Vice President**

**SELLER: ST. FRANCIS' HOSPITAL**

**By:** _____

**Name:** _____

**Title:** _____

**SELLER: ST. FRANCIS HOME CARE SERVICES CORPORATION**

**By:** _____

**Name:** _____

**Title:** _____

**SELLER: ST. FRANCIS HEALTH CARE FOUNDATION, INC.**

**By:** _____

**Name:** _____

**Title:** _____

**SELLER: SFH VENTURES, INC.**

**By:** _____

**Name:** _____

**Title:** _____

**SELLER: SAINT FRANCIS HOSPITAL PRESCHOOL PROGRAM**

**By:** _____

**Name:** _____

**Title:** _____

[Signature Page to Asset Purchase Agreement]

# EXHIBIT A

## ASSIGNMENT AND ASSUMPTION AGREEMENT

**EXHIBIT B**

**MANAGEMENT SERVICES AGREEMENT**

**EXHIBIT C**

**BILL OF SALE**

# EXHIBIT D

## SERVICES AGREEMENT

**Schedule 3.1**

<u>Bond Terms</u>

The Exchange Bond Obligations shall have an interest rate of 5.00% and a beginning principal amount equal to the Net Bond Amount and shall have the following additional terms:

- Term: 30 years

- Call Protection:  10 years

- Premiums:

    - 1% if a call occurs during year 11

    - 0.5% if a call occurs during year 12

- Debt Service Schedule:  See attached schedule

Westchester County Health Care Corporation ("<u>WCHCC</u>") will be the issuer and shall be obligated to make payments under the Exchange Bond Obligations to the Master Trustee (as defined below).  Payments of interest will be made semi-annually and payments of principal will be made annually based upon the schedule attached hereto. Any bonds issued in connection with the Exchange Bond Obligations will be evidenced by one or more obligations issued under the Master Trust Indenture, dated as of November 1, 2000, as supplemented and amended to date (the "<u>Master Indenture</u>"), between WCHCC and U.S. Bank, as successor master trustee (the "<u>Master Trustee</u>"), and shall be payable solely from and secured by (i) a pledge of the gross receipts of WCHCC and (ii) mortgages (collectively, the "<u>Mortgage</u>") on WCHCC's leasehold interest under the Restated and Amended Lease Agreement, dated as of December 30, 1998, between Westchester County and WCHCC, of real property upon which WCHCC's health care facilities are located, with all proceeds realized from the Mortgage to be applied proportionately and ratably to all obligations issued under the Master Indenture.  The bonds, the bondholders and obligees of any obligation or indebtedness of Buyer will be unsecured with no further security interest in either (i) the Purchased Assets or (ii) any of the Buyer's assets, except as provided in the Master Indenture. There shall be no required debt service reserve fund or operating reserve fund associated with the Exchange Bond Obligations.  The issuance of bonds will be subject to an acceptable opinion of bond counsel that interest income on such bonds will be exempt from federal and state income taxes.  Any costs or fees associated with effecting the Exchange Bond Obligations shall borne by Buyer.  Any costs associated with seeking credit agency rating review of the Exchange Bond Obligations shall be borne by Buyer.

# Schedule 3.1 (continued)

**5.00%** 30 Year Exchange Bonds (Semiannual Interest Payments; Annual Principal Payments)

Schedule assumes a March 1 Closing Date.  The actual debt service schedule will be adjusted to take account of the actual Closing Date.

| | | | | 5.00% Exchange Bonds with 30 yr maturity | |
|---|---|---|---|---|---|
| Period Ending | Principal | Interest | Debt Service | Annual Debt Service | PV of Debt Service |
| 9/1/2014 | $0 | $683,800 | $683,800 | $0 | $667,187 |
| 3/1/2015 | $411,000 | $683,800 | $1,094,800 | $1,778,600 | $1,042,667 |
| 9/1/2015 | $0 | $673,525 | $673,525 | $0 | $625,868 |
| 3/1/2016 | $432,000 | $673,525 | $1,105,525 | $1,779,050 | $1,002,610 |
| 9/1/2016 | $0 | $662,725 | $662,725 | $0 | $586,428 |
| 3/1/2017 | $454,000 | $662,725 | $1,116,725 | $1,779,450 | $964,540 |
| 9/1/2017 | $0 | $651,375 | $651,375 | $0 | $548,938 |
| 3/1/2018 | $477,000 | $651,375 | $1,128,375 | $1,779,750 | $928,193 |
| 9/1/2018 | $0 | $639,450 | $639,450 | $0 | $513,227 |
| 3/1/2019 | $501,000 | $639,450 | $1,140,450 | $1,779,900 | $893,453 |
| 9/1/2019 | $0 | $626,925 | $626,925 | $0 | $479,214 |
| 3/1/2020 | $526,000 | $626,925 | $1,152,925 | $1,779,850 | $860,100 |
| 9/1/2020 | $0 | $613,775 | $613,775 | $0 | $446,761 |
| 3/1/2021 | $551,000 | $613,775 | $1,164,775 | $1,778,550 | $827,563 |
| 9/1/2021 | $0 | $600,000 | $600,000 | $0 | $415,938 |
| 3/1/2022 | $579,000 | $600,000 | $1,179,000 | $1,779,000 | $797,780 |
| 9/1/2022 | $0 | $585,525 | $585,525 | $0 | $386,575 |
| 3/1/2023 | $608,000 | $585,525 | $1,193,525 | $1,779,050 | $769,151 |
| 9/1/2023 | $0 | $570,325 | $570,325 | $0 | $358,609 |
| 3/1/2024 | $639,000 | $570,325 | $1,209,325 | $1,779,650 | $742,123 |
| 9/1/2024 | $0 | $554,350 | $554,350 | $0 | $331,921 |
| 3/1/2025 | $671,000 | $554,350 | $1,225,350 | $1,779,700 | $716,150 |
| 9/1/2025 | $0 | $537,575 | $537,575 | $0 | $306,550 |
| 3/1/2026 | $704,000 | $537,575 | $1,241,575 | $1,779,150 | $691,078 |
| 9/1/2026 | $0 | $519,975 | $519,975 | $0 | $282,394 |
| 3/1/2027 | $739,000 | $519,975 | $1,258,975 | $1,778,950 | $667,394 |
| 9/1/2027 | $0 | $501,500 | $501,500 | $0 | $259,391 |
| 3/1/2028 | $777,000 | $501,500 | $1,278,500 | $1,780,000 | $645,384 |
| 9/1/2028 | $0 | $482,075 | $482,075 | $0 | $237,438 |
| 3/1/2029 | $815,000 | $482,075 | $1,297,075 | $1,779,150 | $623,582 |

| | | | | | |
|---|---|---|---|---|---|
| 9/1/2029 | $0 | $461,700 | $461,700 | $0 | $216,574 |
| 3/1/2030 | $856,000 | $461,700 | $1,317,700 | $1,779,400 | $603,331 |
| 9/1/2030 | $0 | $440,300 | $440,300 | $0 | $196,701 |
| 3/1/2031 | $899,000 | $440,300 | $1,339,300 | $1,779,600 | $584,020 |
| 9/1/2031 | $0 | $417,825 | $417,825 | $0 | $177,772 |
| 3/1/2032 | $944,000 | $417,825 | $1,361,825 | $1,779,650 | $565,488 |
| 9/1/2032 | $0 | $394,225 | $394,225 | $0 | $159,722 |
| 3/1/2033 | $991,000 | $394,225 | $1,385,225 | $1,779,450 | $547,814 |
| 9/1/2033 | $0 | $369,450 | $369,450 | $0 | $142,556 |
| 3/1/2034 | $1,040,000 | $369,450 | $1,409,450 | $1,778,900 | $530,852 |
| 9/1/2034 | $0 | $343,450 | $343,450 | $0 | $126,213 |
| 3/1/2035 | $1,092,000 | $343,450 | $1,435,450 | $1,778,900 | $514,900 |
| 9/1/2035 | $0 | $316,150 | $316,150 | $0 | $110,649 |
| 3/1/2036 | $1,147,000 | $316,150 | $1,463,150 | $1,779,300 | $499,777 |
| 9/1/2036 | $0 | $287,475 | $287,475 | $0 | $95,809 |
| 3/1/2037 | $1,204,000 | $287,475 | $1,491,475 | $1,778,950 | $485,192 |
| 9/1/2037 | $0 | $257,375 | $257,375 | $0 | $81,693 |
| 3/1/2038 | $1,264,000 | $257,375 | $1,521,375 | $1,778,750 | $471,351 |
| 9/1/2038 | $0 | $225,775 | $225,775 | $0 | $68,250 |
| 3/1/2039 | $1,327,000 | $225,775 | $1,552,775 | $1,778,550 | $458,171 |
| 9/1/2039 | $0 | $192,600 | $192,600 | $0 | $55,449 |
| 3/1/2040 | $1,394,000 | $192,600 | $1,586,600 | $1,779,200 | $445,799 |
| 9/1/2040 | $0 | $157,750 | $157,750 | $0 | $43,247 |
| 3/1/2041 | $1,464,000 | $157,750 | $1,621,750 | $1,779,500 | $433,977 |
| 9/1/2041 | $0 | $121,150 | $121,150 | $0 | $31,632 |
| 3/1/2042 | $1,538,000 | $121,150 | $1,659,150 | $1,780,300 | $422,843 |
| 9/1/2042 | $0 | $82,700 | $82,700 | $0 | $20,564 |
| 3/1/2043 | $1,614,000 | $82,700 | $1,696,700 | $1,779,400 | $411,822 |
| 9/1/2043 | $0 | $42,350 | $42,350 | $0 | $10,029 |
| 3/1/2044 | $1,694,000 | $42,350 | $1,736,350 | $1,778,700 | $401,323 |
| **Total** | **$27,352,000** | **$26,026,350** | **$53,378,350** | **$53,378,350** | **$27,531,724** |